IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF DELAWARE

| | |
|---|---|
| NESSCAP CO., LTD. and NESSCAP, INC.,<br><br>        Plaintiffs,<br><br>    v.<br><br>MAXWELL TECHNOLOGIES, INC.<br><br>        Defendant. | JURY TRIAL DEMANDED<br><br>Civil Action No.: 1:07-cv-00035-GMS |

**NESSCAP CO., LTD.'S AND NESSCAP, INC.'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO STRIKE DEFENDANT'S ANSWER AND
MOTION TO STRIKE OR DISMISS DEFENDANT'S COUNTERCLAIMS**

Denise Seastone Kraft (DE No. 2778)
EDWARDS ANGELL PALMER & DODGE LLP
919 North Market Street
Wilmington, DE 19801
(302) 777-7770
(302) 777-7263 (fax)

George W. Neuner (*Of the Massachusetts Bar*)
Brian M. Gaff (*Of the Massachusetts Bar*)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199-7613
(617) 439-4444
(617) 439-4170 (fax)

*Attorneys for Plaintiffs NessCap Co., Ltd. and
NessCap, Inc.*

Dated: March 28, 2007

# TABLE OF CONTENTS

I.      NATURE AND STAGE OF THE PROCEEDING ...................................1

II.     SUMMARY OF THE ARGUMENT ..........................................................2

III.    STATEMENT OF FACTS .........................................................................3

IV.     ARGUMENT...............................................................................................4

        A.    Maxwell's Answer Should Be Stricken In Its Entirety As Impertinent And
              Redundant.....................................................................................................5

        B.    Maxwell's Counterclaims Should Be Stricken As Redundant Or, In The
              Alternative, Dismissed for Lack of Service................................................7

              1.    Maxwell's Counterclaims Are Redundant And Should Be Stricken
                    Pursuant To Fed. R. Civ. P. 12(f) ................................................7

              2.    Maxwell's Unserved Counterclaims Should Be Dismissed
                    Pursuant To Fed. R. Civ. P. 12(b)(5)...........................................8

V.      CONCLUSION .....................................................................................11

i

## TABLE OF AUTHORITIES

### Cases

*Best Foods, Inc. v. General Mills, Inc.*
  3 F.R.D. 459 (D. Del. 1944) ............................................................................................6

*Burke v. Mesta Mach. Co.*
  5 F.R.D. 134 (D. Pa. 1946).............................................................................................6

*Green Bay Packaging, Inc. v. Hoganson & Association, Inc.*
  362 F. Supp. 78 (N.D. Ill. 1973)......................................................................................6

*Lampe v. Xouth, Inc.*
  952 F.2d 697 (3rd Cir. 1991) .........................................................................................10

*Mississippi Publishing Corp. v. Murphree*
  326 U.S. 438 (1946) .......................................................................................................10

*Oklahoma Radio Associates v. Federal Deposit Insurance Corporation*
  969 F.2d 940 (10th Cir. 1992) ..........................................................................................9

*Omni Capital International v. Rudolf Wolff & Co.*
  484 U.S. 97 (1987) .........................................................................................................10

*Owens v. Blue Tee Corp.*
  177 F.R.D. 673 (M.D. Ala. 1998)..................................................................................7, 8

### Rules

Fed. R. Civ. P. 12(b)(5) ..................................................................................2, 7, 9, 11

Fed. R. Civ. P. 12(f)........................................................................................2, 5, 7, 8

Fed. R. Civ. P. 12(h)..............................................................................................10

Fed. R. Civ. P. 4........................................................................................1, 2, 4, 5, 9, 11

Fed. R. Civ. P. 4(d)...................................................................................................6

Fed. R. Civ. P. 5.......................................................................................................8

### Treatises

4B Charles A. Wright & Arthur R. Miller, Federal Practice and
  Procedure § 1145 (2007) ................................................................................................9

5C Charles A. Wright & Arthur R. Miller, Federal Practice and
  Procedure § 1382 (2007) ................................................................................................6

I.     **NATURE AND STAGE OF THE PROCEEDING**

On January 18, 2007, Plaintiffs NessCap Co., Ltd. ("LIMITED") and its Delaware

parent company, NessCap, Inc. ("INC") filed – but did not serve – the instant case against

Maxwell Technologies, Inc. ("Maxwell"), a Delaware corporation, seeking a declaratory

judgment of invalidity and noninfringement of Maxwell's U.S. Patent Nos. 6,525,924 and

6,631,074.   On March 8, Maxwell filed an Answer (D.I. 4) and counterclaims for

infringement of these same two patents.   Maxwell filed its Answer and counterclaims

without first having been served with the summons and complaint pursuant to Fed. R.

Civ. P. 4. On the next day, Maxwell filed a Motion to Consolidate[1] the instant case with

an unrelated ongoing action that LIMITED filed against Maxwell in this Court on

December 14, 2006.  The unrelated ongoing action (Case No. 1:06-cv-00764-GMS; "the

first Delaware action") alleges that Maxwell infringes LIMITED's U.S. Patent No.

6,743,544.  On March 23, LIMITED filed in the first Delaware action its Opposition to

Maxwell's Motion to Consolidate and cross-filed its Opposition in the instant case (D.I.

8).  Maxwell filed its Reply (D.I. 9) on March 27.

The Maxwell patents identified in the Complaint (D.I. 1) are the subject of

concurrent litigation between the parties in the U.S. District Court for the Southern

District of California in San Diego where Maxwell previously had filed a suit against

LIMITED and INC for infringement of these patents (Case No. 3:06-cv-02311-JAH-

BLM; "the San Diego action").  At the time the instant case was filed, LIMITED's and

INC's Motions to Dismiss were pending in the San Diego action.  As described in

LIMITED's Opposition to Maxwell's Motion to Transfer (D.I. 18 in the first Delaware

---

[1]     D.I. 6.

action, at 6), LIMITED and INC filed the instant case with the intent of pursuing it in this Court where there are no jurisdictional issues only if the San Diego District Court dismissed the litigation between the parties pending there in response to the Motions to Dismiss. On March 13, the San Diego District Court ruled that the case there would continue, thereby obviating the need for the instant case.

As described more fully in its Opposition to Maxwell's Motion to Consolidate (D.I. 8), and in view of the decision by the San Diego District Court, LIMITED and INC have decided to terminate the instant case, not serve process on Maxwell, and proceed with litigating the issues in San Diego. Nevertheless, Maxwell refuses to cooperate by withdrawing its motion and its pleadings in the instant case, thereby necessitating the filing of this Motion.

## II.    SUMMARY OF THE ARGUMENT

1.    Because LIMITED and INC have not served Maxwell pursuant to Fed. R. Civ. P. 4, the instant case is not before this Court. Consequently, the matter contained in Maxwell's Answer is wholly impertinent and should be stricken pursuant to Fed. R. Civ. P. 12(f). Further, the Answer contains matter that will prove to be redundant with respect to the pleadings in the San Diego action and, as a consequence, should be stricken for that reason as well.

2.    Maxwell's counterclaims should be stricken pursuant to Fed. R. Civ. P. 12(f) because they are identical to the counts alleging infringement that it brought in its San Diego complaint. In the alternative, Maxwell's counterclaims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process.

III.    **STATEMENT OF FACTS**

LIMITED is the wholly owned subsidiary of INC, which is a Delaware corporation. LIMITED is a company located only in South Korea and organized under Korean law. LIMITED is engaged in the research, development, production, and sales of electrical energy storage products known as "ultracapacitors." LIMITED was formed on May 1, 2001 as a spin-off from Ness Corporation, which was formed in August 1999 to continue work started at the New Energy Storage System Center ("NESS") at the Institute of Advanced Engineering, a central R&D Center founded by Daewoo Group in August 1998. *See* Declaration of Sunwook Kim, Ph.D., D.I. 19 in the first Delaware action, ¶¶ 4-7.

Maxwell is a Delaware corporation. Its headquarters is in San Diego, California and it has office and manufacturing facilities in Rossens, Switzerland. Balanson Declaration, D.I. 14 in the first Delaware action, ¶ 3. Maxwell filed its initial complaint in the San Diego action against LIMITED and its parent corporation on October 17, 2006 and, on November 2, 2006, filed its First Amended Complaint alleging infringement of its U.S. Patent Nos. 6,525,924 and 6,631,074. *See* Declaration of Brian M. Gaff ("Gaff Declaration II"), Ex. 1, filed concurrently herewith as Exhibit A. In November 2006 LIMITED and its parent company moved to dismiss the San Diego action pursuant to Fed. R. Civ. P. 12 for insufficient service and, in the case of the parent company, lack of personal jurisdiction as well. On March 13, 2007, the San Diego District Court granted in part and denied in part the motions to dismiss, effectively allowing the case to go forward against LIMITED and its parent company. *See* Gaff Declaration, D.I. 8-2, Ex. 7.

## IV.  **ARGUMENT**

As an initial matter, and as described below and in LIMITED's Opposition to Maxwell's Motion to Consolidate (D.I. 8),[2] the instant case is not before this Court because neither LIMITED nor INC have served Maxwell with the summons and complaint pursuant to Fed. R. Civ. P. 4.  Maxwell's arguments to the contrary are a transparent attempt to provide support for its Motion to Consolidate (D.I. 6) and bootstrap its Motion to Transfer (D.I. 12 in the first Delaware action).  Consequently, there is no basis for Maxwell's Answer and counterclaims, which should be stricken and/or dismissed as described below.

The tactics that Maxwell has employed in this Court are not intended to advance the litigation here.  Instead, they are desperate attempts to remedy the procedural errors that Maxwell made in prosecuting its San Diego action.  Maxwell admits that it seeks rulings from this Court on consolidation and transfer that it can use in San Diego[3] clearly to overcome its procedural shortcomings there.  For example, Maxwell claims that it may need to avail itself of this Court's jurisdiction because it is faced with the delays associated with serving LIMITED with the San Diego summons and complaint according to the Hague Convention.  *See* Maxwell's Reply (D.I. 9) at 1.  Maxwell's plaintive cry that LIMITED and/or INC have engaged in "continued delay tactics" that have prevented resolution of the litigation on the merits rings hollow.  *Id.*  Indeed, Maxwell fails to mention that on two separate occasions LIMITED offered to relieve Maxwell of the requirement to effect service in the San Diego action under the Hague Convention and

---

[2]  *See* Opposition (D.I. 8) at 8-11.

[3]  *See* Maxwell's Reply in support of its Motion to Consolidate (D.I. 9) at 10 ("[C]onsolidation and transfer to San Diego will obviate the need for service under the Hague Convention [in the San Diego action]… .").

that Maxwell rejected LIMITED's offers.[4]  It is Maxwell, not LIMITED or INC, that is engaging in "procedural gamesmanship"[5] by filing a flurry of motions in this Court in an attempt to paper-over its failure to (i) provide LIMITED with a waiver of service pursuant to Fed. R. Civ. P 4(d) or, (ii) accept LIMITED's earlier offers to facilitate service in the San Diego action and move that case forward.  Maxwell should not be permitted to engage in this activity in this Court to remedy its errors in another action in another court.

### A.    Maxwell's Answer Should Be Stricken In Its Entirety As Impertinent And Redundant

Maxwell's Answer (D.I. 4) should be stricken pursuant to Fed. R. Civ. P. 12(f) because the matter contained in the Answer is wholly impertinent and redundant.  It is impertinent in light of the instant case not being before this Court, and it is redundant with respect to the pleadings in the San Diego action.  The parties are litigating the declaratory judgment issues in San Diego and pursuing them in this Court will establish duplicative and wasteful litigation and prejudice the Plaintiffs.

Rule 12(f) provides that a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f).  "A statement of matters applied to facts which do not belong to the matter in question … [is impertinent]." *Burke v. Mesta Mach. Co.*, 5 F.R.D. 134, 138 (D.

---

[4]    On December 1, 2006 (well <u>before</u> the filing of the first Delaware action and the instant case) LIMITED offered to drop its objections to Maxwell's insufficient service of process in the San Diego action.  Later, on March 16, 2007 LIMITED's counsel agreed to accept service on behalf of LIMITED.  <u>Maxwell rejected both offers.</u>  *See* Gaff Declaration, D.I. 8-2, Exs. 10, 11.
[5]    Maxwell's Reply (D.I. 9) at 1.

Pa. 1946). Because the summons and complaint have not been served, there is no "matter in question."

Redundant matter is generally characterized by its needless repetition. *See* 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (2007). "It is well settled that ... repetitious and unnecessary pleadings should be stricken." *Green Bay Packaging, Inc. v. Hoganson & Association, Inc.*, 362 F. Supp. 78, 82 (N.D. Ill. 1973). "[A]ny pleading not germane to the issues should be stricken on motion by the adverse party." *Best Foods, Inc. v. General Mills, Inc.*, 3 F.R.D. 459, 460 (D. Del. 1944).

As described more fully in LIMITED's Opposition to Maxwell's Motion to Consolidate (D.I. 8), the instant case is not yet before this Court because neither LIMITED not its parent corporation INC served the complaint and summons and neither Plaintiff requested a waiver of service pursuant to Fed. R. Civ. P. 4(d). Opposition (D.I. 8) at 8-11. Consequently, there is no "matter in question" here, and all of Maxwell's statements in its Answer bear on issues that are not before this Court. Indeed, these issues are now before the San Diego District Court.

The declaratory judgment counts set forth in the unserved complaint in the instant case are identical to those that INC raised in its counterclaims against Maxwell in the San Diego action.[6] *See* Gaff Declaration II, Ex. 2. Given this identity, it is expected that Maxwell will reply to these counterclaims in the San Diego action on or before the April 3, 2007 deadline in substantially the same way as it answered the unserved complaint in the instant case. Consequently, the resulting repetition of the substance of Maxwell's

---

[6]    LIMITED intends to bring the same counterclaims against Maxwell when it responds to Maxwell's Complaint pursuant to the San Diego District Court's order (*see* Gaff Declaration, D.I. 8-2, Ex. 7).

Answer in the instant case in its forthcoming reply in the San Diego action renders the matter in Maxwell's Answer wholly redundant.

A Rule 12(f) motion to strike is the mechanism to avoid the expenditure of time and money that results from litigating spurious issues by dispensing with those issues. Absent a ruling to strike Maxwell's Answer, LIMITED and INC will be substantially prejudiced by having to respond to Maxwell's Answer and the counterclaims that it brought therein in an action that (i) the Plaintiffs want to terminate, (ii) is not before this Court, and (iii) is duplicative of the San Diego action. Further, striking Maxwell's Answer will not prejudice Maxwell in any way because it will be free to present the identical statements in the ongoing, previously filed San Diego action. Accordingly, LIMITED and INC respectfully request that this Court strike Maxwell's Answer pursuant to Fed. R. Civ. P. 12(f).

**B.     Maxwell's Counterclaims Should Be Stricken As Redundant Or, In The Alternative, Dismissed for Lack of Service**

Maxwell's counterclaims should be stricken pursuant to Fed. R. Civ. P. 12(f) because they are identical to the counts alleging infringement that it brought in its San Diego complaint. In the alternative, Maxwell's counterclaims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(5) for insufficiency of service of process.

**1.     Maxwell's Counterclaims Are Redundant And Should Be Stricken Pursuant To Fed. R. Civ. P. 12(f)**

When counterclaims brought by the defendant in one action are identical to the claims it sets forth in its complaint as a plaintiff in another previously filed action against the same party, the counterclaims should be stricken pursuant to Fed. R. Civ. P. 12(f) as redundant. *Owens v. Blue Tee Corp.*, 177 F.R.D. 673, 678 (M.D. Ala. 1998).

7

Notwithstanding the reluctance to use Rule 12(f) to strike a counterclaim, it is the appropriate remedy when a court will ultimately address underlying issues. *Id.* at n.6.

As in *Owens*,[7] there is no question that Maxwell's counterclaims are duplicative of its claims in its San Diego complaint. *See* Gaff Declaration II, Exs. 1, 2. Maxwell's counterclaims allege infringement of U.S. Patent Nos. 6,525,924 and 6,631,074. Maxwell's claims in its San Diego complaint allege infringement of the identical patents. Litigation on these issues is now proceeding in San Diego District Court, and that court will address the claims and defenses of each party in due course. Unless Maxwell wants to seek dismissal of its San Diego action and pursue the substance of it in this Court, it is pointless and a waste of the Court's and the parties' resources to consider these matters in this Court. Consistent with the time and cost savings purposes of Rule 12(f), LIMITED and INC respectfully urge that this Court strike Maxwell's counterclaims in their entirety.

## 2.    Maxwell's Unserved Counterclaims Should Be Dismissed Pursuant To Fed. R. Civ. P. 12(b)(5)

There is no dispute that the summons and complaint in the instant case have not been served on Maxwell. Nevertheless, Maxwell answered the unserved complaint and filed counterclaims against both Plaintiffs, apparently relying on Fed. R. Civ. P. 5 to effect service of its counterclaims.[8] Maxwell's reliance is misplaced. Rule 5 does not apply to the instant, inchoate case. Accordingly, and as an alternative to striking Maxwell's counterclaims as described above, LIMITED and INC respectfully urge that

---

[7]    Although *Owens* involved two cases pending in the same court, one of which was transferred in, the reasoning in that decision applies equally here.

[8]    *See* Maxwell's Reply (D.I. 9) at 10 ("NessCap Inc. and NessCap LIMITED have both been served with Maxwell's counterclaims to the first and second Delaware actions ... .").

Maxwell's counterclaims be dismissed for insufficient service of process pursuant to Fed. R. Civ. P. 12(b)(5).

As discussed in a leading treatise, service pursuant to "Rule 5(b) presumes that the lawsuit has not been terminated and that the papers delivered to the attorney are part of an ongoing lawsuit." *See* 4B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1145 (2007) (emphasis added). The theory behind Rule 5 is that parties, once properly before the court in an ongoing lawsuit following service of the summons and complaint under Rule 4, will endeavor to keep themselves apprised of the proceedings. Consequently, the parties are able to take advantage of the less costly and less time consuming provisions regarding notice that Rule 5 permits as compared to Rule 4.

Notwithstanding Maxwell's premature filing of its Answer and counterclaims, the instant case is not an ongoing lawsuit. Maxwell tries to argue otherwise by stating that it "received notice of the lawsuit and began its duty to defend."[9] This is irrelevant. No filing in the instant case will transform from it from inactive to pending because compliance with the exacting requirements for service of the summons and complaint pursuant to Fed. R. Civ. P. 4 is necessary. This compliance is necessary not only to notify the defendant of the commencement of an action against him, but also to provide "a ritual that marks the court's assertion of jurisdiction over the lawsuit." *Oklahoma Radio Associates v. Federal Deposit Insurance Corporation*, 969 F.2d 940, 943 (10th Cir. 1992) (citation omitted). Indeed, the Supreme Court has made clear that:

> Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of

---

[9]    Maxwell's Reply (D.I. 9) at 5.

> summons must be satisfied.  "[S]ervice of summons is the
> procedure by which a court having venue and jurisdiction
> of the subject matter of the suit asserts jurisdiction over the
> person of the party served." *Mississippi Publishing Corp.*
> *v. Murphree*, 326 U.S. 438, 444-445, 66 S.Ct. 242, 245-
> 246, 90 L.Ed. 185 (1946).    Thus, before a court may
> exercise personal jurisdiction over a defendant, there must
> be more than notice to the defendant and a constitutionally
> sufficient relationship between the defendant and the
> forum.    There also must be a basis for the defendant's
> amenability to service of summons.    Absent consent, this
> means there must be authorization for service of summons
> on the defendant.

*Omni Capital International v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) (emphasis

added).

For Maxwell to have availed itself of the provisions of Rule 5 to serve its

counterclaims, the instant lawsuit would have had to have been an ongoing action.  For

the instant case to be an ongoing action, LIMITED and INC would have had to first serve

their summons and complaint on Maxwell pursuant to Rule 4, thereby giving the Court

personal jurisdiction over the parties. *See, e.g., Lampe v. Xouth, Inc.*, 952 F.2d 697, 701

(3rd Cir. 1991).  Maxwell cannot nullify this requirement and transform the dormant

instant case into an ongoing action by claiming that it "answer[ed] the complaint without

raising an objection to lack of personal jurisdiction."  Maxwell's Reply (D.I. 9) at 6.

While the failure to raise such an objection may result in a waiver of a defense pursuant

to Fed. R. Civ. P. 12(h), such failure has no bearing on complying with the "ritual"[10] that

is proper service of process pursuant to Rule 4.

Because the instant case is not an ongoing action and is not before this Court,

Maxwell's filing of its counterclaims is tantamount to its commencement of another,

---

[10]    *Oklahoma Radio Associates*, 969 F.2d at 943.

independent action. Accordingly, Maxwell must serve its counterclaims and a summons on LIMITED and INC pursuant to Fed. R. Civ. P. 4. It is clear from the Certificate of Service associated with its Answer (D.I. 4) that Maxwell did not serve its counterclaims on LIMITED and INC in compliance with Rule 4, at least because it did not serve a corresponding summons on LIMITED (in South Korea) and INC (in Delaware). Accordingly, in the alternative to striking Maxwell's counterclaims as discussed above, LIMITED and INC respectfully urge that this Court dismiss Maxwell's counterclaims pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process.

## V.    CONCLUSION

Following the March 13 order[11] from the San Diego District Court, LIMITED and INC have made clear to Maxwell their desire to drop the instant case and litigate in San Diego (where litigation is proceeding) the issues raised in the present unserved complaint. *See* Gaff Declaration, D.I. 8-2, Exs. 8-11. Maxwell, however, refuses to cooperate with dropping the instant case by withdrawing its Motion to Consolidate (D.I. 6) and pleadings, thereby needlessly complicating the litigation between the parties. This frustrates the efficient termination of a case assigned to this Court and squanders the Court's and the parties' resources on preparing and considering unnecessary filings

---

[11] *See* Gaff Declaration, D.I. 8-2, Ex. 7.

11

relating to a case that is not pending.   For the above reasons, LIMITED and INC respectfully urge that the Court strike Maxwell's Answer and strike or dismiss Maxwell's counterclaims.

Dated: March 28, 2007

Respectfully submitted,

EDWARDS ANGELL PALMER & DODGE LLP


_____
Denise Seastone Kraft (DE No. 2778)
919 North Market Street
Wilmington, DE  19801
(302) 777-7770
(302) 777-7263 (fax)

*Attorneys for Plaintiffs NessCap Co., Ltd. and NessCap, Inc.*


**OF COUNSEL:**

George W. Neuner (*Of the Massachusetts Bar*)
Brian M. Gaff (*Of the Massachusetts Bar*)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199-7613
(617) 439-4444
(617) 439-4170 (fax)

**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF DELAWARE

| | |
|---|---|
| NESSCAP CO., LTD. and NESSCAP, INC., | |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | Civil Action No.: 1:07-cv-00035-GMS |
| MAXWELL TECHNOLOGIES, INC. | |
| Defendant. | |

## DECLARATION OF BRIAN M. GAFF

I, Brian M. Gaff, hereby declare and state as follows:

1.     I am associated with the law firm of Edwards Angell Palmer & Dodge LLP in Boston, Massachusetts, which represents Plaintiff NessCap Co., Ltd. in this action.

2.     I am a member in good standing of the bars of the Commonwealth of Massachusetts and the States of California, New York, and New Hampshire.

3.     I am admitted *pro hac vice* before this Court.

4.     Attached as Exhibit 1 to this Declaration is a true and accurate copy of Maxwell Technolgies, Inc.'s First Amended Complaint (D.I. 12) filed on November 2, 2006, in case no. 3:06-cv-02311-JAH-BLM in U.S. District Court for the Southern District of California (San Diego).

5.     Attached as Exhibit 2 to this Declaration is a true and accurate copy of NessCap, Inc.'s Answer to First Amended Complaint, Affirmative Defenses, and

---

**DECLARATION OF BRIAN M. GAFF**

Counterclaims filed on March 14, 2007, in case no. 3:06-cv-02311-JAH-BLM in U.S. District Court for the Southern District of California (San Diego).

I declare under penalty of perjury under the laws of the United States of America and State of Delaware that the foregoing is true and correct and that this declaration was executed on this 28th day of March, 2007.

BRIAN M. GAFF

BOS2_599749.1

DECLARATION OF BRIAN M. GAFF

Page 2

**EXHIBIT 1**

DAVID C. DOYLE (CA SBN 70690)
ERIC M. ACKER (CA SBN 135805)
E. DALE BUXTON II (CA SBN 222580)
KATHERINE L. PARKER (CA SBN 222629)
MORRISON & FOERSTER LLP
12531 High Bluff Drive
Suite 100
San Diego, California  92130-2040
Telephone: 858.720.5100

Attorneys for Plaintiff
MAXWELL TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAXWELL TECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NESSCAP, INC., and NESSCAP CO., LTD.<br><br>Defendants. | Case No.   06-cv-2311 JAH (BLM)<br><br>**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

## PARTIES

1.     Maxwell Technologies, Inc. ("Maxwell" or "Plaintiff") is a public corporation existing under the laws of the State of California and has its principal place of business at 9244 Balboa Avenue, San Diego, California 92123.

2.     Nesscap, Inc. is incorporated under the laws of Delaware.  Nesscap, Inc. owns 100% of its Korean subsidiary, Nesscap Co., Ltd. which has its principal place of business at 750-8, Gomae-Dong, Kiheung-Gu, Yongin, Kyonggi-Do, 449-901, Republic of Korea.  Nesscap, Inc. and Nesscap Co., Ltd will collectively be referred to as "Nesscap" or "Defendant".

## JURISDICTION AND VENUE

3.     This is an action arising under the patent laws of the United States, Title 35 of the United States Code, Section 271.  The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1338(a) and 1331.

sd-342006

4.      Personal jurisdiction is based upon Fed. R. Civ. P. 4(h) and Cal. Civ. Proc. Code § 410.10 governing long-arm jurisdiction.  Nesscap's contacts with this jurisdiction include Nesscap's doing business in this district, and its commission of acts of patent infringement in this district.

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). Nesscap's contacts with this district are sufficient to render it amenable to personal jurisdiction in this district, and Nesscap has committed acts of infringement in this district.  Nesscap's contacts with this district include sales and offers for sale of infringing products.  These contacts are related to, or gave rise to, Maxwell's claims for patent infringement.

**FIRST CLAIM**
(Infringement of U.S. Patent No. 6,525,924)

6.      Plaintiff hereby incorporates by this reference paragraphs 1 through 5 inclusive.

7.      On February 25, 2003, U.S. Patent No. 6,525,924 ("the '924 patent") entitled "Device for Accumulating Electrical Energy Composed of a Winding of Superimposed Strips and Method of Production" was duly and legally issued, and assigned to Montena Components S.A. by the named inventors.  A true and correct copy of the '924 patent is attached hereto as Exhibit 1.

8.      Plaintiff acquired Montena Components S.A. and all of its assets pursuant to a Stock Purchase and Barter Agreement dated May 30, 2002.  Therefore, Plaintiff is the current owner of the '924 patent.  This Stock Purchase and Barter Agreement was recorded with the U.S. Patent and Trademark Office on October 13, 2006.  A true and correct copy of the Stock Purchase and Barter Agreement as recorded with the U.S. Patent and Trademark Office is attached hereto as Exhibit 2.

9.      Defendant has been infringing the '924 patent in violation of 35 U.S.C. § 271 by making, using, and/or selling or offering for sale products embodying the patented invention in the United States.

10.      Upon information and belief, Defendant will continue to infringe the '924 patent unless enjoined by this court.

sd-342006

11.     Upon information and belief, Defendant's past and continued infringement of the '924 patent is willful and deliberate, rendering this case appropriate for treble damages under 35 U.S.C. § 284 and making this an exceptional case under 35 U.S.C. § 285.

## SECOND CLAIM
### (Infringement of U.S. Patent No. 6,631,074)

12.     Plaintiff hereby incorporates by this reference paragraphs 1 through 11 inclusive.

13.     On October 7, 2003, U.S. Patent No. 6,631,074 ("the '074 patent") entitled "Electrochemical Double Layer Capacitor Having Carbon Powder Electrodes" was duly and legally issued, and assigned to Maxwell Technologies, Inc. by the named inventors.  A true and correct copy of the '074 patent is attached hereto as Exhibit 3.

14.     Defendant has been infringing the '074 patent in violation of 35 U.S.C. § 271 by making, using, and/or selling or offering for sale products embodying the patented invention in the United States.

15.     Upon information and belief, Defendant will continue to infringe the '074 patent unless enjoined by this court.

16.     Upon information and belief, Defendant's past and continued infringement of the '074 patent is willful and deliberate, rendering this case appropriate for treble damages under 35 U.S.C. § 284 and making this an exceptional case under 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.     A judgment by the Court that Defendant is infringing the '924 and '074 patents;

B.     Preliminary and permanent injunctions pursuant to 35 U.S.C. § 283 that enjoin Defendant and its agents, servants, employees, successors, and assigns, and all persons acting under the authority of, or in privity or concert with Defendant from directly or indirectly infringing, or contributing to the infringement of the '924 and '074 patents;

C.     An award of damages that the Defendant be ordered to account for and pay to Plaintiff for the infringement of the '924 and '074 patents;

D.    That such damages be trebled for the willful, deliberate, and intentional infringement by Defendant as alleged herein in accordance with 35 U.S.C. § 284;

E.    That Plaintiff be awarded interest on the damages so computed;

F.    An award of costs and attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

G.    For such other and further relief the Plaintiff may be entitled to as a matter of law or that the Court may deem just and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury pursuant to Rule 38 of the Rules of Civil Procedure.

Dated: November 2, 2006          MORRISON & FOERSTER LLP


By:___/s David C. Doyle_____
Attorneys for Plaintiff
MAXWELL TECHNOLOGIES, INC.
Email: ddoyle@mofo.com



US006525924B2

(12) **United States Patent** (10) Patent No.: **US 6,525,924 B2**
Gallay et al. (45) Date of Patent: **Feb. 25, 2003**

(54) **DEVICE FOR ACCUMULATING ELECTRICAL ENERGY COMPOSED OF A WINDING OF SUPERIMPOSED STRIPS AND METHOD OF PRODUCTION**

(75) Inventors: **Roland Gallay**, Farvagny (CH); **Dominique Guillet**, Marly (CH); **Vincent Hermann**, Fribourg (CH); **Adrian Schneuwly**, Schmitten (CH)

(73) Assignee: **Montena Components S.A.**, Rossens (CH)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/966,258**

(22) Filed: **Oct. 1, 2001**

(65) **Prior Publication Data**

US 2002/0048140 A1 Apr. 25, 2002

(30) **Foreign Application Priority Data**

Oct. 25, 2000 (EP) ............................................ 00810995

(51) Int. Cl.⁷ ................................................ **H01G 4/06**
(52) U.S. Cl. ................... **361/511**; 361/301.1; 361/330; 361/512; 361/502; 361/503
(58) Field of Search ............................. 361/511, 301.3, 361/517, 535, 512, 523, 528, 532, 514, 502, 513, 433, 328, 330

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,447,854 A * 5/1984 Markarian .................. 361/329

4,546,415 A * 10/1985 Kent et al. .................. 361/433
4,633,369 A 12/1986 Lapp et al.
5,017,442 A * 5/1991 Watanabe et al.
6,021,040 A * 2/2000 Suzuki et al. ............... 361/514
6,031,713 A * 2/2000 Takeishi et al. ............. 361/517
6,054,233 A * 4/2000 Vourlis
6,282,081 B1 8/2001 Takabayashi et al.
6,307,733 B1 * 10/2001 Maruyama et al. ......... 361/511
6,310,756 B1 * 10/2001 Miura et al. .............. 361/301.3
6,310,764 B1 * 10/2001 Will et al. .................. 361/513

FOREIGN PATENT DOCUMENTS

DE 31 37 593 A1 4/1983
GB 1 425 026 A 2/1976

* cited by examiner

*Primary Examiner*—Anthony Dinkins
*Assistant Examiner*—Nguyen T. Ha
(74) *Attorney, Agent, or Firm*—Oliff & Berridge, PLC

(57) **ABSTRACT**

The invention relates to a device for accumulation of electrical energy. The device is a substantially cylindrical winding of strips. At least one strip is a strip conductor. The device is defined transversally by a substantially cylindrical lateral face and longitudinally by two opposite end faces. Each of the two opposite end faces contains an edge of the strip conductor. In the device, at least one of the edges of at least one strip conductor contains a plurality of teeth. The teeth are disposed on at least one of the end faces and form at least one set in which they are substantially superimposed in a predetermined direction, approximately perpendicular to a plane tangent to the cylindrical face. The teeth constitute a group of elements of electrical connection to a terminal and in which each element extends itself in continuity with the strip conductor which comprises the element.

**14 Claims, 3 Drawing Sheets**



**EXHIBIT 1**
**PAGE 5**



**FIG. 1**

EXHIBIT 1
PAGE 6



**FIG. 2**

EXHIBIT 1
PAGE 7



FIG. 3A

FIG. 3B

FIG. 3C

FIG. 3D

EXHIBIT 1
PAGE 8

US 6,525,924 B2

1

# DEVICE FOR ACCUMULATING ELECTRICAL ENERGY COMPOSED OF A WINDING OF SUPERIMPOSED STRIPS AND METHOD OF PRODUCTION

This invention relates to a device for accumulating electrical energy composed of a winding of superimposed strips. The invention also relates to a method for producing a device for accumulating electrical energy composed of a winding of superimposed strips.

The invention applies preferably, but not exclusively, to the production of capacitors of electrochemical type.

Production of capacitors through spiral winding of a plurality of strips of different materials which are preferably superimposed has been known for a long time. Conventionally, two of the strips are of electrically conducting material so as to constitute the two electrodes of the capacitor, and these strip electrodes are each connected by at least one collector element at an electrical connection terminal outside the capacitor.

The windings thus produced are generally of substantially cylindrical shape, generated by rotation or flattened, and have a substantially cylindrical lateral face and two opposite end faces.

These windings are generally covered by a protective sheathing made of an electrically insulating material and to which electrical connection terminals are fixed.

As described in U.S. Pat. No. 4,633,369 for making up collector elements that connect the electrodes to terminals of a capacitor obtained by winding strips or sheets. Known is offsetting the two strip electrodes with respect to a median plane orthogonal to the winding in such a way that after winding, each strip has, at right angles to one of the end faces of the winding, an edge which is free by the amount of the offsetting.

The amount of offsetting is selected in such a way that a metallic element can be crimped, clamped or soldered onto the conducting part formed at each end of the capacitor, and thereby constitute a collector element which itself can be connected to an electrical terminal of the said capacitor.

This technical solution is satisfactory with respect to efficiency of the connection and the section that is established for the current to pass through, but since it is cumbersome, it has serious drawbacks.

An object of the invention is to propose a device for accumulating electrical energy made up of a winding of superimposed strips which does not have the aforementioned drawbacks.

To this end, the invention has as its subject matter a device for accumulating electrical energy comprising a substantially cylindrical winding of strips, at least one of which is an electrical strip conductor, this device being defined transversally by a substantially cylindrical lateral face and longitudinally by two opposite end faces which each include an edge of the said electrical strip conductor. This device is characterized in particular in that at least one of the edges of at least one electrical strip conductor contains a plurality of teeth disposed in such a way that on at least one of the end faces of the device they form at least one set in which they are substantially superimposed in a predetermined direction, approximately perpendicular to a plane tangent to the cylindrical face of the said device, so as to constitute a group of elements of electrical connection to a terminal and in which each element extends in continuity with the electrical strip conductor which comprises it.

The invention also has as its subject matter a method of producing a device of the aforementioned type.

2

The invention will be better understood from reading the description which follows, given by way of non-limiting example, with reference to the attached drawing representing schematically:

FIG. **1**: a view in longitudinal section of a device according to the invention,

FIG. **2**: a view in perspective, showing the device according to the invention during its production, according to a preferred embodiment of the method for producing the invention,

FIGS. **3**A to **3**D: four views in perspective of four steps involved in producing the device according to the invention.

Referring to the drawing, one sees a device **1** for accumulating electrical energy comprising a substantially cylindrical winding of strips **2**, at least one of which is an electrical strip conductor **2**. This device **1** is defined transversally by a substantially cylindrical lateral face **1**A and longitudinally by two opposite end faces **1**B, **1**C which each contain an edge **2**B, **2**C of the said electrical strip conductor **2**.

The device **1** is preferably an electrochemical capacitor made up of a spiral winding of a plurality of superimposed strips **2**.

Preferably, but not exclusively, each electrical strip conductor **2** is made of aluminum.

In one embodiment of the invention for producing electrochemical capacitors, the device comprises two electrical strip conductors **2** which are superimposed.

Each electrical strip conductor **2** has two opposite faces **21**, **22**, one of which **21**, referred to as the first, bears a layer **3** of material allowing a high degree of electrochemical activity, and the other **22**, referred to as the second, likewise bears a layer **3** of material permitting a high degree of electrochemical activity, itself covered by a layer element **4**, referred to as the separator element **4**.

The indication according to which each face **21**, **22** of the electrical strip conductor **2** bears a layer **3** of material permitting a high degree of electrochemical activity includes in particular the fact that this layer **3** consists of a deposit of material allowing a high degree of electrochemical activity on the said layer **21**, **22** or an applied strip of material allowing a high degree of electrochemical activity.

Likewise, the indication according to which the second face **22** of the electrical strip conductor **2** bears a layer **3** of material permitting a high degree of electrochemical activity, itself covered by the separator element **4**, includes in particular the fact that this separator element **4** consists of a deposit of material on the layer **3** of material permitting a high degree of electrochemical activity or an applied strip of this material.

In the embodiment of the invention for producing electrochemical capacitors, the separator layer **4** consists of a material which is an electrical insulator and an ionic conductor when it is impregnated with an electrolyte agent.

For example, the electrolyte is a liquid or a polymer which impregnates the layers **3** of material permitting a high degree of electrochemical activity and the separator element **4**.

In the embodiment of the invention for producing electrochemical capacitors, the material may be, but is not limited to, carbon (activated carbon, graphite, carbon black), rare earth oxides, metal foams, etc.

As shown in the drawing, each of the electrical strip conductors **2** constitutes one of the electrodes of the capacitor, and is connected by at least one electrical connecting element **5** to at least one electrical connection terminal **6** that is external to the capacitor **1**.

EXHIBIT 1
PAGE 9

US 6,525,924 B2

3

In the embodiment shown, the device 1 comprises a protective sheathing 1D, made up of a wall 1D, for instance rigid and consisting of electrically insulating material.

This device is noteworthy in that at least one of the edges 2B, 2C of at least one electrical strip conductor 2 bears a plurality of teeth 5 disposed in such a way that on at least one of the end faces 1B, 1C of the device 1, they form at least one set in which they are substantially superimposed in a predetermined direction, approximately perpendicular to a plane tangent to the cylindrical face 1A of the said device, so as to constitute a group of elements 5 of electrical connection to a terminal 6 and in which each element 5 extends in continuity with the strip 2 which comprises it.

These technical features enable the device 1 to be provided with groups of electrical collector elements each constituting an electrical conductor, the transverse cross-section of which is large without any drawback with regard to the volume it occupies on each end face 1B, 1C of the said device 1.

The device 1 for accumulating electrical energy is likewise noteworthy in that, on the one hand, each electrical strip conductor 2, including teeth 5, which is used to make up the device has an initial width L greater than the distance D separating the end faces 1B, 1C of the winding, and, on the other hand, the teeth 5 are obtained by cutting notches 7 in at least one lateral border 2D, 2E of the said electrical strip conductor 2.

Designated by the initial width L of the electrical strip conductor 2 is the width which can be measured between its two lateral borders 2D, 2E before cutting the notches 7.

Conforming to these technical features makes it possible to ensure that each tooth 5 is in continuity with the electrical strip conductor 2 which comprises it and that there is therefore no break in the electrical connection desired.

The device 1 for accumulating electrical energy is also noteworthy in that, on the one hand, in each set where the teeth 5 are superimposed, they are, at least locally, applied tightly against one another by their opposite faces 5A, 5B so as to establish electrical contact between them, and, on the other hand, they are at least indirectly connected to an electrical connection terminal 6, external to the device 1.

Conforming to these technical features makes it possible to establish an electrical connection of high quality with each electrical connection terminal 6, external to the device 1.

The device 1 for accumulating electrical energy is also noteworthy in that in each set where the teeth 5 are superimposed, they are, at least locally, applied tightly against one another by riveting by means of an element 8 inserted through the thickness of the set of said teeth 5.

For example, a spindle 8 is inserted through the thickness of the set of said teeth 5, with its end then deformed in such a way as to lock the assembly.

In a variant, the device for accumulating electrical energy is also noteworthy in that in each set where the teeth 5 are superimposed, they are, at least locally, applied tightly against one another by soldering.

This solution does not exclude use of the aforementioned spindle 8.

In another embodiment, the device 1 comprises at least one set of teeth 5 on each of these end faces 1B, 1C, and each of these sets is connected to a terminal 6 situated at the level of the said face 1B, 1C.

In another embodiment:

the device 1 comprises an electrical conducting element 9 disposed substantially axially with respect to the winding and which has an end 9B, 9C jutting out over each of the end faces 1B, 1C of the device,

4

at the level of a first 1B of the end faces 1B, 1C of the device 1, at least one first set of teeth 5 is connected at least directly to a first end 9B of the conducting element 9 which is situated at the level of this first end face 1B,

at the level of the second end face 1C, the second end 9B of the conducting element 9 is, for its part, connected to a first terminal 6, whereas at least a second set of teeth 5 situated at the level of this second face 1C is itself connected to a second terminal 6.

The invention also has as an object an electrical method for producing a device 1 for accumulating electrical energy, on the one hand, defined transversally by a substantially cylindrical lateral face 1A and longitudinally by two opposite end faces 1B, 1C separated by a distance D, and, on the other hand, obtained by winding strips 2 at least one of which being an electrical strip conductor 2 whose initial width L, defined between two lateral borders 2D, 2E, is greater than the distance D that separates the said opposite end faces 1B, 1C.

The method according to the invention is noteworthy in that it is at the latest after the strips 2 have been wound that the teeth 5 are obtained by cutting notches 7 in at least one of the two lateral borders 2D, 2E which determine the initial width L of at least one electrical strip conductor 2.

The notches are made preferably after the winding.

In a variant embodiment, the cutting of at least part of the notches 7 defining each tooth 5 is achieved after the winding of the part of the electrical strip conductor 2 that has to bear this tooth 5.

This technique makes it possible to achieve the teeth as each strip to be provided with teeth is wound, which makes it possible for the winding machines to be operated without any real technical difficulties and without repercussions on the high productivity of this type of machine.

According to an equally noteworthy variant of the method, at least part of the notches 7 which delimit the teeth 5 are obtained prior to the winding of at least one electrical strip conductor 2.

In another embodiment, all the notches 7 that delimit the teeth 5 are achieved prior to the winding of the electrical strip conductor 2.

In a noteworthy way,

the winding of the strips 2 is carried out around an electrical conductor element 9 of length such that it is able, at least after the device has been made, to have one end 9B, 9C jutting out over each of the end faces 1B, 1C of the said device 1,

at the latest after the winding, teeth 5 are formed on two electrical strip conductors 2 in such a way that each of the two end faces 1B, 1C of the device 1 is able to be provided with at least one set of teeth 5,

at the level of a first end face 1B of the winding, at least one first set of teeth 5 is connected to a first end 9B of the conducting element 9 which is situated at the level of this end face 1B,

at the level of the second end face 1C, on the one hand, the second end 9B of the conducing element 9 is connected to a first terminal 6, and, on the other hand, at least one set of teeth 5 situated at the level of this second face is connected to a second terminal 6.

However, this last-mentioned embodiment of the method does not exclude production of devices which are flattened after withdrawal of a removable winding tube on which they have been made beforehand.

In a noteworthy way, at least one electrical strip conductor 2 is used having two opposite faces 21, 22, one of which 21, referred to as the first, bears a layer 3 of material permitting

EXHIBIT 1
PAGE 10

US 6,525,924 B2

5

a high degree of electrochemical activity, and the other **22**, referred to as the second, likewise bears a layer **3** of material permitting a high degree of electrochemical activity, itself covered by a layer element **4**, referred to as separator element **4**.

In a likewise noteworthy way, at least one electrical strip conductor **2** is used whose two layers **3** of material permitting a high degree of electrochemical activity and whose separator element **4**, which equip the two opposite faces **21**, **22**, extend from one of the two lateral borders **2D**, **2E** over a transverse dimension substantially equal to the distance D which separates the two end faces **1B**, **1C** of the device **1**.

To this end, each face **21**, **22** of the electrical strip conductor **2** has a portion without covering which is particularly suitable for making teeth **5**.

What is claimed is:

1. A device for accumulating electrical energy comprising a substantially cylindrical winding of strips at least one of which is an electrical strip conductor, this device being defined transversally by a substantially cylindrical lateral face and longitudinally by two opposite end faces which each contain an edge of the electrical strip conductor, this device being characterized in that at least one of the edges of at least one electrical strip conductor includes a plurality of teeth disposed in such a way that on at least one of the end faces of the device they form at least one set in which they are substantially superimposed in a predetermined direction, approximately perpendicular to a plane tangent to the cylindrical face of the device, in such a way as to constitute a group of elements of electrical connection to a terminal and in which each element extends in continuity with the electrical strip conductor which comprises the element.

2. The device for accumulating electrical energy according to claim 1, characterized in that, on the one hand, each strip, including teeth, which is used to constitute the device has an initial width (L) greater than the distance (D) which separates the end faces of the winding, and, on the other hand, the teeth are obtained by cutting notches in at least one lateral border of the electrical strip conductor.

3. The device for accumulating electrical energy according to claim 1, characterized in that, on the one hand, in each set where the teeth are superimposed they are, at least locally, applied tightly against one another by their opposite faces in such a way as to establish electrical contact between them, and, on the other hand, they are at least indirectly connected to an electrical connection terminal, external to the device.

4. The device for accumulating electrical energy according to claim 3, characterized in that in each set where the teeth are situated superimposed, they are, at least locally, applied tightly against one another by riveting by means of an element inserted through the thickness of the set of said teeth.

5. The device for accumulating electrical energy according to claim 3, characterized in that in each set where the teeth are situated superimposed, they are, at least locally, applied tightly against one another by soldering.

6. The device for accumulating electrical energy according to claim 3, characterized in that it comprises at least one set of teeth on each of said end faces, and each of said sets is connected to a terminal situated at the level of the face.

7. The device for accumulating electrical energy according to claim 3, characterized in that

the device **1** further comprises an electrical conducting element disposed substantially axially with respect to the winding and which has an end jutting out over each of the end faces of the device,

6

at the level of a first of the end faces of the device, at least one first set of teeth is connected at least directly to a first end of the conducting element which is situated at the level of this first end face,

at the level of the second end face, the second end of the conducting element is, for its part, connected to a first terminal, whereas at least a second set of teeth situated at the level of this second face is itself connected to a second terminal.

8. A method of producing a device for accumulating electrical energy the device defined transversally by a substantially cylindrical lateral face and longitudinally by two opposite end faces separated by a distance, the method comprising winding strips at least one of which being an electrical strip conductor whose initial width (L), defined between two lateral borders, is greater than the distance (D) that separates the opposite end faces, this method being characterized in that it is at the latest after the strips have been wound that the teeth are achieved by cutting notches in at least one of the two lateral borders which determine the initial width (L) of at least one electrical strip conductor.

9. The method of production according to claim 8, characterized in that the cutting of at least part of the notches determining each tooth is achieved after the winding of the part of the electrical strip conductor that has to bear this tooth.

10. The method of production according to claim 8, characterized in that at least part of the notches which delimit the teeth are achieved prior to the winding of at least one electrical strip conductor.

11. The method of production according to claim 8, characterized in that all the notches that delimit the teeth are achieved prior to the winding of the electrical strip conductor.

12. A method of producing a device for accumulating electrical energy, the device defined transversally by a substantially cylindrical lateral face and longitudinally by two opposite end faces separated by a distance (D), the method comprising winding strips at least one of which being an electrical strip conductor whose initial width (L), defined between two lateral borders, is greater than a distance (D) that separates the opposite end faces, this method being characterized in that:

the winding of the strips is carried out around an electrical conductor element of length such that it is able, at least after the device has been made, to have one end jutting out over each of the end faces of the device,

at the latest after the winding, teeth are formed on two electrical strip conductors in such a way that each of the two end faces of the device is able to be provided with at least one set of teeth,

at the level of a first end face of the winding, at least one first set of teeth is connected to a first end of the conducting element which is situated at the level of this end face,

at the level of the second end face, on the one hand, the second end of the conducing element is connected to a first terminal, and, on the other hand, at least one set of teeth situated at the level of this second face is connected to a second terminal.

13. The method of production according to claim 8, characterized in that at least one electrical strip conductor is used having two opposite faces, one of which, referred to as the first, bears a layer of material permitting a high degree of electrochemical activity, and the other, referred to as the second, likewise bears a layer of material permitting a high

**EXHIBIT 1**
**PAGE 11**

US 6,525,924 B2

7

degree of electrochemical activity, itself covered by a layer element, referred to as separator element.

**14**. The method of production according to claim **13**, characterized in that at least one electrical strip conductor is used whose two layers of material permitting a high degree of electrochemical activity and whose separator element,

8

which equip the two opposite faces, extend from one of the two lateral borders over a transverse dimension substantially equal to the distance (D) which separates the two end faces of the device.

\* \* \* \* \*

EXHIBIT 1
PAGE 12

STOCK PURCHASE AND BARTER AGREEMENT

BY AND BETWEEN

MAXWELL TECHNOLOGIES, INC.

AND

MONTENA SA

May 30, 2002

EXHIBIT 2
PAGE 13

# STOCK PURCHASE AND BARTER AGREEMENT

THIS STOCK PURCHASE AND BARTER AGREEMENT, dated as of the 30th day of May, 2002 (this "Agreement"), is entered into by and between Maxwell Technologies, Inc., a Delaware corporation ("Purchaser"), and Montena SA, a corporation governed by the laws of Switzerland ("Seller").

## RECITALS

1.      Seller owns 67% of the outstanding capital stock of Montena Components Ltd., a corporation governed by the laws of Switzerland (the "Company"), and has contractual rights or the possibility to acquire more than an additional 32% of the outstanding capital stock of the Company to a total of at least 99% of such outstanding capital stock.

2.      Purchaser desires to purchase all of the outstanding capital stock of the Company, and Seller desires to increase its ownership of Company capital stock to at least 99% and to sell all of its shares of Company capital stock to Purchaser, all on the terms and conditions hereof.

## SECTION 1

## PURCHASE AND SALE OF CAPITAL STOCK

1.1      <u>Sale of Capital Stock</u>.  Subject to the terms and conditions hereof, the Purchaser agrees to purchase from the Seller, and the Seller agrees to sell to the Purchaser, all of the shares of capital stock of the Company owned by Seller, which shall amount to a total of not less than 99%, i.e. not less than 99,000 shares, of such capital stock (the "Acquired Stock").

1.2      <u>Purchase Price</u>.  The purchase price for 100% of the capital stock of the Company outstanding on the Closing Date (as defined below) shall be a total of 2,475,000 shares of the common stock, $ 0.10 par value, of Purchaser, delivered in certificate form as soon as practicable after the Closing Date.  Such shares of Purchaser common stock are sometimes hereinafter referred to collectively as the "Purchase Price".  In the event that the Acquired Stock does not constitute 100% of the outstanding capital stock of the Company, the Seller shall be entitled to receive that percentage of the Purchase Price that is equal to the percentage of the total outstanding shares of capital stock of the Company represented by the Acquired Stock.  The Purchase Price, or, if applicable, the portion thereof to which Seller is entitled, is subject to possible future adjustment as described below in Section 10.2

1.3      <u>Closing</u>.  The closing of the transactions contemplated in this Agreement (the "Closing") shall be held on June 30, 2002, at such place and in such manner as the Purchaser and Seller shall agree (the date of the Closing is hereinafter referred to as the "Closing Date").  At the Closing, the parties shall each take all such action and deliver all such documents, instruments, certificates and other items as may be required under this Agreement or otherwise in order to perform and fulfill all covenants, conditions and agreements on its part to be performed or

**EXHIBIT 2**
**PAGE 14**

fulfilled at or prior to the Closing Date and to cause all conditions precedent to the other party's obligations under this Agreement to be satisfied in full.

## SECTION 2

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

As of the date hereof, the Seller hereby represents and warrants to Purchaser as follows (references herein to "the best knowledge of Seller" includes matters that are or should be known by the management and key employees of the Company):

2.1 <u>Organization, Good Standing and Qualification.</u> The Company is a corporation duly organized, validly existing and in good standing under the laws of Switzerland and has all requisite power and authority and has all licenses and other governmental authorizations necessary to own, operate and lease its properties and carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified or duly licensed to transact business and is in good standing in each jurisdiction, within or outside Switzerland, that the nature of the business conducted by it or its ownership or leasing of any property makes such qualification necessary. True and complete copies of the organizational documents of the Company have been delivered to the Purchaser.

2.2 <u>Subsidiaries.</u> The Company does not own, directly or indirectly, any ownership interest or other security or investment in any corporation, partnership, limited liability company, joint venture, organization or other entity.

2.3 <u>Authorization and Enforceability.</u> Seller has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder. All action on the part of Seller and Seller's officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and any agreements required or contemplated hereunder and the performance of all obligations of Seller hereunder and thereunder, including the transfer and sale of the Acquired Stock, has or will have been taken before the Closing Date. This Agreement has been duly executed and delivered by Seller and constitutes the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, except as may be limited by bankruptcy, reorganization, insolvency, moratorium or other laws relating to or affecting the enforcement of creditors' rights and remedies generally and except as enforcement may be limited by general principles of equity.

2.4 <u>Capitalization.</u> The share capital of the Company amounts to CHF 1,000,000.--, divided into 100,000 fully paid in registered shares with a par value of CHF 10.-- each (hereinafter referred to as the "Outstanding Stock"). The Outstanding Stock constitutes all of the issued and outstanding equity interests of the Company. The Outstanding Stock is owned beneficially and of record by the shareholders listed on Schedule 2.4 attached to this Agreement. There are as of the Closing Date no shares of capital stock of the Company, or other equity interests or securities of any nature in the Company, reserved for issuance nor are there any preemptive rights, rights of first refusal, right of first offer or any outstanding subscriptions,

**EXHIBIT 2
PAGE 15**

options, warrants, rights, convertible securities, calls, commitments, or other agreements, arrangements or commitments relating to the issued or unissued capital stock or other equity interests or securities of the Company. No share of Outstanding Stock is subject to any voting trust agreement or other contract, agreement, arrangement, commitment or understanding, including any such agreement, arrangement, commitment or understanding restricting or otherwise relating to the voting or disposition of any share of Outstanding Stock. There are not any outstanding bonds, debentures, notes or other indebtedness of the Company having the right to vote (or convertible into, or exchangeable for securities having the right to vote) on any matters on which stockholders of the Company may vote. As of the Closing Date, there will not be any outstanding contractual obligations of the Company to repurchase, redeem or otherwise acquire any capital stock or equity interests or securities of the Company or any other entity or person.

2.5    <u>Valid Issuance; Share Ownership</u>. All shares of Outstanding Stock have been duly authorized and validly issued and are fully paid and nonassessable, and have been issued in compliance with applicable laws. The Acquired Shares are owned by Seller free and clear of any lien, charge, encumbrance or claim by any other person or entity, and Seller has full and complete authority to transfer such shares to Purchaser hereunder. Upon delivery of the Acquired Shares to the Purchaser pursuant to this Agreement against payment of the consideration therefor, Purchaser shall acquire good and valid title to, and beneficial ownership of, such shares.

2.6    <u>Consents and Approvals</u>. Seller shall cause the Company board to approve the transfer of the Acquired Stock to Purchaser before the Closing Date. No other consent or approval by, or filings with, any governmental or administrative body or agency or other third party is required in connection with the execution, delivery or performance by Seller of this Agreement or any agreement required or contemplated by the provisions hereof or for the consummation by Seller of the transactions contemplated hereby or thereby.

2.7    <u>No Conflicts</u>. Neither the execution and delivery of this Agreement or any agreements provided for hereunder, nor the consummation of the transactions contemplated hereby or thereby, will (a) violate any provision of the organizational documents of the Company or Seller, (b) violate, breach, conflict with, or constitute a default (or constitute an event which, with the giving of notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any contract, agreement, lease, license or document to which the Company or Seller is a party, (c) violate any order, writ, injunction, decree, law, statute, rule or regulation of any governmental authority applicable to Seller or to the Company or its business or any property of or used by the Company or (d) give rise to a declaration or imposition of any lien or other encumbrance upon any share of Outstanding Stock or any property of or used by the Company.

2.8    <u>Financial Statements</u>. The Seller has delivered to the Purchaser the following financial statements of the Company, all of which are attached to this Agreement as Schedule 2.8: (i) audited income statements for the years ended June 30, 2000 and June 30, 2001 and unaudited income statements and statements of cash flow for the nine-month period and quarter

**EXHIBIT 2**
**PAGE 16**

ended March 31, 2002; (ii) audited balance sheets as of June 30, 2000 and June 30, 2001 and an unaudited balance sheet as of March 31, 2002 (the "Balance Sheet"); and (iii) a pro forma income statement and cash flow statements for the year ended June 30, 2002 and a pro forma balance sheet as of June 30, 2002.   The financial statements referred to in clauses (i) and (ii) are hereinafter collectively referred to as the "Historical Financial Statements", and financial statements referred to in clause (iii) are collectively referred to as the "Pro forma Financial Statements".  The Historical Financial Statements (i) have been prepared in conformity with Swiss Accounting Standards consistently applied with prior periods, and (ii) fairly present the financial condition and results of operations of the Company as of the dates and for the periods indicated therein.  The books of account, financial data, schedules and other records of the Company, including any of the foregoing delivered or made available to the Purchaser or its representatives in connection with the transactions contemplated hereby, have been maintained in the ordinary course of business of the Company, and there are no material misstatements, mistakes or omissions therein, and there have been no transactions involving the Company that properly should have been reflected in the Historical Financial Statements in accordance with such accounting principles that have not been reflected therein.  The Balance Sheet accurately reflects all liabilities, obligations and commitments of any nature (whether absolute, accrued, contingent or otherwise and whether matured or unmatured) of the Company, except (a) liabilities, obligations or commitments incurred since the date of the Balance Sheet in the ordinary course of business of the Company and consistent with past practice and (b) other liabilities or obligations not required to be shown on a balance sheet prepared in accordance such accounting principles.  The Pro forma Financial Statements represent the best estimate by Seller and management of the Company for the operating results and financial condition of the Company for the period and as of the date of the Pro forma Financial Statements, based on reasonable assumptions and taking into account all known trends in the Company's business and operations.

2.9    Accounts Receivable.  Schedule 2.9 attached to this Agreement contains a complete and correct list of all accounts receivable of the Company as of March 31, 2002 (the "Accounts Receivable"), and except as noted on Schedule 2.9, such accounts represent bona fide sales made or services performed on or prior to such date in the ordinary course of business of the Company and consistent with past practices.  To the best knowledge of Seller, there is no contest, claim or right of set-off contained in any oral or written agreement with any account debtor relating to the amount or validity of any Account Receivable, and the Accounts Receivable, net of reserves, are collectible in the ordinary course of business of the Company.  The reserves for uncollectible Accounts Receivable reflected in the Balance Sheet have been established in the ordinary course of business, in accordance with Swiss Accounting Standards and consistent with past practices.

2.10    Inventory.  All inventory of the Company and the value of such inventory existing on the date of the Balance Sheet, net of reserves for obsolescence, is useable and salable in the ordinary course of business of the Company, and the reserve for obsolescence has been established in the ordinary course of business, in accordance with Swiss Accounting Standards and consistent with past practices.

**EXHIBIT 2**
**PAGE 17**

2.11    Fixed Assets.  All fixtures, furniture, machinery, equipment and other fixed assets owned or leased by the Company (the "Fixed Assets") are in good operating condition and repair, normal wear and tear excepted, and are adequate for the uses to which they are being put. None of the Fixed Assets are in need of maintenance or repairs, except for ordinary, routine maintenance and repairs.  The Fixed Assets constitute all of the fixed assets used by the Company in the operation of its business, and (other than the lease of real property and buildings from the Seller) the Company does not make use of fixed assets of any other party, including without limitation the Seller, in the conduct of the Company's business.

2.12    Absence of Certain Changes or Events.  Since the date of the Balance Sheet and except for the sale of the PEC business and as set forth on Schedule 2.12 attached to this Agreement, the Company has conducted its business in the ordinary course consistent with past practice and none of the following has occurred:

(a)    event, fact or circumstances that, individually or in the aggregate, could reasonably be expected to result in a material adverse effect on the operations,  conditions or prospects of the Company;

(b)    acquisition of or agreement to acquire by merging with, or by purchasing a substantial equity interest in or a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, limited liability company, association or other business entity, in a transaction or series of related transactions;

(c)    issuance by the Company of, or commitment by it to issue, any common stock or other equity securities or obligations or any securities convertible into or exchangeable or exercisable for equity securities;

(d)    other than under the Company's current line of credit with commercial banks, indebtedness incurred, assumed or guaranteed by the Company or any commitment to incur indebtedness entered into by the Company, or any loans made or agreed to be made by the Company;

(e)    increase in the compensation of officers or employees (including any such increase pursuant to the grant of or increase to any bonus, pension, profit sharing or other plan or commitment) or any increase in the compensation payable or to become payable to any officer or employee or any severance or termination pay, except for increases to non officer employees in the ordinary course of business, consistent with past practice or as required by any existing agreement;

(f)    incurrence or imposition of a lien, security interest or encumbrance on any of the assets or other  properties of the Company;

(g)    damage, destruction or loss (whether or not covered by insurance) in an aggregate amount exceeding U.S. $5,000;

**EXHIBIT 2**
**PAGE 18**

(h)     delay or failure to pay or perform any obligation (including accounts payable) of the Company when due;

(i)      settlement or other resolution of any litigation, or termination, amendment, modification or waiver of, or any breach, violation or default by any party under, any contract or agreement of the Company, or entrance into a material contract, commitment or agreement;

(j)      forgiveness, waiver or agreement to extend repayment of any indebtedness or other material obligation owed by or to the Company;

(k)     disposition or lapse of any rights to use any of the intellectual property or intangible assets of the Company;

(l)      contract, agreement or transaction with Seller, any affiliate of the Company, any officer, director, stockholder or employee of the Company or any family member of any such person other than in the ordinary course of business or as mentioned or disclosed in this Agreement;

(m)    declaration, setting aside or payment of any dividend or other distribution or payment (whether in cash, property or equity interests) to Seller or otherwise with respect to the capital stock of the Company, or any redemption, purchase or acquisition of any of the securities of the Company;

(n)     payment on any indebtedness to Seller or any person or entity affiliated with Seller;

(o)     material change in the tax liability of the Company;

(p)     capital expenditures or commitments for additions to any property of the Company constituting capital assets in an aggregate amount exceeding U.S. $5,000 and not previously contained in a capital budget furnished to the Purchaser; or

(q)     negotiation, discussion or contract or agreement to take or agree to take any of the actions described in subsections (a) through (p) above.

2.13    <u>Insurance</u>.  The Company has in full force and effect fire, casualty and liability insurance policies with recognized insurers.  This insurance is sufficient in amount as of the date of the Closing, subject to reasonable deductibles, to allow the Company to replace any of the material properties of the Company that may be damaged or destroyed.  This insurance insures the Company and its assets and other properties against such casualties and contingencies and is carried in such amounts as is customary for companies similarly situated, which insurance is deemed by the Company to be sufficient.  The Company has not given any notice or filed any claim with any of the insurers under any of these insurance policies.

**EXHIBIT 2**
**PAGE 19**

2.14    Employee Benefits.  The Company is current in all of its obligations (financial and otherwise) under all of its health, pension and similar programs and employee benefit plans, has complied in all material respects with all applicable laws relating thereto and the scope and coverage of all of these programs and plans is customary for companies similarly situated.

2.15    Litigation; No Orders.  There are no actions, claims, suits, proceedings, arbitrations, complaints, grievances, unfair labor practice or employment discrimination charges or complaints, or investigations pending or, to the best knowledge of Seller, threatened (a) against the Company, its business or any property before any court, administrative, governmental or regulatory body or arbitrator or mediator or (b) that challenge the validity or propriety of any of the transactions contemplated by this Agreement.  There are no (i) facts or circumstances known to Seller that could give rise to, or provide the basis for, any action which would be required to be disclosed pursuant to this Section 2.15 or (ii) outstanding judgments, orders, decrees, awards or citations of any governmental authority against the Company or the Company's business (including any assets, property, right, obligation or liability of such business).

2.16    Material Contracts and Other Agreements.  The Company is not a party to, nor is the Company or any of its assets or other properties used in its business bound or affected by, any contract, agreement, understanding, instrument, lease or other commitment, written or oral, absolute or contingent, other than (i) contracts listed on Schedule 2.16 attached to this Agreement, accurate and complete copies of which have been delivered or made available to the Purchaser and (ii) contracts which do not involve commitments by any party thereto in excess of U.S. $25,000 in value.  All of the contracts listed in Schedule 2.16 are valid, binding and legally enforceable in accordance with their respective terms, and the Company is not in material default under any such contract.  The Company is not a party to any contract that restricts it from carrying on its business or any part thereof anywhere in the world or restricts it from competing in any line of business with any person or entity, except for the PEC business in accordance with the Purchase Agreement concluded with EPCOS (see also Section 10.2) the terms of which were disclosed to Purchaser.

2.17    Client and Supplier Relationships.  Neither the Company nor Seller has received any notice and neither is in possession of any actual knowledge that might reasonably indicate that any of the Company's current clients, customers, subcontractors, vendors or suppliers intends to cease retaining, purchasing from, selling to or dealing with the Company in the manner in which such transactions have previously occurred or that any such current client, customer, subcontractor, vendor or supplier intends to alter in any respect the amount of such retention, purchases or sales or the extent of dealings with the Company  or would alter in any respect any such retention, purchases, sales or dealings in the event of the consummation of the transactions contemplated in this Agreement.

2.18    Compliance with Laws and Charter.  To the best knowledge of Seller the Company has at all times been, and all of its assets and properties have at all times been, in compliance in all material respects with any and all applicable rules, statutes, laws, ordinances and regulations, including, without limitation, any applicable franchise, building, zoning, health,

**EXHIBIT 2**
**PAGE 20**

environmental, safety, employment, labor relations or other rule, statute, law, ordinance or regulation. The Company is in compliance in all respects with its organizational documents.

2.19    Licenses and Permits. The Company has all licenses, permits, franchises, authorizations, rights, privileges, variances, exemptions, orders and approvals issued or granted by any governmental authority necessary to conduct the Company's business as it is now being conducted and as currently proposed to be conducted, and each of the foregoing (the "Licenses") is in full force and effect. Neither the Company nor the Seller has received any notice to the effect that, or otherwise been advised that, the Company is not in compliance with, or that it is in violation of, any such License. The Company is in compliance in all material respects with the terms of each such License, and there are not currently existing circumstances that are likely to result in a failure of the Company to comply with, or in a violation by the Company of, any such License.

2.20    Title to Properties; Liens and Encumbrances. The Company has good and marketable title to all of its properties and assets (all of which are sufficient for it to run its business as currently conducted and as proposed to be conducted) and, with respect to the property and assets leased by the Company, holds valid leasehold interests therein and is in compliance with such leases, in each case subject to no mortgage, pledge, lien, security interest, conditional sale agreement, encumbrance or charge, except (i) tax or ordinary course liens for obligations not yet due or payable or (ii) liens or encumbrances which do not individually or in the aggregate materially impair the Company's use thereof or materially detract from the value of the Company's properties and assets and which have arisen only in the ordinary course of business.

2.21    Brokers; Certain Expenses. The Company has not paid or become obligated to pay any fee or commission to any broker, finder, investment banker or other intermediary in connection with this Agreement.

2.22    Taxes. The Company has timely filed all tax returns that are required to have been filed on or before the Closing with appropriate governmental authorities or agencies and such returns are true in all respects. The Company has paid or established adequate reserves for all material income, franchise, sales, value added and other taxes, assessments, governmental charges, import and export duties, penalties and interest due and payable by it. There are no agreements or other arrangements providing for an extension of time with respect to the assessment of any tax or deficiency against the Company and there is no pending action, proceeding or dispute with any taxing authority relating to any of such returns, and Seller has no knowledge of any proposed liability for any tax to be imposed upon the properties or assets of the Company for which there is not an adequate reserve reflected on the Balance Sheet or of any governmental inquiry into any of the foregoing. However, it is understood that the Company is, based on a tax ruling with the cantonal authorities, partially exempted from the payment of cantonal income taxes until June 30, 2005.

2.23    Related-Party Relationships. Except for a lease agreement according to Exhibit C and a intercompany loan agreement as set forth in Section 10.1, no shareholder (including

**EXHIBIT 2**
**PAGE 21**

without limitation Seller), officer, director or affiliate of the Company has any (i) interest, directly or indirectly, in any lease, lien, contract, license, loan or other agreement, transaction or arrangement to which the Company is a party or that relates in any way to any property or any aspect of the Company's business, (ii) interest in any properties, assets, liabilities or other obligations of the Company or (iii) employment relationship or other relationship as a director, manager or similar such position with, or any interest, direct or indirect, in any competitor, supplier, vendor or customer of, or other person or entity having any business dealings or a business relationship with, the Company. Except as set forth in Schedule 2.23, neither Seller nor any officer, director or affiliate of the Company will own, hold, possess or have any other right or obligation with respect to any property or other asset on or after the Closing that is currently used in the business of the Company.

2.24    <u>Labor Matters</u>.  The Company is a party to and bound by a collective labor agreement with labor organizations as disclosed in the due diligence report. The Company has not violated any terms of the collective labor agreement or any laws affecting the collective bargaining rights of its employees.  The Company enjoys good and harmonious labor and employee relations with its employees and Seller has no reason to believe that the consummation of the transactions contemplated hereby will adversely affect such relations.  The Company has at all times been in full compliance in all material respects with all applicable laws respecting employment and employment practices, terms and conditions of employment, wages and hours, and immigration and naturalization.  The Company is not a party to, or bound by, any employment or other contract or agreement that contains any severance or termination pay liability or obligation, except as disclosed in the due diligence report.

2.25    <u>Trademarks, Patents and Other Rights</u>.  The Company owns or has sufficient legal right to use all patents, patent applications, trademarks, trademark applications, service marks, trade names and copyrights (collectively, "<u>Intellectual Property</u>") and all know-how, computer programs and technical data necessary for its business as now conducted and as presently contemplated to be conducted, and which right, to the best knowledge of Seller, does not conflict with or infringe upon the valid rights of others.  Neither the Company nor Seller has received any notice of, nor does Seller have any knowledge of, any infringement by the Company or any of its employees of the asserted rights of others.  The Company has a valuable body of trade secrets, including know-how, concepts, designs, computer programs and other technical data (the "<u>Proprietary Information</u>") for the development, manufacture and sale of its products.  To the best knowledge of Seller after reasonable inquiry, the Company has the right to use the Proprietary Information, free and clear of any rights (including license rights), liens, encumbrances or claims of others.  Reasonable security measures have been taken and will continue to be taken by the Company to protect the secrecy, confidentiality and value of the Proprietary Information and the Intellectual Property.

**EXHIBIT 2**
**PAGE 22**

## SECTION 3

## REPRESENTATIONS AND WARRANTIES OF
## PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

3.1    Organization and Power; Foreign Qualification.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties, and to carry on its business, as such is now being conducted.  Purchaser is duly qualified to transact business and is in good standing in every jurisdiction in which the character of its business makes such qualification necessary, except for such jurisdictions where the failure to so qualify would not have a material adverse effect on its financial condition, results of operation or business.

3.2    Capital Structure of Purchaser.  The authorized capital stock of Purchaser consists of 40,000,000 shares of common stock, $ 0.10 par value, of which 11,339,225 shares are issued and outstanding as of May 20, 2002.  Except for the transactions contemplated pursuant to this Agreement, for convertible preferred securities of PurePulse Corporation issued to two companies affiliated with Sanyo Corporation which are exchangeable into Maxwell common stock and for outstanding stock options granted to Purchaser's officers, directors and employees, there are no outstanding options, warrants, convertible debt or securities, calls, agreements, arrangements, commitments, understandings or other rights to purchase any of Purchaser's capital stock, or securities convertible into or exchangeable for any such capital stock.  All of the outstanding shares of capital stock of Purchaser have been duly authorized, validly issued and are fully paid and nonassessable.

3.3    Authorization and Enforceability of Agreements.  Purchaser has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder.  This Agreement has been duly executed and delivered by Purchaser and constitute the legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as may be limited by bankruptcy, reorganization, insolvency, moratorium or other laws relating to or affecting the enforcement of creditors' rights and remedies generally and except as enforcement may be limited by general principles of equity.  This Agreement has been duly and validly authorized by and approved by all requisite corporate action on the part of Purchaser.  No further approvals or consents by, or filings with, any federal, state, municipal, foreign or other court or governmental or administrative body, agency or other third party is required in connection with the execution and delivery by Purchaser of this Agreement, or the consummation by Purchaser of the transactions contemplated hereby, except for those which, if not obtained, would not have a material adverse impact on the ability of Purchaser to perform its business as currently conducted or the ability of Purchaser to execute and deliver such agreement, or to consummate the transactions contemplated hereby.

**EXHIBIT 2**
**PAGE 23**

3.4    No Conflicts.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) violate any provisions of the charter or Bylaws of Purchaser, (b) violate, or be in conflict with, or constitute a default (or other event which, with the giving of notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any material lease, license, promissory note, contract, agreement, mortgage, deed of trust or other instrument or document to which Purchaser is a party or by which Purchaser or any of its properties or assets may be bound, (c) violate any order, writ, injunction, decree, law, statute, rule or regulation of any court or governmental authority applicable to Purchaser or its properties or assets or (d) give rise to a declaration or imposition of any claim, lien, charge, security interest or encumbrance of any nature whatsoever upon any of the assets of Purchaser.

3.5    Financial Statements and SEC Reports.  Purchaser has timely filed all required forms, reports, statements and documents with the Securities and Exchange Commission ("SEC") since January 1, 2000, all of which have complied in all material respects with all applicable requirements of the federal securities laws.  Purchaser has heretofore delivered or made available to Seller true and complete copies of (i) its Annual Report on Form 10-K for the fiscal year ended December 31, 2001, (ii) its Quarterly Report on Form 10-Q for the three-month period ended March 31, 2002 and (iii) its proxy statement relating to its Annual Meeting of Stockholders held on May 14, 2002, (the documents referred to in clauses (i), (ii) and (iii) being hereinafter referred to as the "SEC Reports").  As of their respective dates, the SEC Reports did not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.  The financial statements (including any related notes) of Purchaser included in the SEC Reports were prepared in conformity with GAAP applied on a consistent basis, and present fairly the consolidated financial position, results of operations and cash flows of Purchaser and its consolidated subsidiaries as of the date and for the periods indicated.

3.6    Brokers and Finders.  Purchaser has not engaged or authorized any broker, finder, investment banker or other third party to act on behalf of Purchaser, directly or indirectly, as a broker, finder, investment banker or in any other like capacity in connection with this Agreement or the transactions contemplated hereby, or has consented to or acquiesced in anyone so acting, and Purchaser knows of no claim for compensation from any such broker, finder, investment banker or other third party for so acting on behalf of Purchaser or of any basis for such a claim.

3.7    Maxwell Shares.  The shares of Maxwell common stock to be issued and delivered as the Purchase Price pursuant to this Agreement will, on delivery of certificates therefor in accordance with the terms hereof, be duly authorized, fully paid in and nonassessable shares, validly issued and outstanding.  Purchaser is not aware of any facts or circumstances that would prevent it from satisfying its obligation to cause a Registration Statement on Form S-3 to become and remain effective in accordance with the terms of Section 10.3 below.

**EXHIBIT 2**
**PAGE 24**

3.8   No Material Adverse Changes.  Since March 31, 2002, there has not occurred any event, nor has there been the development of any condition, which has had or is reasonably likely to have a material adverse effect on the results of operations, financial condition or business of Purchaser and its subsidiaries.

# SECTION 4

## PRE-CLOSING COVENANTS OF SELLER

4.1   Activities Pending Closing.  Seller hereby agrees, for itself and on behalf of the Company, that from the date hereof to the Closing Date the Company will, except to the extent disclosed in Section 2 or to the extent that Purchaser shall otherwise give its written consent:

(a)     Operate its business (including collection of the accounts receivable and payment of accounts payable) substantially as now operated and only in the ordinary course and, to the extent of and consistent with such operation, use its best efforts to preserve intact its present business organization and preserve its relationships with persons having business dealings with it;

(b)     Maintain all of the assets and properties related to its business in customary repair, order and condition, reasonable wear and tear and damage by unavoidable casualty excepted, and take all steps reasonably necessary to maintain its intangible assets, including, without limitation, its trademarks, trade names, copyrights and patents and any pending applications therefor;

(c)     Maintain its books, accounts and records, in the usual, regular and ordinary manner and consistent with past practice;

(d)     Except for taxes contested in good faith, pay all taxes and other governmental levies and duties upon its properties, business and income as they become due;

(e)     Refrain from disposing of or encumbering any of its properties and assets;

(f)     Maintain insurance upon its business and related assets and properties in respect of the kinds of risks customarily insured against, in accordance with its current practices;

(g)     Not do any act that would cause a breach of or material default under any material contract, commitment or obligation of it;

(h)     Not declare or pay any dividends or declare or make any other distribution, direct or indirect, to Seller or otherwise on account of any shares of its capital stock,

**EXHIBIT 2**
**PAGE 25**

or redeem, retire, purchase or otherwise acquire, directly or indirectly, any shares of Outstanding Stock;

(i)     Not borrow any money, or incur, assume or guaranty or otherwise become directly or indirectly responsible for the payment of any indebtedness or obligation of any officer, director, employee or agent or of any other person (other than the endorsement of negotiable instruments for deposit or collection or any other transactions in the ordinary course of business and consistent with past practice);

(j)     Not pay (in cash or kind) any indebtedness to Seller or any other holder of capital stock or other equity interest of the Company, except for any payment necessary to adjust the intercompany loan to CHF 2,363,000 as set forth in Section 10.1;

(k)     Not amend or modify in a manner materially adverse to the Company, or terminate, any material contract or agreement to which the Company is a party or pursuant to which the Company's assets may be bound;

(l)     Not increase, or commit to increase, the direct or indirect compensation payable or to become payable to its officers or directors, or to any of its employees or Affiliates, whether by amendment or adoption of a health, pension or other employee benefit plan or arrangement or otherwise, or commit to make severance, bonus or special payments to any of such parties, upon a change in ownership or management or upon termination of such parties;

(m)     Upon becoming aware thereof, promptly advise Purchaser in writing of any material adverse change in its condition (financial or otherwise), assets, liabilities, earnings, business or prospects, and provide Purchaser with all current financial data; and

(n)     Promptly advise Purchaser of the commencement or threat of any suit, claim, action or litigation, or any administrative, arbitration or other proceedings or governmental investigations or inquiries.

4.2     _Consents and Approvals; Fulfillment of Conditions._  Seller will use, and will cause the Company to use, its best efforts to (i) obtain all necessary consents and approvals of other persons and governmental and regulatory authorities to the consummation of the transactions contemplated by this Agreement and (ii) perform, comply with and fulfill all obligations, covenants and conditions required by this Agreement to be performed, complied with and fulfilled by them prior to or at the Closing Date.

4.3     _Notice._  Seller will give prompt notice to Purchaser of the occurrence, or failure to occur, of any event of which it has knowledge and which it determines would cause any representation or warranty contained in this Agreement to be untrue or inaccurate in any respect at any time from the date hereof to and including the Closing Date.

**EXHIBIT 2
PAGE 26**

4.4     Access.  Purchaser may, prior to the Closing Date, through its employees, agents and representatives (including accountants and attorneys), make or cause to be made such reasonable investigation as it deems necessary or advisable of the assets, properties and business of the Company, but such investigation shall not affect the representations and warranties of Seller hereunder or the right of Purchaser to terminate this Agreement as provided in Section 8.1(b) hereof.  Seller agrees to permit Purchaser and its employees, agents and representatives to have complete access to the properties, books and records, contracts and other documents of the Company, during regular business hours and at such other times agreeable to the Company and to Purchaser.  Seller shall furnish to Purchaser such financial and operating data and other information with respect to the Company's business as Purchaser shall from time to time reasonably request and shall authorize the key employees and expressly authorized representatives of the Company to discuss the affairs of the Company with the employees, agents and representatives of Purchaser.  Purchaser's representatives shall also be permitted to contact the customers and clients of the Company to discuss their respective businesses, after the responsible employee of the Company has contacted the customer. Purchaser, through its employees, agents and representatives shall keep any information strictly confidential in accordance with the terms of the confidentiality agreement signed on May 8, 2002.

4.5     Publicity.  Seller agrees that a joint press release regarding the transactions contemplated by this Agreement will be issued immediately following the date of this Agreement, the form and content of which shall be subject to the mutual agreement of Seller and Purchaser, and thereafter neither Seller, the Company nor any of their agents or affiliates, shall either directly or indirectly make any press release or other public communication with respect to the transaction contemplated hereby without the prior written consent of Purchaser, which consent will not be unreasonably denied.

## SECTION 5

## PRE-CLOSING COVENANTS OF PURCHASER

5.1     Consents and Approvals; Fulfillment of Conditions.  Purchaser will use its best efforts to (i) obtain all necessary consents and approvals of other persons and governmental and regulatory authorities to the consummation of the transactions contemplated by this Agreement and (ii) perform, comply with and fulfill all obligations, covenants and conditions required by this Agreement to be performed, complied with and fulfilled by it prior to or at the Closing Date.

5.2     Notice.  Purchaser shall give prompt notice to Seller of the occurrence, or failure to occur, of any event of which it has knowledge and which it determines would cause any representation or warranty of Purchaser contained in this Agreement to be untrue or inaccurate in any respect at any time from the date hereof up to the Closing Date.

5.3     Publicity.  Purchaser agrees that a joint press release regarding the transactions contemplated by this Agreement will be issued immediately following the date of this Agreement, the form and content of which shall be subject to the mutual agreement of Seller

**EXHIBIT 2**
**PAGE 27**

and Purchaser, and thereafter neither Purchaser nor any of its agents or affiliates, shall either directly or indirectly make any press release or other public communication with respect to the transaction contemplated hereby without the prior written consent of Seller, which consent will not be unreasonably denied, unless required to be made by applicable law or Nasdaq National Market rule or regulation.

5.4 <u>Access</u>. Seller may, prior to the Closing Date, through its employees, agents and representatives (including accountants and attorneys), make or cause to be made such reasonable investigation as it deems necessary or advisable of the assets, properties and business of Purchaser, but such investigation shall not affect the representations and warranties of Purchaser hereunder or the right of Seller to terminate this Agreement as provided in Section 8.1(c) hereof. Purchaser agrees to permit Seller and its employees, agents and representatives to have complete access to the properties, books and records, contracts and other documents of Purchaser, during regular business hours and at such other times agreeable to the Purchaser and to Seller. Purchaser shall furnish to Seller such financial and operating data and other information with respect to Purchaser's business as Seller shall from time to time reasonably request and shall authorize the key employees and expressly authorized representatives of Purchaser to discuss the affairs of Purchaser with the employees, agents and representatives of Seller.

5.5 <u>Loan at Closing</u>. Purchaser agrees to loan to Seller the sum of U.S. $3 million as a part of the Closing (the "Closing Loan"). The Closing Loan shall be made by wire transfer at least 2 working days prior to the Closing Date and shall be evidenced by Seller's Secured Promissory Note (the "Note") in the form attached to this Agreement as Exhibit A. The Note shall bear simple interest at 6.5% per annum and shall be secured by a pledge under a Stock Pledge Agreement in the form attached as Exhibit B to this Agreement of 225,000 shares out of the total number of shares of Maxwell common stock issued to Seller at the Closing (the "Pledged Stock"). Seller agrees to repay the Closing Loan as set forth under the Note and as provided under Section 10.4 of this Agreement.

## SECTION 6

## CONDITIONS TO CLOSING BY PURCHASER

The obligation of Purchaser to consummate the transactions contemplated by this Agreement on the Closing Date are subject to the satisfaction in all material respects, on or before the Closing Date, of the following conditions (unless waived in writing by Purchaser):

6.1 <u>Accuracy of Representations and Warranties; Performance of Covenants</u>. The representations and warranties of the Seller set forth herein shall be accurate in all material respects on and as of the date hereof and on and as of the Closing Date (as though made on and as of the Closing Date), and the Company and the Seller each shall have, in all material respects, performed all obligations and complied with all covenants required to be performed or to be complied with by them under this Agreement prior to the Closing Date, and Purchaser shall have

**EXHIBIT 2**
**PAGE 28**

received a certificate, dated the Closing Date, signed on behalf of the Company and Seller by a duly authorized officer of each to all such effects.

6.2    Acquired Stock.  Seller shall have validly transferred to Purchaser the Acquired Stock, which shall constitute no less than 99% of the Outstanding Stock, in accordance with the terms and conditions of this Agreement.

6.3    Facility Lease.  Seller shall have caused its subsidiary Montena Properties SA to conclude with the Company a lease in the form attached to this Agreement as Exhibit C for a facility owned by Montena Properties SA and reasonably acceptable to Purchaser under which the Company would consolidate its operations and conduct its business.

6.4    Closing Loan. Seller shall have executed and delivered to Purchaser the Note and Pledge Agreement relating to the Closing Loan.

6.5    No Litigation.  No legal action or other proceedings brought by third parties to restrain or prohibit the consummation of the transactions contemplated by this Agreement or to obtain other relief in connection with this Agreement or the transactions contemplated hereby shall be pending or threatened.

6.6    Adverse Changes.  There shall not have been instituted or threatened any litigation which materially affects the Company, and there shall not have occurred any loss or destruction of any material part of the assets of the Company or any material adverse change in the financial condition, business, prospects or operations of the Company.

6.7    Other Matters.  All corporate and other proceedings and actions taken in connection with the transactions contemplated hereby and all certificates, agreements, instruments and documents referred to in this Section 6 or incident to any such transactions shall be reasonably satisfactory in form and substance to Purchaser.

## SECTION 7

## CONDITIONS TO CLOSING BY SELLER

The obligations of Seller to consummate the transactions contemplated by this Agreement on the Closing Date are subject to the satisfaction in all material respects, on or before the Closing Date, of the following conditions (unless waived in writing by Seller):

7.1    Accuracy of Representations and Warranties; Performance of Covenants by Purchaser.  The representations and warranties of Purchaser set forth herein shall be accurate in all material respects on and as of the date hereof and the Closing Date (as though made on and as of the Closing Date), and Purchaser shall have, in all material respects, performed all obligations and complied with all covenants required to be performed or to be complied with by it under this Agreement prior to the Closing Date, and Seller shall have received a certificate

**EXHIBIT 2**
**PAGE 29**

from Purchaser, dated the Closing Date, signed on behalf of Purchaser by a duly authorized officer to all such effects.

7.2    Purchase Price.  Purchaser shall have given instructions to its transfer agent to issue and deliver to Seller a certificate or certificate for the shares of Maxwell common stock to which Seller is entitled pursuant to Section 1.2, excluding the Pledged Shares. Purchaser shall instruct its transfer agent to deliver a certificate for the Pledged Shares to Purchaser to hold pursuant to the Pledge Agreement.

7.3    Facility Lease.  Seller shall have caused its subsidiary Montena Properties SA to conclude with the Company a lease in the form attached to this Agreement as Exhibit C for a facility owned by Montena Properties SA under which the Company would consolidate its operations and conduct its business.

7.4    Closing Loan.  Seller shall have received the proceeds of the Closing Loan.

7.5    No Litigation.  No legal action or other proceedings brought by third parties to restrain or prohibit the consummation of the transactions contemplated by this Agreement or to obtain other relief in connection with this Agreement or the transactions contemplated hereby shall be pending or threatened

7.6    Adverse Changes.  There shall not have been instituted or threatened any litigation which materially affects Purchaser, and there shall not have occurred any loss or destruction of any material part of the assets of Purchaser or any material adverse change in the financial condition, business, prospects or operations of Purchaser and its subsidiaries, taken as a whole.

7.7    Other Matters.  All corporate and other proceedings and actions taken in connection with the transactions contemplated hereby and all certificates, agreements, instruments and documents referred to in this Section 7 or incident to any transactions shall be reasonably satisfactory in form and substance to Seller.

## SECTION 8

## TERMINATION OF AGREEMENT

8.1    Termination.  This Agreement may be terminated and the transactions contemplated hereunder abandoned at any time prior to the Closing Date, as follows, and in no other manner:

(a)    By written agreement of Purchaser and Seller;

(b)    By Purchaser if (i) at any time Purchaser has reasonable grounds to believe, and does believe, that there has been a material misrepresentation, breach of warranty or

**EXHIBIT 2**
**PAGE 30**

breach of covenant on the part of Seller or the Company in any of the representations, warranties or covenants under this Agreement which breach is not curable, or, if curable, is not cured within 30 days after written notice of such breach is given to Seller; or (ii) any of the conditions set forth in Section 6 hereof shall not have been met in all material respects by June 30, 2002.

       (c)     By Seller if (i) at any time Seller has reasonable grounds to believe, and does believe, that there has been a material misrepresentation, breach of warranty or breach of covenant on the part of Purchaser in any of the representations, warranties or covenants under this Agreement which breach is not curable, or if curable, is not cured within 30 days after written notice of such breach is given to Purchaser, or (ii) any of the conditions set forth in Section 7 hereof shall not have been met in all material respects by June 30, 2002.

       8.2    <u>Effect of Termination</u>. In the event that this Agreement shall be terminated pursuant to Section 8.1, all further obligations of the parties hereto under this Agreement shall terminate without further liability or obligation of either party to the other, including liability for damages.

       8.3    <u>Costs and Expenses</u>. Upon termination of this Agreement, all expenses incurred in connection with the transactions contemplated herein, including but not limited to legal and accounting expenses, shall be borne by the respective party incurring such expenses.

## SECTION 9

## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

       9.1    <u>Survival</u>. The representations and warranties made by the Seller, on the one hand, and by Purchaser, on the other hand, in this Agreement or in any document, certificate, schedule or instrument delivered in connection herewith shall survive the Closing and shall continue in effect for a period of 12 months after the Closing Date, notwithstanding any investigation by or on behalf of Seller or Purchaser.

       9.2    <u>Indemnity by Seller</u>. Seller shall indemnify and hold harmless Purchaser and the Company from and against, and shall reimburse Purchaser or the Company on demand for any loss, liability, damage or expense, including reasonable attorneys' fees and costs of investigation incurred as a result thereof (other than Purchaser's or the Company's administrative costs and expenses) that Purchaser or the Company shall incur or suffer (collectively, "Maxwell's Recoverable Losses"), arising out of or resulting from (i) any material breach or inaccuracy of any representation or warranty of Seller contained in Section 2 hereof or in any document, certificate, schedule or instrument delivered by or on behalf of Seller pursuant hereto; (ii) any default or breach of an agreement or covenant made by Seller under or pursuant to this Agreement; or (iii) any loss, cost, claim, liability or obligation arising out of or relating to the activities of the Company on or prior to the Closing Date that is not disclosed or reflected on the Balance Sheet or otherwise specifically disclosed. Purchaser agrees that for any particular loss coming within this Section 9.2, Seller shall be required to indemnify for such loss only once and only either for the benefit of Purchaser or the Company, but not both. The parties agree that

**EXHIBIT 2**
**PAGE 31**

Seller's indemnity obligation hereunder shall apply when Maxwell's Recoverable Losses exceed, in the aggregate U.S. $100,000 and then only to the extent of such excess.

        9.3    Indemnity by Purchaser. Purchaser shall indemnify and hold harmless Seller from and against, and shall reimburse Seller for any loss, liability, damage or expense, including reasonable attorneys' fees and costs of investigation incurred as a result thereof (other than Seller's administrative costs and expenses) that Seller shall incur or suffer (collectively, "Seller's Recoverable Losses") arising out of or resulting (i) any material breach or inaccuracy of any representation or warranty of Purchaser contained in Section 3 hereof or in any document, certificate, schedule or instrument delivered by or on behalf of Purchaser pursuant hereto; (ii) any default or breach of an agreement or covenant made by Purchaser under or pursuant to this Agreement; or (iii) any loss, cost, claim, liability or obligation arising out of or relating to the activities of the Company after the Closing Date. The parties agree that Purchaser's indemnity obligation hereunder shall apply when Seller's Recoverable Losses exceed, in the aggregate U.S. $100,000 and then only to the extent of such excess.

        9.4    Claims for Indemnification; Disputes

        (a)    Claims for Indemnification. Any party hereto shall give Seller or Purchaser, as the case may be (the "Indemnitor"), written notice (the "Claim Notice") of any claim (including the receipt of any demand) or the commencement of any action with respect to which indemnity may be sought ( the "Claim" or the "Claims). The Claim Notice shall state (i) the aggregate amount of Maxwell's Recoverable Losses or Seller's Recoverable Losses (in either case, "Recoverable Losses") as to which indemnification is being sought (which amount may be estimated and updated from time to time), (ii) the components of the amount of Recoverable Losses for which indemnification is being sought (which components may be estimated and updated from time to time); and (iii) the specific grounds upon which the Claim for indemnification is being made. The right to indemnification for a Claim shall be deemed to be accepted by the Indemnitor unless, within 30 days after the Indemnitor's receipt of the Claim Notice, the Indemnitor shall notify the claimant in writing that it objects to the right to indemnification with respect to the Claim.

        (b)    Resolution of Disputes. The parties shall undertake in good faith to or to have their representatives promptly meet and attempt to resolve all disputes regarding indemnification. If the parties are unable to resolve such disputes within 20 days, the resolution of the disputes shall be referred to and settled by arbitration to be held in San Diego, California and conducted in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. Judgment upon the award may be entered in any court of competent jurisdiction or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be. The successful or prevailing party or parties shall be entitled to recover all attorneys' fees, expert witness fees and other costs incurred in such action, in addition to any other relief to which it or they may be entitled.

**EXHIBIT 2**
**PAGE 32**

## SECTION 10

## POST-CLOSING COVENANTS

10.1    Intercompany Loan. On the Closing Date Purchaser shall provide by wire transfer an intercompany loan to the Company of U.S. $1 million and shall cause the Company within seven days of the Closing Date to use the full proceeds of that loan to pay a portion of the existing indebtedness of the Company to Seller which as of the Closing Date will amount to CHF 2,363,000. The remaining balance of such indebtedness of the Company to Seller (hereinafter referred to as "Seller Indebtedness") shall be considered due and owing only at the times and to the extent provided in Section 10.2 below.

10.2    PEC Cash Proceeds. The Company has sold its PEC (power capacitor) business to EPCOS for a series of cash installments consisting of 500,000 Euros due in April 2002, 700,000 Euros due in August 2002 and 300,000 Euros due in October 2002. Such installment payments are hereinafter collectively referred to as the "PEC Installment Payments". The Company remains liable for certain liabilities relating to the PEC business, including without limitation social obligations to former employees, obligations under long-term purchase contracts and product warranties and obligations to refrain from engaging in a competitive activity in the PEC business (power capacitor business) (hereinafter, the "PEC Liabilities"). The Company retained and did not sell to EPCOS its PEC inventories and PEC production machinery, which the Company is holding for future sales to third parties. The proceeds from the sale of the PEC inventories and PEC production machinery are hereinafter referred to collectively as the "PEC Additional Proceeds". Purchaser agrees to cause the Company to pay to Seller the following amounts:

(a) on August 31, 2002, the Company will pay to Seller the excess of (i) 1,200,000 Euros plus any PEC Additional Proceeds received on or prior to that date, over (ii) PEC Liabilities paid or accrued as of that date;

(b) on March 31, 2003, the Company will pay to Seller the excess of (i) 300,000 Euros plus any PEC Additional Proceeds received after August 31, 2002 and on or before March 31, 2003, over (ii) PEC Liabilities paid or accrued after August 31, 2002 and on or before March 31, 2002.

The above payments shall first be credited to the repayment of Seller Indebtedness, and to the extent that such payments exceed Seller Indebtedness, they shall be considered an addition to the Purchase Price and shall be paid to Seller to the extent of the appropriate portion thereof pursuant to Section 1.2 hereof. In the event that the PEC Installment Payments are delayed or not paid by EPCOS, the obligation of the Company under clauses (a) and (b) above shall be proportionately delayed or excused. In the event that the above payments do not fully repay Seller Indebtedness, Seller agrees that any remaining balance of such indebtedness shall be canceled and forgiven. If the sum of the PEC Installment Payments and PEC Additional Proceeds is not sufficient to discharge all of the PEC Liabilities, Seller agrees that, in addition to

**EXHIBIT 2**
**PAGE 33**

canceling and forgiving the remaining balance of Seller Indebtedness and notwithstanding any limitations under Section 9.2 above, it shall remain liable for and shall indemnify Purchaser against any remaining PEC Liabilities.

10.3  Registration of Maxwell Shares.  Within 10 days following the Closing Date, Purchaser shall file a registration statement for the resale of the Maxwell common stock received at Closing by Seller as a part of the Purchase Price.  Seller agrees to cooperate in the preparation and filing of such registration statement, including providing required information concerning the shares owned and to be sold by Seller.  Purchaser shall use its best efforts to cause such registration statement to become effective as soon as possible, and upon a declaration of effectiveness by the SEC, Purchaser will use its best efforts to keep such registration statement effective for one year from the Closing Date.  Seller understands and acknowledges that there may be periods following the effectiveness of such registration statement in which Purchaser is required to suspend any use of the prospectus under the registration statement and any sales thereunder into the market until the information disclosed under such prospectus or incorporated by reference into such prospectus is corrected or updated.  After expiration of one year from the Closing Date, Seller understands that it may sell into the public market up to a number of shares per 90-day period equal to 1% of Purchaser's total outstanding shares, and following another year thereafter, Seller may sell such stock into the public market without restriction.

10.4  Repayment of the Closing Loan.  Seller hereby agrees that, promptly upon the effectiveness of the S-3 registration statement described in Section 10.3 of this Agreement, it shall diligently seek to sell in the public trading market 225,000 shares of Maxwell common stock within a period of 90 days at a price of at least $13.35 per share.  Seller agrees not to sell such stock at less than $13.35 per share without the prior consent of Purchaser.  If Seller desires to sell at a price lower than $13.35 per share and Purchaser does not give its consent, Seller may proceed with such sale but the proceeds will not be applied to the Closing Loan and no shares will be released from the Pledge Agreement.  Seller further agrees that it will not distribute to its or the Company's shareholders more than 250,000 shares of the Purchaser received as part of the Purchase Price until such time as the Closing Loan is repaid in full.  The intention of this provision and the rest of this Section 10.4 is to require Seller to repay the Closing Loan in full from the sale of up to 225,000 shares of Maxwell common stock before any shares are sold at a price below $13.35 per share (unless Purchaser consents) and before more than 250,000 shares of Maxwell common stock are distributed by Seller to its or the Company's shareholders.

Purchaser and Seller each agree to cooperate with the other in order to facilitate the sale of such stock within the 90-day period at the maximum price possible with the minimum adverse impact on the trading price of such stock.  Seller shall notify Purchaser immediately after any sale of stock and shall regularly provide information on the number of shares sold and the selling price.  At the end of each 30-day period within said 90-day period, Seller shall provide a written summary of the stock sales that occurred in that 30-day period that are creditable toward payment of the Closing Loan, including a total of the proceeds received by Seller, and such proceeds shall be paid to Purchaser as an installment payment of the principal and accrued interest on the Note.  At the time of each such installment payment, Purchaser shall release and return to Seller from the Pledged Stock a number of shares equal to the number of shared sold by

EXHIBIT 2
PAGE 34

Seller in such 30-day period. The due date of the Note shall correspond to the end of said 90-day period, and if at that time, Seller has not sold a total of 225,000 shares that are applied to the Note, the due date of the Note shall be extended for 30 days. The Note shall only be extended for one 30-day period if said 225,000 shares have not been sold, and the term for the Note shall not be extended beyond a total of 120 days from the effective date of the S-3 registration statement. If, during the term of the Note, sales of Maxwell common stock by Seller result in either (i) payment of the total principal and accrued interest due under the Note, or (ii) the sale of a total 225,000 shares of Maxwell common stock that are applied to the Note, then the Note shall at that time be considered satisfied and paid in full and the Pledged Stock shall be released to Seller. Any portion of the principal or accrued interest not yet paid if clause (ii) applies shall be forgiven. In the event that neither clause (i) nor (ii) has occurred within the term of the Note (as extended), then Purchaser and Seller agree that Purchaser shall retain any shares of the Pledged Stock not yet released in full satisfaction of any remaining obligations of Seller under the Note.

10.5 <u>Use of Montena Name</u>. Seller agrees that the Company may, following the Closing, continue to use the name "Montena Components SA" in association with the lines of business being pursued by the Company as of the Closing Date. The right of the Company to such use shall continue indefinitely and extend to all countries of the world.

10.6 <u>Maxwell Board Seat</u>. As soon as practicable following the Closing, Purchaser agrees to appoint a representative of Seller to the Board of Directors of Purchaser and shall nominate and recommend to the stockholders the election of such nominee, or a replacement reasonably acceptable to Purchaser, to the Board of Directors at each subsequent annual meeting during the time which Seller continues to hold at least 1,000,000 Maxwell common stock received as the Purchase Price hereunder.

10.7 <u>Matran Facility</u>. Seller agrees that the portion of the Company's operations now located at the Matran facility (known as the Metar group) may continue its occupancy in the same manner as currently exists for no rent or other occupancy charge until the earlier of (i) March 31, 2003, or (ii) the closing of a sale of the Matran facility by Seller.

10.8 <u>Board of Directors of the Company</u>. As soon as practicable following the Closing, Seller agrees to arrange for the resignation of all members of the Company's Board of Directors from the Board except for Martin Schutt. Upon those resignations, Purchaser shall appoint two new members of such Board, who are anticipated to be Carl Eibl and Hannes Berchtold. Purchaser shall give full release to all members of the Company Board for their activities performed during the financial year 2001/02.

**EXHIBIT 2**
**PAGE 35**

## SECTION 11

## GENERAL PROVISIONS

11.1    Entire Agreement; Modifications; Waiver. This Agreement and the agreements contemplated hereunder supersede any and all agreements heretofore made, written or oral, relating to the subject matter hereof, and constitute the entire agreement of the parties relating to the subject matter hereof. This Agreement may be amended only by an instrument in writing signed by Purchaser and Seller. Inspection of documents or the receipt of information pursuant to this Agreement shall not constitute a waiver of any representation, warranty, covenant or condition hereunder. No waiver shall be binding unless executed in writing by the party making such waiver.

11.2    Severability. If any clause or provision of this Agreement shall be held invalid or unenforceable by the final determination of a court of competent jurisdiction, and all appeals therefrom shall have failed or the time for such appeals shall have expired, such clause or provision shall be deemed eliminated from this Agreement but the remaining provisions shall nevertheless be given full force and effect.

11.3    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto, and their respective successors. The rights and obligations under this Agreement are not assignable or transferable by either side without the prior written consent of the other side.

11.4    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

11.5    Governing Law. This Agreement shall be construed and interpreted in accordance with the internal substantive laws of the State of California.

11.6    Notices. All notices required or desired to be given hereunder shall be given in writing and signed by the party so giving notice, and shall be effective when personally delivered or delivered by courier, one business day after transmission if sent by facsimile and appropriate confirmation is received, or ten (10) days after being sent by certified or registered mail, return receipt requested, first class postage and fees prepaid, addressed as set forth below. Any party from time to time may change such party's address for giving notice by giving notice thereof in the manner outlined above:

**EXHIBIT 2**
**PAGE 36**

If to Purchaser:

      Maxwell Technologies, Inc.
      8888 Balboa Avenue
      San Diego, California 92123
      Attention: Donald M. Roberts
      Facsimile: (858) 277-6754

If to Seller:

      Montena SA
      Ch de la Cornache 1
      CH-1753 Matran
      Switzerland
      Attention: Jose Cortes
      Facsimile: (++41) 026 407 36 39

With copy to:

      Cortes & Grossenbacher
      Herzogstrasse 14
      CH-8044 Zurich
      Switzerland
      Attention: Jose Cortes
      Facsimile: (++41) 01 254 90 81

      11.7    Expenses.  Whether or not the transactions contemplated under this Agreement are consummated, each of Seller and Purchaser (and not the Company) shall pay its own expenses (including outside legal and accounting fees) incident to the negotiation, preparation of the definitive written agreement, filings and preparation of documents in connection with the issuance or transfer of shares, and any other documents prepared in connection with this Agreement.  Seller agrees that it shall not use any assets of the Company or otherwise charge the Company for any expenses of Seller hereunder.

      11.8    Recovery of Enforcement Costs.  If any legal action or arbitration or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of the Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled

**EXHIBIT 2**
**PAGE 37**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MONTENA SA

By: _____

Name: Martin Schütt

Title: Member BOD

Corbos Joe L

chairman of the board

"Seller"

MAXWELL TECHNOLOGIES, INC.

By: _____

Name: C J / E.31

Title: CEO

"Purchaser"

**EXHIBIT 2**
**PAGE 38**

Exhibit A

**SECURED
PROMISSORY NOTE**

$3,000,000 U.S.
June __, 2002                                   San Diego, California

FOR VALUE RECEIVED, the undersigned, Montena SA, a corporation organized under the laws of Switzerland, ("Maker") hereby promises to pay to the order of Maxwell Technologies, Inc., a Delaware corporation, ("Holder") at its offices located at 8888 Balboa Avenue, San Diego, California 92123, or such other place as Holder may designate in writing from time to time, the principal sum of Three Million Dollars, U.S., ($3,000,000) plus accrued interest, on the terms and conditions of this Promissory Note ("Note"). Interest shall accrue under this Note at the rate of 6.5% per annum, and accrued interest shall be paid with each installment payment of principal

This Note evidences the Closing Loan as defined in Section 5.5 of that certain Stock Purchase and Barter Agreement dated the date of this Note between Maker and Holder (the "Stock Purchase Agreement"). Maker's repayment obligation under this Note is secured by a pledge of 225,000 shares of Holder common stock (the "Pledged Shares") under that certain Stock Pledge Agreement dated the date of this Note between Maker and Holder (the "Stock Pledge Agreement").

The repayment of principal and accrued interest under this Note shall be coordinated with the sale into the public trading market of shares of Holder common stock issued to Maker at the closing of the Stock Purchase Agreement. Pursuant to the Stock Purchase Agreement, Holder has committed to register resales of Holder common stock issued to Maker under the Stock Purchase Agreement on a registration statement on Form S-3 to be filed and effective as soon as possible after the date hereof. Maker has committed to sell up to 225,000 shares of Holder common stock within 90 days of the effective date of such registration statement (the "Resale Effective Date") and to use the proceeds of such sales to pay the principal and interest under this Note.

Accordingly, Maker shall make installment payments within 10 working days following each successive 30-day period during the term of this Note. Such installment payments shall be in the amount of the net proceeds of sales of Holder common stock made by Maker during such 30-day period, including sales at a per-share price less than $13.35, which are agreed by Purchaser to be subject to such installment payment treatment. Upon such an installment payment, Holder shall release from the Stock Pledge Agreement a number of Pledged Shares equal to the number of shares of Holder common stock sold in connection with such installment payment. Each such installment payment shall first be applied to accrued interest hereunder and

**EXHIBIT 2
PAGE 39**

then to unpaid principal. This Note shall be considered fully paid and satisfied upon the payment through said installments of the entire unpaid principal and accrued interest hereunder or the sale by Maker of a total of 225,000 shares of Holder common stock. If (i) a total of 225,000 shares of Holder common stock applicable to installment payments hereunder has not been sold by the date that is 90 days following the Resale Effective Date, and (ii) the total of accrued interest and principal under this Note has not been repaid by such date, the term of this Note shall be extended for an additional 30 days. If neither event in clause (i) or (ii) above shall have occurred by the expiration of a 120-day period from the Resale Effective Date, then Maker agrees that Holder shall transfer back to itself any Pledged Shares then remaining under the Stock Pledge Agreement, and Holder agrees that any remaining balance of principal and accrued interest shall, upon such transfer back, be considered fully paid and satisfied and this Note considered paid in full.

In the event of default of Maker in the timely payment of any amount hereunder or the occurrence of an Event of Default as defined in the Pledge Agreement, the entire unpaid balance of principal and accrued interest under this Note shall be immediately due and payable, together with costs of collection, including, but not limited to, reasonable attorneys' fees, costs and expenses. Maker waives presentment; demand; notice of dishonor; notice of default or delinquency; notice of acceleration; notice of protest and non-payment; notice of costs, expenses, or losses and interest; and diligence in taking any action to collect any sums owing under this Note. Any principal or interest not paid when due shall bear a default rate of interest at the maximum rate permitted by applicable law.

The Maker shall at any time be permitted to prepay, without penalty or charge, all or any portion of the amount due under this Note.

This Note is made in the State of California, U.S.A. and it is mutually agreed that California law shall apply to the interpretation of the terms and conditions of this Note.

IN WITNESS WHEREOF, this Note is executed the above date first written.

Montena SA

By _M. Clat_____

**EXHIBIT 2**
**PAGE 40**

Exhibit B

# STOCK PLEDGE AGREEMENT

THIS STOCK PLEDGE AGREEMENT (this "Pledge Agreement") is made as of June __, 2002, between Montena SA, a corporation organized under the laws of Switzerland, as pledgor ("Pledgor"), and Maxwell Technologies, Inc., a Delaware corporation, as pledgee ("Pledgee").

R E C I T A L S:

A.     Pledgor is the beneficial owner of Two Hundred Twenty-Five Thousand (225,000) shares (the "Shares") of common stock, $0.10 par value per share of Pledgee.

B.     Pursuant to the terms of that certain Secured Promissory Note in the amount of $3,000,000 U.S. of even date herewith delivered by Pledgor to Pledgee (the "Note"), Pledgor has agreed to make payments of principal and interest to Pledgee as provided in the Note.

C.     Pursuant to the terms of the Note, Pledgor is required to execute this Pledge Agreement to secure payment in full of all obligations under the Note, whether for principal, interest, fees, expenses or otherwise and to ensure compliance with the terms and conditions of this Pledge Agreement.

A G R E E M E N T:

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the parties hereto agree as follows:

1.     Grant of Security Interest in the Shares.  Pledgor hereby grants to Pledgee a security interest in the Shares, pledges and hypothecates the Shares to Pledgee, and deposits the certificates evidencing the Shares (the "Certificates") with Pledgee as collateral security for the payment by Pledgor of all obligations existing under the Note, whether for principal, interest, fees, expenses or otherwise, and the satisfaction of all obligations of Pledgor under this Pledge Agreement.  The Certificates, together with one or more stock assignments duly executed in blank with signatures appropriately guaranteed or witnessed, are being delivered herewith to Pledgee, to be retained by Pledgee as the pledgeholder for the Shares.

2.     Representation and Warranty of Pledgor.  Pledgor represents and warrants to Pledgee that the Shares are free and clear of all claims, mortgages, pledges, liens and other

**EXHIBIT 2**
**PAGE 41**

encumbrances of any nature whatsoever, except the liens and restrictions set forth herein and in the Note.

3.  Voting of Shares.  So long as there shall exist no Event of Default (as hereinafter defined), Pledgor shall be entitled to exercise, as Pledgor deems proper but in a manner not inconsistent with the terms hereof, Pledgor's rights to voting power with respect to the Shares.  Pledgee, and not Pledgor, shall be entitled to vote the Shares at any time that there exists an Event of Default.

4.  Dividends.  So long as there shall exist no Event of Default, Pledgor shall be entitled to receive any dividend (ordinary or extraordinary, whether paid in cash, stock or property) or other distribution with respect to the Shares.  If there exists an Event of Default, such dividend or other distribution shall be delivered to Pledgee to be held as additional collateral security under this Pledge Agreement.

5.  Pledgee's Duties.  So long as Pledgee exercises reasonable care with respect to the Shares in its possession, Pledgee shall have no liability for any loss or damage to such Shares, and in no event shall Pledgee have liability for any diminution in value of the Shares occasioned by economic or market conditions or events.  Pledgee shall be deemed to have exercised reasonable care within the meaning of the preceding sentence if the Shares in its possession are accorded treatment substantially equal to that which Pledgee accords its own property.

6.  Partial Release of Shares.   The Note provides for installment payments of the indebtedness thereunder based on sales of shares of Pledgee common stock held by Pledgor other than the Shares.  Upon the making of each installment payment under the Note, Pledgee agrees to release and deliver back to Pledgor, free and clear of the security interest created by this Pledge Agreement, that number of the Shares that equals the number of other such shares sold by Pledgee in connection with such installment payment.

7.  Foreclosure and Sale of Collateral.  Upon the occurrence of any Event of Default, Pledgee may, without notice, except as specified below, at its option, sell all or any part of the Shares, for cash, note or other property upon credit for future delivery or upon such other terms as Pledgee may deem commercially reasonable.  Upon such sale, Pledgee, unless prohibited by a provision of any applicable statute, may purchase all or any part of the Shares being sold, free from and discharged of all trusts, claims, rights of redemption and equities of Pledgor.  If, at any time when Pledgee shall determine to exercise its rights to sell all or any part of the Shares pursuant to this Section 7, such Shares, or the part thereof to be sold, shall not be effectively registered under the Act as then in effect or any similar statute then in force, subject to the provisions of Section 8 hereof, Pledgee, in its sole and absolute discretion, is hereby expressly authorized to sell such Shares, or any part thereof, by private sale in such manner and under such circumstances as Pledgee may deem necessary or advisable in order that such sale may be effectuated legally without such registration or the Pledgee may undertake, in its sole and absolute discretion, to register the Shares under the Act in order to sell such Shares in a public offering, the costs of such registration to be for the account of the Pledgor.

31.

EXHIBIT 2
PAGE 42

8. Redemption of Collateral. Notwithstanding any other provision of this Pledge Agreement, upon the occurrence of an Event of Default, Pledgee shall give Pledgor written notice of the time and place of any public sale or of the time on or after which any private sale or other Transfer is to be made at least ten (10) days before the date fixed for any public sale or before the day on or after which any private sale or other Transfer is to be made. Pledgor agrees that, to the extent notice of sale shall be required by law, such ten (10) days' notice shall constitute reasonable notification. This notice shall also specify the aggregate outstanding monetary obligations of the Pledgor to Pledgee at the date of such notice (the "Total Obligation"). At any time during such five-day period, Pledgor shall have the right to redeem the Shares by the payment by certified or bank cashier's check of an amount equal to the Total Obligation.

9. Events of Default. Any breach of or default under the payment provisions of the Note by Pledgee shall be considered an Event of Default for purposes hereof and shall entitle Pledgor to pursue its remedies hereunder and under the Note.

10. Termination and Release or Retention of Shares. This Pledge Agreement shall terminate and all remaining Shares held hereunder shall be released from the pledge under this Pledge Agreement and delivered to Pledgor upon the first to occur of the following events during the term of the Note: (i) the payment of all unpaid principal and accrued interest under the Note, or (ii) the sale by Pledgee of a total of 225,000 shares of Pledgor common stock following the date hereof. If neither such event occurs during the term of the Note, then Pledgee shall retain the balance of the Shares then still held hereunder and not already released under Section 6 above in full satisfaction of the remaining unpaid principal and accrued interest under the Note. In such event, Pledgor agrees to sign and deliver such stock power or other instruments as may be necessary to vest in Pledgee title to such Shares, and Pledgee agrees to cancel the Note and any further obligations Pledgor may have under the Note.

11. Cumulation of Remedies; Waiver of Rights. The remedies provided herein in favor of Pledgee shall not be deemed exclusive but shall be cumulative and shall be in addition to all of the remedies in favor of Pledgee existing at law or in equity. No delay on the part of Pledgee in exercising any of its options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof.

12. Execution of Endorsements, Assignments, Etc. Upon the occurrence of an Event of Default, Pledgee shall have the right for and in the name, place and stead of Pledgor to execute endorsements, assignments or other instruments of conveyance or transfer with respect to all or any of the Shares and any other shares of the capital stock of Pledgee or other property which is held by Pledgee as collateral security pursuant to this Pledge Agreement.

13. Miscellaneous.

(a) Further Assurances; Changes in Capitalization. Each party hereto agrees to perform any further acts and execute and deliver any documents which may be

32.

**EXHIBIT 2**
**PAGE 43**

reasonably necessary to carry out the intent of this Pledge Agreement. The provisions of this Pledge Agreement shall apply to any and all stock or other securities of the Pledgee or any successor or assign of the Pledgee, which may be issued in respect of, in exchange for or in substitution of, the Shares by reason of any split, reverse split, recapitalization, reclassification, combination, merger, consolidation or otherwise, and such Shares or other securities shall be encompassed within the term "Shares" for purposes of this Pledge Agreement and the Pledgee shall have a security interest in all such securities on the same terms set forth in this Pledge Agreement.

> (b)    Notice.  Except as otherwise provided herein, all notices, requests, demands and other communications under this Agreement shall be in writing, and if by fax, shall be deemed to have been validly served, given or delivered when sent, or if by personal delivery or messenger or courier service, or by registered or certified mail, shall be deemed to have been validly served, given or delivered upon actual delivery, at the following addresses, telephone and facsimile numbers (or such other address(es), telephone and facsimile numbers a party may designate for itself by like notice):

> If to Pledgee:

> > Maxwell Technologies, Inc.
> > 8888 Balboa Avenue
> > San Diego, California  92123
> > Attention:   Donald M. Roberts, Esq.
> > Fax:    (858) 277-6754

> If to Pledgor:

> > Montena SA
> > Ch. De la Cornache 1
> > CH-1753 Matran, Switzerland
> > Attention:  Jose Cortes
> > Fax: (++41) 026 407 36 39

> With copy to:

> > Cortes & Grossenbacher
> > Herzogstrasse 14
> > CH-8044 Zurich
> > Switzerland
> > Attention: Jose Cortes
> > Fax: (++41) 01 254 90 81

33.

**EXHIBIT 2**
**PAGE 44**

(c)     Amendments.  This Pledge Agreement may be amended only by a written agreement executed by the parties hereto.

(d)     Governing Law.  This Pledge Agreement shall be governed by and construed in accordance with the laws of the State of California.

(e)     Disputes.  In the event of any dispute between the parties arising out of this Pledge Agreement, the prevailing party shall be entitled to recover from the nonprevailing party the reasonable expenses of the prevailing party including, without limitation, reasonable attorneys' fees.

(f)     Entire Agreement.  This Pledge Agreement constitutes the entire agreement and understanding among the parties pertaining to the subject matter hereof and supersedes any and all prior agreements, whether written or oral, relating hereto.

(g)     Successors and Assigns.  The rights and obligations under this Agreement are not assignable or transferable by either side without the prior written consent of the other side.

(h)     Headings.  Introductory headings at the beginning of each section and subsection of this Pledge Agreement are solely for the convenience of the parties and shall not be deemed to be a limitation upon or description of the contents of any such section and subsection of this Pledge Agreement.

(i)     Counterparts.  This Agreement may be executed in two counterparts, each of which shall be deemed an original and both of which, when taken together, shall constitute one and the same Pledge Agreement.

34.

**EXHIBIT 2**
**PAGE 45**

IN WITNESS WHEREOF, the parties hereto have duly executed this Pledge
Agreement as of the day and year first above written.

PLEDGEE:

MAXWELL TECHNOLOGIES, INC.
a Delaware corporation


By: _____

Title: _____


PLEDGOR:

MONTENA SA

By _____

Title: _____

**EXHIBIT 2**
**PAGE 46**

# AMENDMENT NUMBER ONE
## TO
## STOCK PURCHASE AND BARTER AGREEMENT'
## BY AND BETWEEN

## MAXWELL TECHNOLOGIES, INC.
## AND
## MONTENA SA

This Amendment Number One, dated as of the 28th day of June 2002 ("Amendment"), is entered into by and between Maxwell Technologies, Inc., a Delaware corporation ("Purchaser"), and Montena SA, a corporation governed by the laws of Switzerland ("Seller"), and amends that certain Stock Purchase and Barter Agreement, dated May 30, 2002 ("Agreement"), by and between Purchaser and Seller. Capitalized terms used in this Amendment but not defined herein shall bear the meanings provided in the Agreement.

## RECITALS

A.    Purchaser and Seller have entered into the Agreement providing for the purchase by Purchaser of the outstanding shares of Montena Components Ltd., a corporation governed by the laws of Switzerland ("Company"), held by Seller.

B.    Purchaser and Seller desire to amend certain provisions of the Agreement as set forth in this Amendment.

## AMENDMENTS

1.    Section 1.2 "Purchase Price" of the Agreement is hereby amended to change the number of shares of common stock of Purchaser in the second line of said section that will constitute the Purchase Price from the number "2,475,000" to the number "2,550,000".

2.    Section 1.3 "Closing" of the Agreement is hereby amended to change the date of Closing in the second line of said section from "June 30, 2002" to "July 5, 2002".

3.    A new Section 1.4 "Value Support" is hereby added to the Agreement as follows:

"1.4 Value Support. Provided that the Company achieves total sales in excess of $20M for the twelve-month period ended June 30, 2003, Purchaser will provide the following share value support to Seller:

To the extent that each share of Purchaser stock issued as part of the Purchase Price (plus any stock of Purchaser's subsidiary, PurePulse Technologies, Inc., subsequently received as a distribution with respect to Purchaser stock) held by Seller on September 1, 2003 has a market value (based on the average 30 trading-day closing price ending on September 1, 2003 - the "30 Day Measurement Price") of less than $9 per share, then Purchaser will issue to Seller such number of additional Purchaser shares (based on the 30 Day Measurement Price) equal, in total

**EXHIBIT 2**
**PAGE 47**

value, to (i) the difference between $9 and the 30 Day Measurement Price multiplied by (ii) such number of shares held by Seller on September 1, 2003; provided, however, that such adjustment will in no event be greater than 500,000 shares."

4.      Section 5.5 "Loan at Closing" of the Agreement is hereby amended to change the number of shares of Purchaser in the sixth line of said section that will constitute Pledged Shares from the number "225,000" to the number "300,000".

5.      Section 10.4 "Repayment of the Closing Loan" of the Agreement is hereby amended in the following two respects:  (i) each time the number "225,000" appears relating to the number of shares of Purchaser common stock to be sold in connection with the repayment of the Closing Loan, such number shall be changed to the number "300,000"; and (ii) each time the amount "$13.35 per share" appears relating to the minimum price at which such shares may be sold and the proceeds applied to the Closing Loan without the consent of Purchaser, such amount shall be changed to the amount "$10.00 per share".

6.      Exhibits "A" and "B" to the Agreement are hereby amended in their entirety to read as set forth as Exhibits "A" and "B" to this Amendment.

7.      Except as specifically set forth in this Amendment, each and every term, condition and provision of the Agreement remains unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

MONTENA SA

By: _____
    Name: Cortes
    Title: Chairman

By: _____
    Name: H. Bachtold
    Title: CFO

"Seller"

MAXWELL TECHNOLOGIES, INC.

By: _____
    Name: C J Eisl
    Title: CEO

"Purchaser"

**EXHIBIT 2
PAGE 48**

EXHIBIT B

## STOCK PLEDGE AGREEMENT

THIS STOCK PLEDGE AGREEMENT (this "Pledge Agreement") is made as of July **5**, 2002, between Montena SA, a corporation organized under the laws of Switzerland, as pledgor ("Pledgor"), and Maxwell Technologies, Inc., a Delaware corporation, as pledgee ("Pledgee").

R E C I T A L S:

A.     Pledgor is the beneficial owner of Three Hundred Thousand (300,000) shares (the "Shares") of common stock, $0.10 par value per share of Pledgee.

B.     Pursuant to the terms of that certain Secured Promissory Note in the amount of $3,000,000 U.S. of even date herewith delivered by Pledgor to Pledgee (the "Note"), Pledgor has agreed to make payments of principal and interest to Pledgee as provided in the Note.

C.     Pursuant to the terms of the Note, Pledgor is required to execute this Pledge Agreement to secure payment in full of all obligations under the Note, whether for principal, interest, fees, expenses or otherwise and to ensure compliance with the terms and conditions of this Pledge Agreement.

A G R E E M E N T:

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the parties hereto agree as follows:

1.     <u>Grant of Security Interest in the Shares</u>.  Pledgor hereby grants to Pledgee a security interest in the Shares, pledges and hypothecates the Shares to Pledgee, and deposits the certificates evidencing the Shares (the "Certificates") with Pledgee as collateral security for the payment by Pledgor of all obligations existing under the Note, whether for principal, interest, fees, expenses or otherwise, and the satisfaction of all obligations of Pledgor under this Pledge Agreement.  The Certificates, together with one or more stock assignments duly executed in blank with signatures appropriately guaranteed or witnessed, are being delivered herewith to Pledgee, to be retained by Pledgee as the pledgeholder for the Shares.

**EXHIBIT 2**
**PAGE 49**

2.    Representation and Warranty of Pledgor. Pledgor represents and warrants to Pledgee that the Shares are free and clear of all claims, mortgages, pledges, liens and other encumbrances of any nature whatsoever, except the liens and restrictions set forth herein and in the Note.

3.    Voting of Shares. So long as there shall exist no Event of Default (as hereinafter defined), Pledgor shall be entitled to exercise, as Pledgor deems proper but in a manner not inconsistent with the terms hereof, Pledgor's rights to voting power with respect to the Shares. Pledgee, and not Pledgor, shall be entitled to vote the Shares at any time that there exists an Event of Default.

4.    Dividends. So long as there shall exist no Event of Default, Pledgor shall be entitled to receive any dividend (ordinary or extraordinary, whether paid in cash, stock or property) or other distribution with respect to the Shares. If there exists an Event of Default, such dividend or other distribution shall be delivered to Pledgee to be held as additional collateral security under this Pledge Agreement.

5.    Pledgee's Duties. So long as Pledgee exercises reasonable care with respect to the Shares in its possession, Pledgee shall have no liability for any loss or damage to such Shares, and in no event shall Pledgee have liability for any diminution in value of the Shares occasioned by economic or market conditions or events. Pledgee shall be deemed to have exercised reasonable care within the meaning of the preceding sentence if the Shares in its possession are accorded treatment substantially equal to that which Pledgee accords its own property.

6.    Partial Release of Shares.   The Note provides for installment payments of the indebtedness thereunder based on sales of shares of Pledgee common stock held by Pledgor other than the Shares. Upon the making of each installment payment under the Note, Pledgee agrees to release and deliver back to Pledgor, free and clear of the security interest created by this Pledge Agreement, that number of the Shares that equals the number of other such shares sold by Pledgee in connection with such installment payment.

7.    Foreclosure and Sale of Collateral. Upon the occurrence of any Event of Default, Pledgee may, without notice, except as specified below, at its option, sell all or any part of the Shares, for cash, note or other property upon credit for future delivery or upon such other terms as Pledgee may deem commercially reasonable. Upon such sale, Pledgee, unless prohibited by a provision of any applicable statute, may purchase all or any part of the Shares being sold, free from and discharged of all trusts, claims, rights of redemption and equities of Pledgor. If, at any time when Pledgee shall determine to exercise its rights to sell all or any part of the Shares pursuant to this Section 7, such Shares, or the part thereof to be sold, shall not be effectively registered under the Act then in effect or any similar statute then in force, subject to the provisions of Section 8 hereof, Pledgee, in its sole and absolute discretion, is hereby expressly authorized to sell such Shares, or any part thereof, by private sale in such manner and

2.

EXHIBIT 2
PAGE 50

under such circumstances as Pledgee may deem necessary or advisable in order that such sale may be effectuated legally without such registration or the Pledgee may undertake, in its sole and absolute discretion, to register the Shares under the Act in order to sell such Shares in a public offering, the costs of such registration to be for the account of the Pledgor.

8.  Redemption of Collateral.  Notwithstanding any other provision of this Pledge Agreement, upon the occurrence of an Event of Default, Pledgee shall give Pledgor written notice of the time and place of any public sale or of the time on or after which any private sale or other Transfer is to be made at least ten (10) days before the date fixed for any public sale or before the day on or after which any private sale or other Transfer is to be made.  Pledgor agrees that, to the extent notice of sale shall be required by law, such ten (10) days' notice shall constitute reasonable notification.  This notice shall also specify the aggregate outstanding monetary obligations of the Pledgor to Pledgee at the date of such notice (the "Total Obligation").  At any time during such five-day period, Pledgor shall have the right to redeem the Shares by the payment by certified or bank cashier's check of an amount equal to the Total Obligation.

9.  Events of Default.  Any breach of or default under the payment provisions of the Note by Pledgee shall be considered an Event of Default for purposes hereof and shall entitle Pledgor to pursue its remedies hereunder and under the Note.

10.  Termination and Release or Retention of Shares.  This Pledge Agreement shall terminate and all remaining Shares held hereunder shall be released from the pledge under this Pledge Agreement and delivered to Pledgor upon the first to occur of the following events during the term of the Note: (i) the payment of all unpaid principal and accrued interest under the Note, or (ii) the sale by Pledgee of a total of 300,000 shares of Pledgor common stock following the date hereof.  If neither such event occurs during the term of the Note, then Pledgee shall retain the balance of the Shares then still held hereunder and not already released under Section 6 above in full satisfaction of the remaining unpaid principal and accrued interest under the Note.  In such event, Pledgor agrees to sign and deliver such stock power or other instruments as may be necessary to vest in Pledgee title to such Shares, and Pledgee agrees to cancel the Note and any further obligations Pledgor may have under the Note.

11.  Cumulation of Remedies; Waiver of Rights.  The remedies provided herein in favor of Pledgee shall not be deemed exclusive but shall be cumulative and shall be in addition to all of the remedies in favor of Pledgee existing at law or in equity.  No delay on the part of Pledgee in exercising any of its options, powers or rights, or the partial or single exercise thereof, shall constitute a waiver thereof.

12.  Execution of Endorsements, Assignments, Etc.  Upon the occurrence of an Event of Default, Pledgee shall have the right for and in the name, place and stead of Pledgor to execute endorsements, assignments or other instruments of conveyance or transfer with respect to

3.

EXHIBIT 2
PAGE 51

all or any of the Shares and any other shares of the capital stock of Pledgee or other property which is held by Pledgee as collateral security pursuant to this Pledge Agreement.

13.     Miscellaneous.

(a)     Further Assurances; Changes in Capitalization.  Each party hereto agrees to perform any further acts and execute and deliver any documents which may be reasonably necessary to carry out the intent of this Pledge Agreement.  The provisions of this Pledge Agreement shall apply to any and all stock or other securities of the Pledgee or any successor or assign of the Pledgee, which may be issued in respect of, in exchange for or in substitution of, the Shares by reason of any split, reverse split, recapitalization, reclassification, combination, merger, consolidation or otherwise, and such Shares or other securities shall be encompassed within the term "Shares" for purposes of this Pledge Agreement and the Pledgee shall have a security interest in all such securities on the same terms set forth in this Pledge Agreement.

(b)     Notice.  Except as otherwise provided herein, all notices, requests, demands and other communications under this Agreement shall be in writing, and if by fax, shall be deemed to have been validly served, given or delivered when sent, or if by personal delivery or messenger or courier service, or by registered or certified mail, shall be deemed to have been validly served, given or delivered upon actual delivery, at the following addresses, telephone and facsimile numbers (or such other address(es), telephone and facsimile numbers a party may designate for itself by like notice):

If to Pledgee:

Maxwell Technologies, Inc.
8888 Balboa Avenue
San Diego, California  92123
Attention:   Donald M. Roberts, Esq.
 Fax:    (858) 277-6754

If to Pledgor:

Montena SA
Ch. De la Cornache 1
CH-1753 Matran, Switzerland
Attention:  Jose Cortes
Fax: (++41) 026 407 36 39

With copy to:

4.

**EXHIBIT 2**
**PAGE 52**

Cortes & Grossenbacher
Herzogstrasse 14
CH-8044 Zurich
Switzerland
Attention: Jose Cortes
Fax: (++41) 01 254 90 81


(c)    <u>Amendments</u>.  This Pledge Agreement may be amended only by a written agreement executed by the parties hereto.

(d)    <u>Governing Law</u>.  This Pledge Agreement shall be governed by and construed in accordance with the laws of the State of California.

(e)    <u>Disputes</u>.  In the event of any dispute between the parties arising out of this Pledge Agreement, the prevailing party shall be entitled to recover from the nonprevailing party the reasonable expenses of the prevailing party including, without limitation, reasonable attorneys' fees.

(f)    <u>Entire Agreement</u>.  This Pledge Agreement constitutes the entire agreement and understanding among the parties pertaining to the subject matter hereof and supersedes any and all prior agreements, whether written or oral, relating hereto.

(g)    <u>Successors and Assigns</u>.  The rights and obligations under this Agreement are not assignable or transferable by either side without the prior written consent of the other side.

(h)    <u>Headings</u>.  Introductory headings at the beginning of each section and subsection of this Pledge Agreement are solely for the convenience of the parties and shall not be deemed to be a limitation upon or description of the contents of any such section and subsection of this Pledge Agreement.

(i)    <u>Counterparts</u>.  This Agreement may be executed in two counterparts, each of which shall be deemed an original and both of which, when taken together, shall constitute one and the same Pledge Agreement.

5.

**EXHIBIT 2**
**PAGE 53**

IN WITNESS WHEREOF, the parties hereto have duly executed this Pledge Agreement as of the day and year first above written.

PLEDGEE:

MAXWELL TECHNOLOGIES, INC.
a Delaware corporation

By: _____
Title: _____CEO_____


PLEDGOR:

MONTENA SA

By _____
Title: _____Chairman_____


6.

**EXHIBIT 2
PAGE 54**



# AMENDMENT NUMBER TWO
## TO
## STOCK PURCHASE AND BARTER AGREEMENT'
## BY AND BETWEEN

## MAXWELL TECHNOLOGIES, INC.
### AND
## MONTENA SA

This Amendment Number Two, dated as of the *12* day of August 2002 ("Second Amendment"), is entered into by and between Maxwell Technologies, Inc., a Delaware corporation ("Purchaser"), and Montena SA, a corporation governed by the laws of Switzerland ("Seller"), and amends that certain Stock Purchase and Barter Agreement, dated May 30, 2002, by and between Purchaser and Seller, as amended by Amendment Number One to Stock Purchase and Barter Agreement dated as of June 28, 2002 ("First Amendment"), by and between Purchaser and Seller. Such Stock Purchase and Barter Agreement and First Amendment are referred to herein collectively as the "Agreement"). Capitalized terms used in this Second Amendment but not defined herein shall bear the meanings provided in the Agreement.

## RECITALS

A.     Purchaser and Seller entered into the Agreement providing for the purchase by Purchaser of the outstanding shares of Montena Components Ltd., a corporation governed by the laws of Switzerland ("Company"), held by Seller.

B.     Purchaser and Seller closed the transactions contemplated under the Agreement on July 5, 2002.

C.     Purchaser and Seller desire to amend certain provisions of the Agreement pertaining to future events and obligations as set forth in this Second Amendment.

## AMENDMENTS

1.     Closing Loan.  The parties agree that the Closing Loan provided for in Section 5.5 of the Agreement and entered into at the Closing shall be fully satisfied by the reconveyance of the Pledged Stock to Purchaser. Accordingly, the parties hereby agree to such satisfaction of the Closing Loan and such reconveyance of the Pledged Stock. Upon such reconveyance, all obligations of Seller under the Note shall be deemed satisfied and terminated. Purchaser shall mark the Note canceled and return the original of the Note so marked to Seller, and Seller shall execute a stock assignment to effect the reconveyance of the Pledged Stock.

2.     Section 1.4 "Value Support" is hereby amended in its entirety as follows:

EXHIBIT 2
PAGE 55

"1.4 Value Support. Provided that the Company achieves total sales in excess of $20M for the twelve-month period ended June 30, 2003, Purchaser will provide the following share value support to Seller:

To the extent that each share of Purchaser stock issued as part of the Purchase Price (plus any stock of Purchaser's subsidiary, PurePulse Technologies, Inc., subsequently received as a distribution with respect to Purchaser stock) held by Seller on September 1, 2003 has a market value (based on the average 30 trading-day closing price ending on September 1, 2003 - the "30 Day Measurement Price") of less than $9 per share, then Purchaser will provide to Seller **additional consideration equal, in total value,** to (i) the difference between $9 and the 30 Day Measurement Price multiplied by (ii) such number of shares held by Seller on September 1, 2003; provided, however, that such **additional consideration** will in no event be greater than 500,000 shares **of Purchaser common stock (based on the 30 Day Measurement Price) or cash equal in value to 500,000 shares of Purchaser common stock valued at the 30 Day Measurement Price. Such additional consideration may be provided by Purchaser (at the sole discretion of Purchaser) in cash or in shares of Purchaser common stock, subject to the following conditions: Purchaser shall provide such additional consideration in shares of Purchaser common stock only if the authority for such issuance has been approved by the shareholders of Purchaser, and in the event that Seller votes its shares of Purchaser common stock on such matter, Seller agrees to vote such shares to approve the use of Purchaser common stock as the additional consideration."**

2.      Except as specifically set forth in this Second Amendment, each and every term, condition and provision of the Agreement remains unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the date first above written.

MONTENA SA

By: _____
    Name: Certes Jose
    Title: Chairman of the board

By: _____
    Name: MARTIN SCHUTI
    Title: MEMBER OF THE BOARD OF DIRECTORS
                    "Seller"

MAXWELL TECHNOLOGIES, INC.

By: _____
    Name: C Eisl
    Title: CEO
                    "Purchaser"

EXHIBIT 2
PAGE 56

US006631074B2

## (12) United States Patent
### Bendale et al.

(10) Patent No.: **US 6,631,074 B2**
(45) Date of Patent: **Oct. 7, 2003**

(54) **ELECTROCHEMICAL DOUBLE LAYER CAPACITOR HAVING CARBON POWDER ELECTRODES**

(75) Inventors: **Priya Bendale**, San Diego, CA (US); **Manuel R. Malay**, San Diego, CA (US); **John Dispennette**, San Diego, CA (US); **Chenniah Nanjundiah**, San Diego, CA (US); **Earl Chaney**, Medina, OH (US)

(73) Assignee: **Maxwell Technologies, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/004,109**

(22) Filed: **Nov. 1, 2001**

(65) **Prior Publication Data**

US 2002/0093783 A1 Jul. 18, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/569,679, filed on May 12, 2000.

(51) **Int. Cl.$^7$** ............................................. **H01G 9/045**

(52) **U.S. Cl.** ...................... **361/509**; 361/508; 361/502; 361/512; 361/516

(58) **Field of Search** ................................ 361/508, 509, 361/510, 512, 523, 528, 503, 504, 502, 578, 579, 516

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,737,889 A * 4/1988 Nishino et al.
6,493,210 B2 * 12/2002 Nonaka et al.

FOREIGN PATENT DOCUMENTS

CA 660854 4/1963

CA 849697 8/1970
EP 0112923 6/1983
EP 0134706 8/1984

(List continued on next page.)

OTHER PUBLICATIONS

Cheng, et al.; "Preparation of Carbon Fibre Reinforced Aluminum Via Ultrasonic Liquid Infiltration Technique", *Materials Science and Technology*, 9, pp. 609–614 (Jul. 1993).

Foster, et al.; "New Highly Conductive Inorganic Electrolytes", *J. Electrochem. Soc.*, pp. 2682–2686, (Nov. 1988).

Farahmandi, et al.; "Optimization of Carbon Fibers Used in Electrochemical Capacitors for Electric Vehicle Applications", *The 36th Power Sources Conference, Cherry Hill, New Jersey*, pp. 23–26 (Jun. 6–9, 1994).

Farahmandi, et al.; "Bipolar Electrochemical Capacitors Based on Organic Electrolytes for Electric Vehicle Applications", *The Fourth International Seminar on Double Layer Capacitors and Similar Energy Storage Devices, Boca Raton, Florida* (Dec. 12–14, 1994).

(List continued on next page.)

*Primary Examiner*—Dean A. Reichard
*Assistant Examiner*—Ha Nguyen
(74) *Attorney, Agent, or Firm*—Foley & Lardner

(57) **ABSTRACT**

A method of making an electrode structure, and a double layer capacitor including the electrode structure, the method includes the steps of: applying a first slurry including conducting carbon powder and a binder to a current collector plate; curing the applied first slurry to form a primary coating; applying a second slurry that includes activated carbon powder, a solvent and a binder to the primary coating; and curing the applied second slurry to form a secondary coating, thereby forming a first electrode. In variations, additional primary and secondary coatings may be formed on both sides of the collector plate.

**6 Claims, 19 Drawing Sheets**

100



106
104
activated carbon
conducting carbon
aluminum collector
102

**EXHIBIT 3**
**PAGE 57**

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0207167 | 12/1985 |
| EP | 0443825 | 8/1991 |
| EP | 0622815 | 11/1994 |
| EP | 0680061 | 3/1995 |
| JP | 5599714 | 7/1980 |
| JP | 594114 | 1/1984 |
| JP | 59105312 | 6/1984 |
| JP | 63268221 | 4/1988 |
| JP | 63261817 | 10/1988 |
| JP | 64001220 | 1/1989 |
| JP | 64001222 | 1/1989 |
| JP | 1246812 | 2/1989 |
| JP | 6446913 | 2/1989 |
| JP | 153524 | 3/1989 |
| JP | 1222425 | 5/1989 |
| JP | 1201908 | 8/1989 |
| JP | 1304719 | 8/1989 |
| JP | 1298712 | 12/1989 |
| JP | 256913 | 2/1990 |
| JP | 265114 | 3/1990 |
| JP | 266917 | 3/1990 |
| JP | 278213 | 3/1990 |
| JP | 21104 | 5/1990 |
| JP | 2177525 | 7/1990 |
| JP | 2248025 | 10/1990 |
| JP | 256805 | 12/1990 |
| JP | 2297915 | 12/1990 |
| JP | 34510 | 1/1991 |
| JP | 3038815 | 2/1991 |
| JP | 3132009 | 6/1991 |
| JP | 3141629 | 6/1991 |
| JP | 3201516 | 6/1991 |
| JP | 3289116 | 12/1991 |
| JP | 465814 | 3/1992 |
| JP | 474405 | 3/1992 |
| JP | 488619 | 3/1992 |
| JP | 499305 | 3/1992 |
| JP | 4206914 | 7/1992 |
| JP | 4206916 | 7/1992 |
| JP | 4336409 | 11/1992 |
| JP | 513284 | 1/1993 |
| JP | 555085 | 3/1993 |
| JP | 5217803 | 8/1993 |
| JP | 5258996 | 10/1993 |
| JP | 5299295 | 11/1993 |
| JP | 6275469 | 6/1994 |
| JP | 10244380 | 9/1998 |
| WO | 9309552 | 5/1993 |

### OTHER PUBLICATIONS

Farahamndi, et al.; "A Comparison of Electrochemical Capacitors Using Organic and Aqueous Electrolytic Solutions for Electric Vehicle Applications", *Third International Seminar on Double Layer Capacitors and Similar Energy Storage Devices, Deerfield Beach, Florida*, (Dec. 6–8, 1993).

Fujii; "KYNOL Novoloid Fibers", *Informational Brochure*, (1990).

*Technical Notes*, "The Charcoal Cloth", (1987).

* cited by examiner

EXHIBIT 3
PAGE 58



Fig. 1

EXHIBIT 3
PAGE 59



Fig. 2

EXHIBIT 3
PAGE 60



Fig. 3

EXHIBIT 3
PAGE 61



Fig. 4

EXHIBIT 3
PAGE 62



Fig. 5

EXHIBIT 3
PAGE 63



Fig. 6

EXHIBIT 3
PAGE 64



Fig. 7

**EXHIBIT 3**
**PAGE 65**



Fig.8

EXHIBIT 3
PAGE 66



Fig. 9

EXHIBIT 3
PAGE 67



Fig. 10

EXHIBIT 3
PAGE 68



Fig.11

EXHIBIT 3
PAGE 69



Fig. 12

EXHIBIT 3
PAGE 70



EXHIBIT 3
PAGE 71



# Fig.18

**EXHIBIT 3**
**PAGE 72**



**Fig. 20**

**EXHIBIT 3**
**PAGE 73**



Fig. 21

EXHIBIT 3
PAGE 74



2104

2142

2144

2120

Fig. 22



2104

2144

2120

2142

2140

Fig. 23

EXHIBIT 3
PAGE 75



Fig. 25



Fig. 24

EXHIBIT 3
PAGE 76



EXHIBIT 3
PAGE 77

US 6,631,074 B2

1

# ELECTROCHEMICAL DOUBLE LAYER CAPACITOR HAVING CARBON POWDER ELECTRODES

The present patent document is a continuation in part of U.S. patent application Ser. No. 09/569,679, of Nanjundiah et al., filed May 12, 2000, for ELECTROCHEMICAL DOUBLE LAYER CAPACITOR HAVING CARBON POWDER ELECTRODES, the entirety of which is hereby expressly incorporated herein by reference.

## BACKGROUND OF THE INVENTION

The present invention relates generally to electrochemical double layer capacitors, and more particularly to a high performance electrochemical double layer capacitor made with low-resistance carbon powder electrodes.

Double layer capacitors, also referred to as electrochemical double layer capacitors (EDLC), are energy storage devices that are able to store more energy per unit weight and unit volume than traditional capacitors. In addition, because of their relatively low internal resistance, double layer capacitors can typically be charged and can, in turn, deliver stored energy at a higher power rating than rechargeable batteries.

Double layer capacitors may consist of two carbon electrodes that are isolated from electrical contact by a porous separator. Both the porous separator and the electrodes are immersed in an electrolyte solution, allowing ionic current (ionic flow) to flow between the electrodes through the separator at the same time that the separator prevents an electrical or electronic (as opposed to an ionic) current from shorting the two carbon electrodes.

Coupled to the back of each of the two carbon electrodes is typically a current collecting plate. One purpose of the current collecting plates is to reduce ohmic losses, i.e., internal resistance, in the double layer capacitor.

Double layer capacitors store electrostatic energy in a polarized liquid layer that forms when an electrical potential exists between the two carbon electrodes immersed in an electrolyte (or electrolyte solution). When the electrical potential is applied across the electrodes, a double layer of positive and negative charges is formed at the electrode-electrolyte interface (hence, the name "double layer" capacitor) by the polarization of electrolyte ions due to charge separation under the applied electrical potential, and also due to dipole orientation and alignment of electrolyte molecules over an entire surface of the electrodes.

Fabrication of double layer capacitors with carbon electrodes is described in U.S. Pat. Nos. 2,800,616 (Becker), and 3,648,126 (Boos et al.).

A major problem in many carbon-electrode capacitors, including electrochemical double layer capacitors with carbon electrodes, is that the performance of the carbon-electrode capacitor is often limited because of high internal resistance related to the carbon electrodes. This high internal resistance may be due to several factors, including high contact resistance of carbon—carbon contacts within the carbon electrodes, and further including high contact resistance of the electrode-current collector contacts. This high internal resistance translates to large ohmic losses in the carbon-electrode capacitor during charging and discharging of the carbon-electrode capacitor. These high ohmic losses further adversely affect, i.e., increase, a characteristic RC (resistance times capacitance) time constant of the capacitor and thus interfere with the carbon-electrode capacitor's ability to be efficiently charged and/or discharged in a short period of time.

2

There is thus a need in the art for systems and methods that lower the internal resistance within a carbon-electrode capacitor, and hence lower the characteristic RC time constant, of the carbon-electrode capacitors, as well as other improvements.

U.S. Pat. No. 5,907,472 to Farahmandi et al., the complete disclosure of which is incorporated herein by reference, discloses a multi-electrode double layer capacitor having aluminum-impregnated carbon cloth electrodes. The use of the aluminum-impregnated carbon cloth electrodes described therein results in an electrochemical double layer capacitor having a very low internal resistance.

U.S. patent application Ser. No. 09/569,679 of Nanjundiah et al., to which priority is claimed in the present patent document, and the complete disclosure of which is incorporated herein by reference, discloses an electrochemical double layer capacitor having low-resistance carbon powder electrodes.

There is also a continuing need for improved electrochemical double layer capacitors. Such improved electrochemical double layer capacitors need to deliver large amounts of useful energy at a very high power output, and very high energy density ratings within a relatively short period of time. Such improved electrochemical double layer capacitors should also have a relatively low internal resistance, and hence a relatively low characteristic RC time constant, and yet be capable of yielding a relatively high operating voltage.

Furthermore, it is apparent that improvements are needed in the techniques and methods of fabricating electrochemical double layer capacitor electrodes so as to lower the internal resistance of the electrochemical double layer capacitor, and hence lower the characteristic RC time constant and maximize the operating voltage.

Since capacitor energy density increases with the square of the operating voltage, higher operating voltages thus translate directly into significantly higher energy densities and, as a result, higher power output ratings. Thus, improved techniques and methods are needed to lower the internal resistance of the electrodes used within an electrochemical double layer capacitor and increase the operating voltage.

## SUMMARY OF THE INVENTION

The present invention advantageously addresses the needs above as well as other needs by providing a method of making an electrode structure for use in an electrochemical double layer capacitor.

In one embodiment, the invention may be characterized as a method of making an electrode structure for use in a double layer capacitor, comprising the steps of: applying a first slurry including conducting carbon powder and a binder to a current collector plate; curing the applied first slurry to form a primary coating; applying a second slurry that includes activated carbon powder, a solvent and a binder to the primary coating; and curing the applied second slurry to form a secondary coating, thereby forming a first electrode.

In another embodiment, the invention may be characterized as a double layer capacitor including a first electrode structure that includes a first current collector foil, a first primary coating formed on a portion of the first current collector foil, and a first secondary coating formed on the first primary coating. The capacitor also includes a second electrode structure that includes a second current collector foil, a second primary coating formed on a portion of the second current collector foil, and a second secondary coating formed on the second primary coating. The first and second

EXHIBIT 3
PAGE 78

3

primary coatings include conducting carbon powder and the first and second secondary coatings include activated carbon powder. Also included is a porous separator positioned between the first and second electrodes structures such that the porous separator contacts and separates the first and second secondary coatings and a means for saturating the porous separator and the first and second electrodes structures in a prescribed electrolyte solution.

In yet another embodiment, the invention may be characterized as a method of making an electrode structure for use in a double layer capacitor, comprising the steps of: applying a first slurry including conducting carbon powder and a binder to one side of a current collector plate; curing the applied first slurry to form a first primary coating; applying a second slurry that includes activated carbon powder, a solvent and a binder to the first primary coating; curing the applied second slurry to form a first secondary coating; applying the first slurry to another side of the current collector plate that is opposite of the one side of the current collector plate; curing the applied first slurry to form a second primary coating on the other side of the current collector plate; applying the second slurry to the second primary coating; curing the applied second slurry to form a second secondary coating on the second primary coating, thereby forming a first electrode.

In a further embodiment, the invention may be characterized as an electrode structure for use in a double layer capacitor including a current collector foil and a primary coating formed on each of a first side and a second side of the current collector foil. Each primary coating includes conducting carbon and a binder. And, a secondary coating is formed on each of the primary coatings, each secondary coating including activated carbon powder, a solvent and a binder.

In another further embodiment, the invention may be characterized as a double layer capacitor including a first electrode structure that includes a first current collector foil, a first primary coating formed on each side of the first current collector foil, and a first secondary coating formed on each of the first primary coatings. Also included is a second electrode structure that includes a second current collector foil, a second primary coating formed on each side of the second current collector foil, and a second secondary coating formed on each of the second primary coatings. The first and second primary coatings include conducting carbon powder and the first and second secondary coatings include activated carbon powder. A porous separator is positioned between the first and second electrodes structures such that the porous separator contacts and electrically separates the first and second secondary coatings of the first and second electrode structures facing each other. And also included is a means for saturating the porous separator and the first and second electrodes structures in a prescribed electrolyte solution.

A better understanding of the features and advantages of the present invention will be obtained by reference to the following detailed description of the invention and accompanying drawings which set forth an illustrative embodiment in which the principles of the invention are utilized.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above and other aspects, features and advantages of the present invention will be more apparent from the following more particular description thereof presented in conjunction with the following drawings wherein;

FIG. 1 is cross-sectional view of a carbon electrode including a foil collector, a first layer of conducting carbon,

4

and a second layer of activated carbon, in accordance with one embodiment of the present invention;

FIG. 2 is a schematic diagram illustrating slurry transfer apparatus and process for applying carbon powder slurry, such as conducting carbon powder slurry or activated carbon powder slurry, to a surface of a foil, so as to form the first layer of conducting carbon or the second layer of activated carbon on the surface of the foil, so as to form the foil electrode of FIG. 1;

FIG. 3 is a top view of the foil, the carbon powder slurry, and a row a wipers that remove the carbon powder slurry from three strips (or lanes) of the foil as the foil passes through the slurry transfer apparatus of FIG. 2., so as to form contact edges of the foil electrode of FIG. 1;

FIG. 4 is a top view of a foil having three lanes of the foil (with the carbon powder slurry having been removed by the wipers of FIG. 3) separated by regions coated with a first layer of conducting carbon and a second layer of activated carbon;

FIG. 5 is a side cross-sectional view of the foil of FIG. 4 having three lanes of the foil separated by regions coated with the first layer of conducting carbon and a second layer of activated carbon;

FIG. 6 is a top view of the foil of FIG. 4 having been cut into two foil electrodes, such as the foil electrode in FIG. 1;

FIG. 7 is a side cross-sectional view of two foil electrodes having their respective second layers of activated carbon juxtaposed against a porous separator, so as to form first and second carbon electrodes electrically (but not ionically) isolated from one another by the porous separator;

FIG. 8 is a side cross-sectional view of the foil of FIG. 4 wherein both first and second sides of the foil include regions having the first layer of conducting carbon and the second layer of activated carbon, and further include three lanes of the foil separated by the regions coated with the first layer of conducting carbon and a second layer of activated carbon;

FIG. 9 is a side cross-sectional view of four foil electrodes, such as in FIG. 8, having first and second sides including the first layer of conducting carbon and the second layer of activated carbon, with one second layer of activated carbon of first and second ones of the foil electrodes juxtaposed against respective sides of a first porous separator, and another second layer of activated carbon of second and third ones of the foil electrodes juxtaposed against respective sides of a second porous separator, so as to form first, second and third carbon electrodes electrically (but not ionically) isolated from one another by the first and second porous separators;

FIG. 10 is a partial top view illustrating windings comprising a pair of the carbon electrodes, such as in FIG. 8, having first and second sides including the first layer of conducting carbon and the second layer of activated carbon, and being separated by a porous separator;

FIG. 11 is an end assembly cross-sectional view of a "jellyroll" electrode assembly comprising a pair of the carbon electrodes, such as in FIG. 8, having first and second sides including the first layer of conducting carbon and the second layer of activated carbon, and being separated by a first and second porous separator in accordance with a "jellyroll" embodiment employing the winding layers of FIG. 10;

FIG. 12 is a perspective view of the "jellyroll" electrode assembly of FIG. 10 including with aluminum arc sprayed regions at an end of the "jellyroll" electrode assembly so as

EXHIBIT 3
PAGE 79

US 6,631,074 B2

5

to provide a low resistance path between contact edges of the first carbon electrode, and including additional arc sprayed regions at an opposite end of the "jellyroll" electrode assembly so as to provide another low resistance path between contact edges of the second carbon electrode;

FIG. 13 is a side cross-sectional view of the "jellyroll" electrode assembly of FIG. 12, having the winding layers of FIG. 11;

FIG. 14 is a side cross-sectional view of the "jellyroll" electrode assembly of FIG. 12, having the winding layers of FIG. 11, and further having a first plug;

FIG. 15 is a side cross-sectional view of the "jellyroll" electrode assembly of FIG. 12, having the winding layers of FIG. 11, and the first plug of FIG. 14, and further having a remainder of a first terminal assembly;

FIG. 16 is a side cross-sectional view of the "jellyroll" electrode assembly of FIG. 12, having the winding layers of FIG. 11, the first plug of FIG. 14 and the remainder of a first terminal assembly of FIG. 15, and further having a second plug, a second collector disk and a second terminal post;

FIG. 17 is a side, exploded cross-sectional view of the "jellyroll" electrode assembly of FIG. 12, having the winding layers of FIG. 11, the first plug of FIG. 14, the remainder of the first terminal assembly of FIG. 15 and the second plug, the second collector disk and the second terminal post of FIG. 16, and further having a first insulating washer, and a can;

FIG. 18 is a partial side cross-sectional view of the second terminal post 1606 of FIG. 16, and the first insulating washer 1702, and the can 1704 of FIG. 17, and further having a second insulating washer 1802, a flat washer 1804, a Belleville washer 1806 and a locknut 1808.

FIG. 19 is a side cross-sectional view of the "jellyroll" electrode assembly of FIG. 12, having the winding layers of FIG. 11, the first plug of FIG. 14, the remainder of the first terminal assembly of FIG. 15, the second plug, the second collector disk and the second terminal post of FIG. 16, the first insulating washer, and the can FIG. 17, the second insulating washer, the flat washer, the Belleville washer and the locknut of FIG. 18;

FIG. 20 is a perspective view of an electrochemical double layer capacitor made in accordance with the "jellyroll" embodiment of FIG. 19;

FIG. 21 is a side cross-sectional view of a variation of the "jellyroll" embodiment of FIGS. 12 through 20, having an improved collector plate, and a reduced number of parts in a first terminal assembly, and a second terminal assembly;

FIG. 22 is a top view of a stud/collector disk/terminal post of the second terminal of the variation of FIG. 21;

FIG. 23 is a side view of a stud/collector disk/terminal post such as in FIG. 22 of the second terminal of the variation of FIG. 21;

FIG. 24 is a side view of a stud/collector disk of the first terminal of the variation of FIG. 21;

FIG. 25 is a top view of a stud/collector disk of the first terminal of the variation of FIG. 21;

FIG. 26 is a side cross-sectional view of another variation of the "jellyroll" embodiment of FIGS. 12 through 20, employing a pocket in the can in a modified second electrode assembly;

FIG. 27 is a side cross-sectional view of another variation of the "jellyroll" embodiment of FIGS. 12 through 20, employing a crimp seal to secure a lid to the can, and employing a pocket in the lid in a modified first electrode assembly;

6

FIG. 28 is a side cross-sectional view of another variation of the "jellyroll" embodiment of FIGS. 12 through 20, employing a low profile "can-within-a-can" assembly and modified first and second electrode assemblies; and

FIG. 29 is a side cross-sectional view of another variation of the "jellyroll" embodiment of FIGS. 12 through 20, employing a ceramic seal between the lid and the first terminal assembly.

Corresponding reference characters indicate corresponding components throughout several views of the drawing.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The following description of the presently contemplated best mode of practicing the invention is not to be taken in a limiting sense, but is made merely for the purpose of describing the general principles of the invention. The scope of the invention should be determined with reference to the claims.

Referring to FIG. 1, shown is a cross-sectional view of a carbon electrode 100 including a foil collector 102, a first layer of conducting carbon 104, and a second layer of activated carbon 106, in accordance with one embodiment of the present invention.

All else being equal, the greater carbon quantity per unit volume that can be achieved within an electrochemical double layer capacitor, the greater the capacitance of the electrochemical double layer capacitor.

This factor alone, however, would suggest that the ideal design for an electrochemical double layer capacitor is a design in which two "chunks" of activated carbon juxtaposed against opposite sides of a porous separator, and bracketed by terminal assemblies, one for each "chunk", are employed to maximize the percentage of the volume of the electrochemical double layer capacitor that is occupied by carbon, and minimize the percentage of the volume of the electrochemical double layer capacitor that is occupied by the porous separator and the terminal assemblies. This "brick sandwich" would then be immersed in an electrolyte, and housed within an appropriate container.

Problematically however, it has also been found that the greater the length an average electron (or hole) must travel through the carbon in charging or discharging the electrochemical double layer capacitor to a given charge, the greater the internal resistance of the electrochemical double layer capacitor, and thus the greater the RC time constant of the electrochemical double layer capacitor.

This fact alone would suggest that the ideal design for an electrochemical double layer capacitor is a design in which a large number of "specs" of activated carbon in an infinitely thin sheet juxtaposed against opposite sides of one or more porous separators are surrounded by large amounts of a highly conductive collector, so as to minimize the length an average electron (or hole) must travel through the carbon in charging or discharging the electrochemical double layer capacitor. This design would then be immersed in an electrolyte, and housed within an appropriate container.

Neither of these extremes, however, is, in fact, ideal. Both the design of electrodes, and the design of the housing in which the electrodes, porous separator, and electrolyte are contained represent a balance between these two extremes, in order to both maximize capacitance, and at the same time minimize internal resistance of the electrochemical double layer capacitor.

In order to achieve this objective, "effectivity" and "utilization" of the carbon used should be maximized by maxi-

EXHIBIT 3
PAGE 80

7
8

mizing the surface area of the carbon used, minimizing the resistivity of the carbon used, and, at the same time, maintaining pore size, and particle size (and thus packing density) of the carbon that optimize both the "effectivity" and "utilization" of the carbon used.

The design of the present embodiment represents a significant improvement over prior approaches because, in part, such design has as its object the above-referenced balance between maximizing carbon and minimizing internal resistance, and as its further object maximizing "effectivity" and "utilization" of the carbon.

The design begins with the electrodes, which, simplified, are as depicted in FIG. 1. Each electrode consists of a thin metal collector 102, onto which are formed two layers of carbon 104, 106, one on top of the other. The metal collector 102 serves both as a very low resistance current path into and out of the carbon electrode 100, but also as a mechanical platform for the two layers 104, 106.

The first layer 104, i.e., the layer in direct mechanical and electrical contact with the thin metal collector 102, is of a "conducting carbon," such as graphitic carbon (i.e., carbon having a laminar structure). This first layer 104 is approximately three times as conducting as the second layer 106, adheres well to both the thin metal collector 102 and the second layer 106, and provides low interfacial resistances between the thin metal collector 102 and the second layer 106. The first layer 104 of conducting carbon (including binder used in the first layer 104) should also be stable in the electrolyte solution selected for use in the electrochemical double layer capacitor.

The second layer 106 is of an "activated carbon," and has surface area, pore size and particle size (packing density) characteristics, and Farads/cc and Farads/g that tend to maximize both the "efficiency" and the "utilization" of the activated carbon. The second layer of activated carbon 106 should maximize capacitance, be stable (including binder used in the second layer) in the electrolyte solution selected for use in the electrochemical double layer capacitor, and should have low resistance of the bulk.

The thin metal collector 102, or current collector 102 may be, for example, an aluminum foil current collector. Foil suitable for the aluminum foil collector (foil collector 102) is available from All-Foils Incorporated of Ohio as A1 1145 fully annealed to full hardened alloy, with a thickness of 12.5 to 50 micrometers, e.g., 1 mil, and a resistivity from between 2.83 to 2.87 micro ohms per centimeter.

The first layer 104 is formed onto the surface of the current collector 102, and may comprise carbon powder such as, for example, Black Pearl 2000, available from Cabot, of Billerica, Mass. Desirable properties of the first layer 104 are low resistivity, e.g., less than four ohms per centimeter; that the first layer 104 adheres well to both the current collector 102 (foil collector 102) and the activated carbon of the second layer 106; low interfacial and sheet resistances between the conducting carbon and the current collector 102 (foil collector 102), and between the conducting carbon 104 and the activated carbon 106, e.g., less than five milliohms cm².

The second layer 106 is formed onto the first layer 104, and may comprise activated carbon powder. The activated carbon powder used in the carbon electrodes is used to provide high capacitance, due to high "effectivity" and "utilization." A high capacitance is possible due, in part, to the large BET surface area of the activated carbon powders, which is on the order of 500 to 2500 m²/g, e.g., 1900 m²/g for activated carbon, such as BP20, available from Kuraray

Chemical of Japan. Surface area of the activated carbon powders is related to particle size distribution, which falls in the range of 3 to 30 $\mu$m with a $d_{50}$=8 $\mu$m. A wide range of particle sizes allows for an efficient packing density; small particles pack within the voids created by larger particles. Such activated carbon may be produced using starting materials such as kynel, rayon, coconut shell, or the like. Iodine absorption for such activated carbon may be, for example, 500 to 2500 mg/g, e.g., 2000 mg/g. Moisture content by a percentage of weight may be, for example, 0.2 to 0.7 percent; ash content by weight may be, of example, 0.05 to 0.12 percent; particle diameter may be, for example, 3 to 30 nanometers; pore size distribution may be, for example, 60 to 500 nanometers, e.g., 60 to 300 nanometers; capacitance may be, for example, 22 to 35 Farads per gram, e.g., 25 Farads per gram, i.e., for example, 15 to 20 Farads per cc., e.g., 16 Farads per cc.

An important parameter in design optimization is Farads/cc—affecting "effectivity" and "utilization". On a base materials level, this is affected by the pore distribution, which typically ranges from 8 to 50 Å. On an electrode level, the packing density of the powder comprising the electrodes determines Farads/cc. Carbon electrodes for the present electrochemical double layer capacitor application are fabricated with a desired electrode porosity (i.e., void to volume ratio) of 25% to 35%, which should be achieved through the selection of packing density and drying conditions. The electrode porosity is optimized to maximize particle-to-particle contact, to lower the resistance, and facilitate electrolyte permeation allowing for wetting of the carbon surfaces.

In order to further reduce the resistivity of the resultant electrode 100, a small percentage (e.g., 1 to 5%) of conducting carbon, which is more conducting than the activated carbon powder, such as Black Pearl 2000, available from Cabot of Billerica, Mass., may be added to the slurry used to form the second layer 106.

A method of making the electrode 100 comprises applying powdered carbon in, for example, a slurry, a paste or a gel form (referred to generally herein as a slurry form) onto current collector 102 (e.g., current collector plate 102 or foil 102, such as aluminum foils) or onto other layers already on the current collector. Such a slurry form of powdered carbon may be made in a solution containing a polymer binder.

The binder may include, for example, polyvinylpyrrolidone; polyamide or the like. Preferred binder may be Kynar 761 or Kynar 2801 available from Atofina Chemicals of Pennsylvania. The binder should be insoluble in the selected electrolyte, for example, insoluble in acetonitrile; and soluble in formulating solvents such as water, acetone, methyl ethyl ketone, N-methyl pyrolidone and the like. The binder should have a volume resistivity higher than 109 ohms per centimeter, e.g., $2\times10^{14}$ ohms per centimeter; thermal decomposition at greater than 150 degrees centigrade, e.g., no less than 375 degrees centigrade, and wettability with aluminum should be good.

Thus, the electrode 100 is made by applying a first layer of conducting carbon 104 (with a binder in a slurry) to the current collector 102; and a second layer of activated carbon 106 (with a small amount of conducting carbon, and with a binder in a slurry) to the first layer 104.

Referring next to FIG. 2, a schematic diagram is shown illustrating slurry transfer apparatus and process 200 for applying carbon powder slurry 202, such as conducting carbon powder slurry or activated carbon powder slurry, to a surface of a current collector 204 (or foil 204), so as to

EXHIBIT 3
PAGE 81

US 6,631,074 B2

9

form the first layer of conducting carbon or the second layer of activated carbon on the surface of the foil.

Prior to the coating process, the surface of the foil **204** can be corona treated, or mechanically or chemically modified, changing the surface energy of the aluminum surface to promote wettability and adhesion.

In accordance with the present embodiment, the coating process proceeds in two steps. The first step involves applying a first layer (or primary coating) to the bare aluminum surface of the foil **204** as a slurry **202** containing a suitable binder (e.g., a water-based binder, such as polyvinylpyrrolidone (PVP), ethylene acrylic acid (EAA); or a solvent-based binder, such as PVDF—"Kynar" 761 or "Kynar" 2801— available from Atofina Chemicals of Philadelphia, Pa., and a suitable solvent, e.g. NMP, MEK, acetone or mixtures thereof). In addition, adhesion promoters may be employed within the primary coating to improve the integrity of the electrode without increasing the interfacial resistance. The proportion by weight of highly conducting carbon (verses other constituents, such as the binder and the solvent) included in the primary coating preferably falls in the range of 25%–95%. The primary coating preferably does not contain activated carbon.

The primary coating reduces the interfacial resistance and serves as a seed coat for a secondary coating.

The primary coating is applied using a slurry transfer apparatus and method **200**, such as a reverse comma coat system and method, as illustrated. Other methods such as slot coating; gravure, extrusion, flexographic or roll coating methods may be used.

The reverse comma coat system and method **200** is illustrated. Shown is a transport roller **206**, a transfer roller **208**, and a carbon slurry roller **210**. Also shown is a set of wipers **212**.

In practice the foil **204** passed between, the transport roller, and the transfer roller. Spacing between the transport roller **206**, against which the foil **204** is held tightly, and the transfer roller **208**, determines the thickness of the primary coating. The carbon slurry **202**, such as that described above for use in applying the primary coating, is introduced onto the carbon slurry roller **210**, and carried to the transfer roller **208**. The carbon slurry **202** is then passed between the carbon slurry roller **210** and the transfer roller **208**. As a result, a portion of the carbon slurry **202** is transferred to the transfer roller **208**, and is then, in turn, transferred to one side of the foil **204**.

Reverse comma coat methods and systems are well known, and thus further explanation thereof is not made herein.

After the carbon slurry **202** is transferred to the one side of the foil **204**, the set of wipers **212** removes portions of the primary coating at edges of the foil **204**, and at a center of the foil **204**, for use in creating contact edges and for assuring that a clean edge can be made after cutting and handling of the foil **204**, as explained more fully below.

The second layer (or secondary coating) is applied over the primary coating, either during a second pass through the reverse comma coat system **200**, or in-line using a second reverse comma coat system. In either case, the secondary layer is applied after sufficient curing of the primary layer has taken place (by evaporation of the solvent), so as to maintain distinct primary and secondary layers.

The secondary coating comprises an activated carbon that is derived from either kynel, coconut or rayon base materials. As mentioned, this activated carbon has a high surface

10

area, typically of the order of 1000 to 2500 m²/g, in order to increase "effectivity". The secondary coating is applied using slurry comprising the high surface area activated carbon, a suitable binder (e.g., PVDF—"Kynar" 2801 available from Atofina Chemicals of Philadelphia, Pa.) and a suitable solvent (e.g. NMP, MEK, acetone or a mixture thereof). The proportion by weight of activated carbon included in the secondary coating preferably, as opposed to other constituents (including binder and solvent), falls in the range of 5% to 40%, e.g., approximately 30%. The secondary coating may also include a small amount of conducting carbon, such as the conducting carbon used in the first layer. The proportion by weight of highly conducting carbon included in the secondary coating preferably falls in the range of 0.01% to 5%, e.g., approximately 0.3%. This slurry is coated onto the primary carbon coat using the reverse comma coat process (or other process), as described above.

Although the process described above is an effective way of reducing the interfacial and sheet resistance, the process steps involved become somewhat more complicated when coating of the foil **204** on both sides, as opposed to one side, is desired. To complete the coating of the foil **204**, in order to achieve a double-sided foil, the foil **204** goes through the reverse comma coat system and method **200** four times, once for each of the first and second layers, on each of the first and second sides.

The reverse comma coat method and system **200** used to apply the secondary coating are similar to those used to apply the primary coating, including the use of the set of wipers **212** to remove portions of the secondary coating at the edges and at the center of the foil **204**. Thus, further separate explanation of the reverse comma coat system and method **200** used to apply the secondary coating is not made herein.

Referring to FIG. **3**, a top view is shown of the foil **302**, the carbon powder slurry **304**, and the set of wipers **306** in a row that remove the carbon powder slurry **304** from the foil **302** in three strips **308**, **310**, **312** (or lanes **308**, **310**, **312**) as the foil **302** passes through the slurry transfer apparatus **200** of FIG. **2**.

The three lanes **308**, **310**, **312** are located at the edges **314**, **316** of the foil **302**, and at the center **318** of the foil **302**, and are substantially free of the carbon powder slurry **304**. The outermost two of these three lanes **308**, **312** are used to assure clean edges can be achieved at the edges **314**, **316** of the foil **302** (without any curling, or bending that may result from handling of the foil **302** before, during or after the application of the first layer and the second layer). Furthermore, these three lanes **308**, **310**, **312** are used to create a contact edge (not shown) at one edge of the carbon electrode (explained more fully hereinbelow), whereby a low resistance electrical connection between a terminal and the carbon electrode can be made.

Referring next to FIG. **4**, a top view is shown of the foil **302** having the three lanes **308**, **310**, **312** of the foil **302** (with the carbon powder slurry having been removed by the wipers of FIG. **3**) separated by regions **402**, **404** coated with a first layer of conducting carbon and a second layer of activated carbon.

Also shown are four cut lines **406**, **408**, **410**, **412** along which cuts in the foil **302** are made after the first layer and the second layer have cured.

Cutting of the foil **302** along the four cut lines **406**, **408**, **410**, **412** is preferably achieved using a precision blade cutting apparatus (not shown), which may be in an apparatus separate from the slurry transfer apparatus **200** (FIG. **2**), or

EXHIBIT 3
PAGE 82

US 6,631,074 B2

11

placed in-line with the slurry transfer apparatus **200** (FIG. 2). Such cutting apparatus are known in the art, and thus further explanation thereof is not made herein. Cutting of the foil **302** along the cut lines **406, 408, 410, 412** assures a clean edge for the electrodes, results in the contact edge along one edge of each electrode, and cuts the foil **302** in half along its length, so as to form two electrodes. The contact edge provides a low resistance current path between each terminal of the electrochemical double layer capacitor, and a respective electrode.

A first cut **410** is made down the center of the foil, and a second cut **406** is made down a center of one of the lanes **308** at the edge of the foil **302**. A third cut **412** is made along one edge of the second region **404** coated with the first and second layers, so as to remove the other lane **312** at the edge of the foil **302**, and a fourth cut **408** is made along another edge of the first region **402** coated with the first and second layers, so as to remove a remainder of the center lane **310** opposite the one edge of the foil **302**.

As a result of the cutting of the foil **302**, two identical separate electrodes are formed, each having a contact edge, and a region coated with the first and second layers, the first being formed from half of the one lane **308** and the first region **402** coated by the first and second layers, and the second being formed from half of the center lane **310** and the second region **404** coated by the first and second layers.

Numerous variations on the above-described embodiment for cutting the foil **302** so as to form the first and second electrodes are contemplated by the inventors and are within the scope of the present embodiment.

Referring to FIG. **5**, a side cross-sectional view is shown of the foil of FIG. **4** having the three lanes of the foil **302** separated by the regions **402, 404** coated with the first layer of conducting carbon **502** and a second layer of activated carbon **504**.

As can be seen, the first layer **502** and the second layer **504** are coated onto the foil **302**, with the three lanes having been cleared of the first layer and the second layer by the set of wipers.

Also shown are the four cut lines **406, 408, 410, 412** along which the cuts in the foil **302** are made after the first layer **502** and the second layer **504** have cured. The four cuts are made along the four cut lines **406, 408, 410, 412**, as described above.

Referring to FIG. **6**, a top view is shown of the foil **302** of FIG. **4** having been cut into two foil electrodes **602, 604**, such as the foil electrode **100** in FIG. **1**.

As can be seen, each of the two foil electrodes **602, 604** comprises the region **402, 404** coated with the first layer of conducting carbon and the second layer of activated carbon; and the contact edges **606, 608**.

Referring next to FIG. **7**, a side cross-sectional view is shown of the two foil electrodes **602, 604** having their respective second layers **504** of activated carbon juxtaposed against a porous separator **702**, so as to form first and second carbon electrodes **602, 604** electrically (but not ionically) isolated from one another by the porous separator **702**.

The purpose of the porous separator **702** is to assure that the two spaced-apart carbon electrodes **602, 604** are never in direct electrical contact with one another (as opposed to ionic flow, which is permitted by the porous separator **702**).

The term "spaced-apart" is intended to refer to this lack of direct electrical contact between the electrodes **602, 604**. A secondary purpose of the porous separator **702** is to enhance electrolyte solution absorption into the space between the two-spaced apart electrodes **602, 604**.

12

This purpose is important to the present embodiment, because contact between the two spaced-apart carbon electrodes **602, 604** would result in a short circuit and rapid depletion of the charges stored in the electrochemical double layer capacitor **700**.

Thus, provided the purpose of preventing direct electrical contact between the foil electrodes **602, 604** is fulfilled, a wide range of materials and/or structures may be used as the porous separator **702**, including, for example, mechanically spacing the two spaced apart carbon powder electrodes **602, 604**, without a physical barrier interposed between the two spaced apart carbon powder electrodes **602, 604**.

The porous separator **702** may be, for example, TF3045 paper available from Nippon Kodoshi Corporation of Japan. The porous separator **702**, alternatively, may be made of polyethylene, polypropylene, other types of paper, combinations or laminations thereof or the like. Thickness of the porous separator **702** may be, for example, from between 1 to 50 micrometers, e.g., 35 micrometers; density may be, for example, from between 0.3 to 0.5 grams per centimeter cubed, e.g., 0.419 grams per centimeter cubed; tensile strength may be, for example, greater than 10 Newtons per 15 millimeters, e.g., 12.7 Newtons per 15 millimeters; porosity may be, for example, 40 to 80 percent, e.g., 72 percent; electrolyte absorbency, for example, 10 to 80 millimeters per 10 minutes, e.g., 39 millimeters per 10 minutes; and thermal stability may be −55 degrees Celsius to 150 degrees Celsius.

In accordance with a preferred embodiment, the illustrated components are compressed against each other with a modest constant pressure, with the porous separator **702** preventing an electrical short, i.e., direct electrical contact, between the foil electrodes **602, 604**.

In practice, all of the available spaces and voids within and between the two carbon electrodes **602, 604** (two foil electrodes **602, 604**) are filled with a highly conductive, preferably non-aqueous electrolyte solution, such as tetra ethylammonium tetra fluoroborate ($Et_4NBF_4$) ($TEABF_4$) salt with acetonitrile ($CH_3CN$) as a solvent.

Other possible salts include Triethyl methyl ammonium and other alkyl ammonium salts.

Other possible solvents include propylene carbonate (PC), ethylmethyl carbonate (EMC), ethylene carbonate (EC), dimethyl carbonate (DMC), methyl formate and their mixtures.

It is to be emphasized, that the invention herein described contemplates the use of alternate electrolyte solutions, particularly non-aqueous (or organic) electrolyte solutions, other than the solution made from acetonitrile described above.

The electrolyte solution should preferably have a conductivity of, e.g., from between 10 to 100 milli-Siemens, e.g., 66 milli-Siemens; a liquidous range of, e.g., from between −55 to 200 degrees Celsius, e.g., −55 to 87 degrees Celsius; and a voltage range of greater than 2 volts.

The ions of the electrolyte solution are free to pass through pores or holes of the porous separator; yet, as mentioned above, the separator prevents the one electrode from physically contacting, and hence electrically shorting with, the other electrode.

In operation, when an electrical potential is applied across the contact edges of the carbon electrodes, and hence across the carbon electrodes **602, 604**, a polarized liquid layer forms at the surface of each electrode immersed in the electrolyte. It is this polarized liquid layer that stores elec-

**EXHIBIT 3**
**PAGE 83**

US 6,631,074 B2

13

trostatic energy and functions as the double layer capacitor—i.e., that functions as two capacitors in series.

More specifically, when a voltage is applied across the carbon electrodes 602, 604, e.g., when one electrode 602 is charged positive relative to the other electrode 604, a polarized liquid layer is formed by the polarization of the electrolyte ions due to charge separation under the applied electric field and also due to the dipole orientation and alignment of electrolyte molecules over the entire surface of the electrodes 602, 604. This polarization stores energy in the capacitor according to the following relationships:

$$C = k_e A/d \qquad (1)$$

and

$$E = CV^2/2 \qquad (2)$$

where C is the capacitance, $k_e$ is the effective dielectric constant of the double layer, d is the separation distance between the layers, A is the surface area of the foil electrodes 602, 604 that are immersed in the electrolyte solution, V is the voltage applied across the foil electrodes 602, 604, and E is the energy stored in the electrochemical double layer capacitor 702.

In the present embodiment, the separation distance d is so small that it is measured in angstroms, while the surface area A, i.e., the surface area "A" per gram of electrode material, is very large. Hence, as can be seen from Eq. (1), when d is very small, and A is very large, the capacitance is very large.

The surface area "A" in the electrochemical double layer capacitor 702 is large because of the makeup of the foil electrodes 602, 604. Specifically, each of the foil electrodes 602, 604 comprises activated carbon powders in the secondary coating 504, respectively. Activated carbon is a highly porous form of carbon. The activated carbon powders do not have a smooth surface, but are pitted with numerous pores. The pores of the activated carbon powders have a typical size of about 5 to 40 Å (Angstroms).

The carbon electrodes 602, 604 are immersed in the electrolyte solution. Each hole and pore increases the surface area of the powder that is exposed to the electrolyte solution. The result is a three-dimensional electrode structure which allows the electrolyte to penetrate into the pores, and contact all, or most all, of the surface area of the carbon powders, thereby dramatically increasing the surface area "A" of the electrode over which the double layer of charged molecules is formed.

Achieving a high capacitance, however, is only one aspect of the present embodiment. As noted above, another important aspect of the present embodiment is that the electrochemical double layer capacitor is capable of storing and discharging energy in a relatively short time period, i.e., the RC time constant of the electrochemical double layer capacitor 702 is relatively small, e.g., on the order of less than 1 second, e.g., 0.5 seconds.

The internal resistance of the electrochemical double layer capacitor 702 is made up of several components. Specifically, the internal resistance components include a contact resistance $R_C$, an electrode resistance $R_{EL}$, an electrolyte solution resistance $R_{ES}$, and a separator resistance $R_{SEP}$.

The contact resistance $R_C$ represents all of the resistance in the current path from the capacitor terminal (not shown) up to the contact edge of the carbon electrode 602, 604. The electrode resistance $R_{EL}$ represents the resistance within the electrodes 602, 604. The electrolyte solution resistance $R_{ES}$ exists relative to the electrolyte solution, and the separator resistance $R_{SEP}$ exists relative to the porous separator 702.

14

The forgoing description has focused principally on teachings of the present embodiment directed to minimizing the electrode resistance $R_{EL}$, although the electrolyte solution and the porous separator 702, described above, are selected to minimize the electrolyte solution resistance $R_{ES}$ (balanced against the voltage that the electrolyte solution will tolerate, as described further herein below) and separator resistance $R_{SEP}$, respectively. Description hereinbelow, beginning in reference, for example, to FIG. 12 is directed to teachings for minimizing contact resistance $R_C$.

Any energy stored within the electrochemical double layer capacitor 700 enters or exits the capacitor by way of an electrical current that flows through $R_C$, $R_{EL}$, $R_{ES}$, and $R_{SEP}$. Thus it is seen that in order for practical charge/discharge times to be achieved, the values of $R_C$, $R_{EL}$, $R_{ES}$, and $R_{SEP}$, which in combination with the capacitance C define the time constant $\tau_C$ of the capacitor 100, are preferably kept as low as possible.

The resistance of the porous separator $R_{SEP}$ is a function of the porosity and thickness of the porous separator 702.

The resistance of the electrolyte solution $R_{ES}$ is a function of the conductivity of the particular electrolyte solution used. In selecting the type of electrolyte solution, several tradeoffs are considered. Aqueous electrolyte solutions generally have a higher conductivity than do non-aqueous solutions (e.g., by a factor of 10). However, aqueous solutions limit the working voltage of the capacitor cell to around 1.0 volt. Because the energy stored in the cell is a function of the square of the voltage, high-energy applications are better served using a non-aqueous electrolyte, which permit cell voltages on the order of 2.0 to 3.0 volts.

The preferred electrolyte, a mixture of acetonitrile ($CH_3CN$) and a suitable salt, exhibits a conductivity on the order of 60 ohm$^{-1}$ cm$^{-1}$.

A result of the present embodiment is that $R_C + R_{EL}$ are reduced to a value that is small in comparison to $R_{SEP} + R_{ES}$.

Referring to FIG. 8, a side cross-sectional view is shown of the foil 302 of FIG. 4 wherein both first and second sides 802, 804 of the foil 302 include regions 806, 808, 810, 812 having the first layer of conducting carbon 814 and the second layer of activated carbon 816, and further include the three lanes 308, 310, 312 of the foil 302 separated by the regions 806, 808, 810, 812 coated with the first layer of conducting carbon 814 and a second layer of activated carbon 816.

The embodiment of FIG. 8 is identical to the embodiment of FIGS. 5 and 7, except that instead of having the first layer 814 and the second layer 816 (and the three lanes of foil 308, 310, 312 without the first layer 814 and the second layer 816) on only one side of the foil, the first layer 814 and the second layer 816 are formed on both sides 802, 804 of the foil 302, effectively doubling the amount of carbon present in the foil electrode, and thereby increasing the capacitance of the electrochemical double layer capacitor.

The foil 302 of FIG. 8 is made in accordance with the process described above in reference to FIGS. 2 through 4, except that the foil 302 passes through the slurry transfer apparatus 200 (FIG. 2) two additional times (or passes through two additional slurry transfer apparatus, inline with an initial two slurry transfer apparatus 200) so that a total of four layers of carbon are deposited onto the foil 302, two layers 814, 816 on each side 802, 804. The foil 302 is inverted after the first layer 814 and the second layer 816 are formed on the first side 802, so that a first layer 814 and a second layer 816 can be formed on the second side 804 of the foil 302.

Alternatively, the foil 302 may be inverted after the first layer 814 is formed on the first side 802, so that the first layer

**EXHIBIT 3
PAGE 84**

US 6,631,074 B2

15

814 on the second side 804 can be formed; thereafter the foil 302 is inverted again so that the second layer 816 can be formed on the first side 802; and, finally, the foil 302 is again inverted so that the second layer 816 on the second side 804 can be formed.

The foil 302, having a first layer 814 and a second layer 816 on each side 802, 804 is then cut along the cut lines 406, 408, 410, 412 depicted, as described above in reference, for example, for FIGS. 4 through 6.

Other possible methods of making the carbon electrodes include employing perforated foil collector plates or screens (not shown). The carbon slurry may be coated onto the perforated foil collector plates or screens through an extrusion process using a die, thus enabling the coating process to be completed in two steps (one for the first layer on both sides of the perforated foil collector plates or screens, and another for the second layer on both sides of the perforated foil collector plates or screens), minimizing the number of process steps thus lowering cost.

Referring next to FIG. 9, a side cross-sectional view is shown of four foil electrodes 902, 904, 906, 907 such as in FIG. 8, having first and second sides 908, 910, 912, 914, 916, 918, 917, 919 including the first layer of conducting carbon 920 and the second layer of activated carbon 922, with the second layer of activated carbon 922 of first and second ones of the foil electrodes 902, 904 juxtaposed against respective sides 924, 926 of a first porous separator 928; another second layer of activated carbon 922 of second and third ones of the foil electrodes 904, 906 juxtaposed against respective sides 930, 932 of a second porous separator 934; and a further second layer of activated carbon 922 of first and fourth ones of the foil electrodes 902, 907 juxtaposed against respective sides 931, 933 of a third porous separator 935 so as to form first, second, third and fourth carbon electrodes 902, 904, 906, 907 electrically (but not ionically) isolated from one another by the first, second and third porous separators 928, 934, 935.

The four foil electrodes 902, 904, 906, 907 and the porous separators 928, 934, 935 are immersed in the electrolyte solution, and function similarly to the foil electrodes 602, 604 separator 702 and electrolyte solution described in reference, for example, to FIG. 7. Note, however, that the first and third ones of the foil electrodes 902, 906 have their contact edges 936, 938 (to the right as depicted) electrically connected, i.e., shorted (not shown), so that such first and third ones of the foil electrodes 902, 906 serve as one electrode of the electrochemical double layer capacitor 900, and the second and forth ones of the foil electrodes 904, 907 have their contact edges 940, 941 (to the left as depicted) electrically connected, i.e., shorted (not shown), so that such second and fourth ones of the foil electrodes 904, 907 serve as another electrode of the electrochemical double layer capacitor 900.

Referring to FIG. 10, a partial top view is shown illustrating winding layers comprising a pair of the carbon electrodes 1002, 1004, such as in FIG. 8, having first and second sides including the first layer of conducting carbon and the second layer of activated carbon, and being separated by the first and second porous separators 1006, 1008.

Shown is a first foil electrode 1002, a first separator 1006, a second foil electrode 1004, and a second separator 1008. As can be seen, the first foil electrode 1002 and the second foil electrode 1004, e.g., the positive foil electrode 1002 and the negative foil electrode 1004, are offset from the first separator 1006 and the second separator 1008, and are positioned on opposite sides, e.g., top and bottom sides, of the first separator. (This difference in width and the rela-

16

tionship between the foil electrodes and the separators can also be seen in FIG. 9.) The second separator 1008 is positioned under the second foil electrode 1004 so that when the first and second separators 1006, 1008, and the first and second foil electrodes 1002, 1004 are rolled together, opposite sides of the first and second separators 1006, 1008 provide insulation between adjacent sides of the first foil electrode 1002 and the second foil electrode 1004.

Advantageously, the first and second foil electrodes 1002, 1004 are double sided, as depicted in FIG. 8, in that they have been coated with the first and second layers on both sides. In this way, the amount of carbon in each electrode is effectively doubled.

When the first foil electrode 1002 is placed against the first separators 1006, a portion 1010 of a contact edge 1012 of the first foil electrode 1002 extends beyond a first edge 1014 of the first and second separators 1006, 1008. The portion 1010 of the contact edge 1012 of the first foil electrode 1002 may be, for example, 0.125 inches wide, while the contact edge 1012 of the first foil electrode 1002 may be, for example, 0.250 inches wide.

At the same time, a portion 1016 of the first and second porous separators 1006, 1008 at an opposite edge 1018 of the first and second porous separators 1006, 1008 extends beyond the first foil electrode 1002 in order to prevent shorting of the first foil electrode 1002 with a contact edge 1020 of the second foil electrode 1004. The portion 1016 of the first and second separators 1006, 1008 may be, for example, 0.125 inches wide.

A portion 1022 of the contact edge 1020 of the second foil electrode 1004 extends beyond the opposite edge 1018 of the first and second separators 1006, 1008, e.g., by 0.125 inches, and a portion 1023 of the first and second porous separators 1006, 1008 at the first edge 1014 of the first and second porous separators 1006, 1008 extends beyond the second foil electrode 1004, e.g., by 0.125 inches, in order to prevent shorting of the second foil electrode 1004 with the contact edge 1012 of the first foil electrode 1002. The contact edge 1020 of the second foil electrode 1004 may be, for example, 0.250 inches wide.

Portion 1010, 1022 of the contact edges 1012, 1020 of the first foil electrode 1002 and second foil electrode 1004 that extend beyond the first and second (or opposite) edges 1014, 1018, respectively, of the first and second separators 1006, 1008 serve as points of contact for the first foil electrode 1002 and second foil electrode 1004, respectively.

FIG. 11 is an end, assembly cross-sectional view of a "jellyroll" electrode assembly 1100 comprising a pair of the carbon electrodes 1102, 1104, such as in FIG. 8, having first and second sides including the first layer of conducting carbon and the second layer of activated carbon, and being separated by first and second porous separators 1106, 1108 in accordance with a "jellyroll" embodiment employing the winding layers of FIG. 10.

Shown is the first foil electrode 1102, the second foil electrode 1104, the first separator 1106, and the second separator 1108. As can be seen, layers comprising the first separator 1106, the first foil electrode 1102, the second separator 1108, and the second foil electrode 1106 are rolled in a "jellyroll" fashion such that each of two coated surfaces of the first foil electrode 1102 and the second foil electrode 1104 are separated by the first and second separators 1106, 1108, respectively, thereby maximizing surface area per unit volume and maximizing capacitance.

The two foil electrodes 1102, 1104 are offset (as described further hereinabove, so as to leave their respective contact edges extending beyond first and second edges of the first

EXHIBIT 3
PAGE 85

US 6,631,074 B2

17

and second separators **1106**, **1108**) and assembled into a jellyroll configuration electrically separated from each other by the first separator **1106** and the second separator **1108**, which can be a polymer film or paper.

Preferably, the first separator **1106** and the second separator **1108** extend beyond ends of the first electrode **1102** and the second electrode **1104** (as described further hereinabove), to prevent "shorting," i.e., electrical current from flowing between the first foil electrode **1102** and the second foil electrode **1104**.

Referring next to FIG. **12**, a perspective view is shown of the "jellyroll" electrode assembly **1100** of FIG. **11** including with aluminum arc sprayed regions **1202**, **1204** at an end **1206** of the "jellyroll" electrode assembly **1200** so as to provide a low resistance path to the contact edge **1208** of the first carbon electrode, and including additional arc sprayed regions (not shown) at an opposite end of the "jellyroll" electrode assembly **1200** so as to provide another low resistance path to the contact edges of the second carbon electrode.

Once the "jellyroll" electrode assembly **1200** is formed, the contact edge **1208** of the first electrode and the contact edge of the second electrode are "smeared" by applying a slight pressure against the respective contact edges, both axially and radially toward a center of the "jellyroll" electrode assembly **1200**. As a result of this "smearing" the contact edges are bent radially toward a center **1210** of the "jellyroll" electrode assembly **1200**, which tends to expose surfaces of the contact edge **1208** of the first electrode and the contact edge of the second electrode and to close gaps between windings at the contact edge **1208** of the first electrode and between windings of the contact edge of the second electrode.

The "jellyroll" electrode assembly **1200** is formed by winding or rolling the first foil electrode, the second foil electrode, the first separator, and the second separator, as described hereinabove.

Once the "jellyroll" electrode assembly **1200** is formed, the contact edge **1208** of the first electrode and the contact edge of the second electrode are "smeared" by applying a slight pressure against the respective contact edges, both axially and radially toward a center of the "jellyroll" electrode assembly **1200**. As a result of this "smearing" the contact edges are bent radially toward a center **1210** of the "jellyroll" electrode assembly **1200**, which tends to expose surfaces of the contact edges **1208** and to close gaps between windings at the contact edges **1208**.

Once "smearing" of the contact edges **1208** is complete, the first end **1206** and second end **1212** of the "jellyroll" electrode assembly **1200** are masked, so that two sectors of each of the first and second ends **1206**, **1212** are exposed, while a remainder of the first and second ends **1206**, **1212** are masked. The two sectors extend from an outside corner edge of the "jellyroll" electrode assembly **1200** and extend radially about two thirds of the way to a center axis **1210** of the "jellyroll" electrode assembly **1200**. Each sector is about 45° wide.

Once the first end **1206** of the "jellyroll" electrode assembly **1200** is masked, the first end **1206** is arc sprayed with aluminum or another electrically conductive material compatible with the electrolyte solution. Once the arc spraying is complete, the masks are removed from the first end **1206**. One purpose of the arc spraying of the first end **1206** of the "jellyroll" electrode assembly **1200** is to provide a low resistance current path between windings (i.e., between contact edges) of the first foil electrode, thus reducing overall electrode resistance.

18

First and second aluminum regions (not shown) are also formed at the second end of the "jellyroll" electrode assembly in a manner similar to that in which first and second aluminum regions **1202**, **1204** are formed at the first end of the "jellyroll" electrode assembly **1200**, providing a low resistance current path between windings (i.e., between contact edges of the second electrode, thus further reducing overall electrode resistance.

In order to create a low resistance contact, a collector disk (not shown) and a terminal post (not shown) are aligned with and placed against each of the ends of the "jellyroll" electrode assembly **1200** so as to place the collector disk into electrical contact with the contact edges of the foil electrode at the respective end of the "jellyroll" electrode assembly **1200**, and with the first and second aluminum regions **1202**, **1204** at the respective end of the "jellyroll" electrode assembly **1200**.

The collector disk is then attached to the end of the "jellyroll" electrode assembly **1200** at the first and second aluminum regions by laser welding, thus providing a low resistance contact between the end of the "jellyroll" electrode assembly **1200** and the terminal assembly. As a result, a low resistance contact is provided between the first foil electrode and the first terminal assembly and the second foil electrode and the second terminal assembly.

Alternatively, the first terminal assembly and the second terminal assembly may be aligned with and placed against the ends of the "jellyroll" electrode assembly **1200** prior to the formation of the first and second aluminum regions, in which case the arc spraying of the first and second aluminum regions serves to "weld" the collector disks into electrical contact with the contact edges of the first and second foil electrodes.

In one variation, when the collector disks are seated against the aluminum coated regions of the ends of the "jellyroll" electrode assembly **1200**, and when the amount of aluminum at the aluminum coated regions is sufficient to raise the collector disks above remaining contact edges of the ends of the "jellyroll" electrode assembly **1200**, thereby creating a small gap between the collector disks and the contact edges, this allows the electrolyte solution to flow beneath the collector disks and then to flow between the windings of the "jellyroll" electrode assembly **1200** that lie beneath the collector disks.

Preferably the collector disks are seated against both the coated regions and the uncoated regions of the ends of the "jellyroll" electrode assembly **1200**, with sufficient electrolyte solution being permitted to flow between the collector disks and the ends of the "jellyroll" electrode assembly **1200** to permit the electrolyte solution to flow between the windings of the "jellyroll" electrode assembly **1200** that lie between the collector disks.

Referring to FIG. **13**, a side cross-sectional view is shown of the "jellyroll" electrode assembly **1200** of FIG. **12**, having the winding layers of FIG. **11**.

Shown is the "jellyroll" electrode assembly **1200** made up of the windings, the contact edge **1302** of the first foil electrode, the contact edge **1304** of the second foil electrode, and a hollow core **1306**.

In order to form the "jellyroll" electrode assembly's winding layers, the first and second foil electrodes, and the first and second separators, are wound, as described herein, as described herein.

Referring to FIG. **14**, is a side cross-sectional view of the "jellyroll" electrode assembly **1200** of FIG. **12**, having the winding layers of FIG. **11**, and further having a first stud **1402** (or plug **1402**), and a first collector disk **1404**.

**EXHIBIT 3**
**PAGE 86**

19                                                                                      20

Shown are the windings, the contact edge **1302** of the first foil electrode, the contact edge **1304** of the second electrode, the hollow core **1306**, and the first stud **1402**, and the first collector disk **1404**.

The first stud **1402** is aligned with a first end of the hollow core **1306**, and is inserted into an opening at the end of the hollow core **1306**, a threaded post **1406** extends from the stud **1402**, away from the hollow core **1306**.

When the stud **1402** is inserted into the opening at the end of the hollow core **1306**, the first collector disk **1404** seats against the first end of the "jellyroll" electrode assembly **1200** including the first and second aluminum regions of the first end of the "jellyroll" electrode assembly **1200**, and is laser welded to the first end of the "jellyroll" electrode assembly **1200**, including the first and second aluminum regions of the first end of the "jellyroll" electrode assembly **1200**.

Referring next to FIG. 15, a side cross-sectional view is shown of the "jellyroll" electrode assembly **1200** of FIG. 12, having the winding layers of FIG. 11, and the first plug **1402** of FIG. 14, and further having a remainder of a first terminal assembly **1502**.

Shown are the windings, the contact edge **1302** of the first foil electrode, the contact edge **1304** of the second foil electrode, the hollow core **1306**, the first stud **1402**, a first collector disk **1404**, a first terminal post **1504**, and a lid **1506**.

The lid **1506** is welded to the first terminal post **1504**, which includes a socket, which may be, for example, threaded and formed at a base of the first terminal post **1504**. Next, a hole in a center at the collector disk is placed over the threaded post of the first stud **1402**, and the first terminal post **1504** is coupled to the threaded post on the first stud **1402** at the-socket, such as by screwing the first terminal **1504** post onto the first stud **1402**, thereby interposing the collector disk **1404** between the first stud **1402** and the first terminal post **1504**.

The first terminal post **1504** (and second terminal post, described below) may have a diameter of approximately 0.625 inches.

Referring to FIG. 16, a side cross-sectional view is shown of the "jellyroll" electrode assembly **1200** of FIG. 12, having the winding layers of FIG. 11, the first plug **1402** of FIG. 14 and the remainder of a first terminal assembly **1502** of FIG. 15, and further having a second collector disk **1604** and a second terminal post **1606**.

Shown is the "jellyroll" electrode assembly's windings, the contact edge **1302** of the first foil electrode, the contact edge **1304** of the second electrode, the hollow core **1306**, the first stud **1402**, the first collector disk **1404**, the first terminal post **1504**, the lid **1506**, the second stud **1602**, the second collector disk **1604**, and the second terminal post **1606**.

The second stud **1602** includes a threaded post onto which a hole in a center of the second collector disk **1604** is placed, and to which the second terminal post **1606** is coupled, such as by screwing a threaded socket of the second terminal post **1606** onto the second stud **1602**. The second stud/collector disk/terminal post **1602/1604/1606** is aligned with a second end of the hollow core **1306**.

The second stud **1602** is then inserted into an opening at the second end of the hollow core **1306**, and the second collector disk **1604** is seated against the second end of the "jellyroll" electrode assembly **1200** including the first and second aluminum regions of the second end of the "jellyroll" electrode assembly **1200**. The second collector disk **1604** is laser welded to the second end of the "jellyroll" electrode assembly **1200**, including the first and second aluminum regions of the second end of the "jellyroll" electrode assembly **1200**.

Referring to FIG. 17, a side, exploded cross-sectional view is shown of the "jellyroll" electrode assembly **1200** of FIG. 12, having the winding layers of FIG. 11, the first plug **1402** of FIG. 14, the remainder of the first terminal assembly **1502** of FIG. 15 and the second plug **1602**, the second collector disk **1604** and the second terminal post **1606** of FIG. 16, and further having a first insulating washer **1702**, and a can **1704**.

Shown is the "jellyroll" electrode assembly **1200** the contact edge **1302** of the first foil electrode, the contact edge of the second foil electrode, the hollow core **1306**, the first stud **1402**, the first collector disk **1404**, the first terminal post **1504**, the lid **1506**, the second stud **1602**, the second collector disk **1604**, the second terminal post **1606**, a first insulating washer **1702** and a can **1704**.

The first insulating washer **1702** is placed over the second terminal post **1606**. The first insulating washer **1702** may be made from Tefzel. Next, the can **1704** is slid over the "jellyroll" electrode assembly **1200** so that the second terminal post **1606** enters the can **1704** first. The can **1704** may be made, for example, from aluminum and have a wall thickness of 0.04 inches. The diameter of the can **1704** may be for example 2.5 inches, and the length of the can may be for example 6 inches. Next, the second terminal post **1606** passes through an axial hole **1706** at an end of the can **1704**. A flange on the first insulating washer **1702** prevents electrical contact between the second terminal post **1606** and the axial hole **1706**.

Simultaneously, the lid **1506** is drawn into the opening of the can **1704**, so that a rim of the lid **1506** sits just inside a lip of the opening of the can **1704**. The rim of the lid **1506** is then welded to the lip of the opening of the can **1704**.

Referring next to FIG. 18, a partial side cross-sectional view is shown of the second terminal post **1606** of FIG. 16, and the first insulating washer **1702**, and the can **1704** of FIG. 17, and further having a second insulating washer **1802**, a flat washer **1804**, a Belleville washer **1806** and a locknut **1808**.

After the second terminal post **1606** passes through the axial hole **1706** (FIG. 17) at an end of the can **1704**, the second terminal post **1606** passes through the second insulating washer **1802**. The second insulating washer **1802** may also be made from Tefzel. The second terminal post **1606** next passes through the flat washer **1804**, and the Belleville washer **1806**. The locknut **1808** is then tightened over the Belleville washer **1806**, which compresses the Belleville washer **1806** against the flat washer **1804**, which in turn is compressed against the second insulating washer **1802**. The second insulating washer **1802** is compressed against an exterior periphery of the axial hole **1706** (FIG. 17) in the can **1704**, and as the second terminal post **1606** is drawn by this compressive force toward the axial hole **1706** (FIG. 17), the first insulating washer **1702** is compressed between the second terminal post **1606** and an interior periphery of the axial hole.

Referring to FIG. 19, a side cross-sectional view is shown of the "jellyroll" electrode assembly **1200** of FIG. 12, having the winding layers of FIG. 11, the first plug **1402** of FIG. 14, the remainder of the first terminal assembly **1502** of FIG. 15, the second plug **1602**, the second collector disk **1604** and the second terminal post **1606** of FIG. 16, the first insulating washer **1702**, and the can **1704** of FIG. 17, the second insulating washer **1802**, the flat washer **1804**, the Belleville washer **1806** and the locknut **1808** of FIG 18.

As can be seen, the first insulating washer **1702** and the second insulating washer **1802**, including the flange of the first insulating washer, serve to insulate the second terminal

**EXHIBIT 3**
**PAGE 87**

US 6,631,074 B2

21

post **1606** from the can **1704**. The flat washer **1804**, and the Belleville washer **1806** are compressed against the second insulating washer **1802** by the locknut **1808**, as the second terminal post **1606** is drawn through the hole in the can **1706** to form an hermetic seal between the second terminal post **1606**, the first insulating washer **1702**, the second insulating washer **1802** and the can **1704**. The Belleville washer **1806** assures that this seal is maintained through thermal cycling by providing a spring force against the flat washer **1804** and the locknut **1808**.

Referring to FIG. **20**, a perspective view is shown of an electrochemical double layer capacitor **2000** made in accordance with the "jellyroll" embodiment of FIG. **19**.

Once the locknut **1808** (FIG. **18**) is tightened against the Belleville washer **1806** (FIG. **18**), as described above, a hermetic seal is formed between the hole **1706** (FIG. **17**) in the can **1704**, the first insulating washer **1702** (FIG. **18**), the second insulating washer **1802** (FIG. **18**), and the second terminal post **1606**. Similarly, the welding of the lid **1506** to the lip **2002** of the can **1704**, and the welding of the lid **1506** to the first terminal post **1504** form another hermetic seal.

A hole **1902** in the lid **1506**, however, remains, and serves as a fill port for an electrolyte solution.

In accordance with the present embodiment, the electrolyte solution may be made up of a solvent and a salt. A preferred solvent is acetonitrile ($CH_3CN$) and preferred salts include 1.4M tetraethyl ammonium tetrafluro borate. Other salts may be used, such as, triethyl ammonium, and other alkyl ammonium salts. Other solvents may include propylene carbonate, ethylene carbonate, ethyl methyl carbonate, dimethyl carbonate, methyl formate, and combinations thereof. Preferred electrolyte has a conductivity of from between ten and one hundred milli-Siemens, e.g., 66 mS, a liquidus range of −55 to 200, e.g., −55 to 87 degrees Celsius and a voltage range of greater than 2 volts.

The electrolyte solution is added to the can **1704** through the hole **1902**. Evacuation of the can **1704** can be performed prior to the adding of the electrolyte solution, so that the electrolyte solution is drawn (backfilled) into the can and into the jellyroll electrode assembly **1200** (FIG. **13**). In particular, the electrolyte solution is drawn into the porous surfaces of the first foil electrode and the second foil electrode made up of the first layer of conductive carbon, and the second layer of activated carbon. Some settling of the electrolyte solution may result in a need for additional electrolyte solution to be added before a plug **2004** and bushing **2006** are inserted into the lid **1506**.

The bushing **2006** is then placed into the hole **1902**, and is seated against a flange (not shown) at an interior edge of the hole **1902**. The bushing **2006** is a hollow cylinder in shape. Next, the plug **2004**, which is cylindrical in shape is pressed into a center of the bushing **2006**, which presses the bushing **2006** against an interior of the hole **1902**, thereby forming a hermetic seal between the hole **1902**, bushing **2006**, and plug **2004**.

Advantageously, the plug **2004** and bushing **2006** may be selected to dislodge when a prescribed level of pressure is reached within the can **1704**, thereby providing an overpressure safety mechanism.

Shown are the first terminal post **1504**, the lid **1506**, the can **1704**, the hole **1902** in the lid **1506**, the bushing **2006**, and the plug **2004**. Also, shown is the second terminal post **1606**.

Referring next to FIG. **21**, a side cross-sectional view is shown of a variation of the "jellyroll" embodiment of FIGS. **12** through **20**, having an improved collector plate, and a reduced number of parts in a first terminal assembly **2102**, and a second terminal assembly **2120**.

22

An electrochemical double layer capacitor made in accordance with the above-described embodiment may have a capacitance of about 2,650 to 2,700 Farads, with an impedance less than 0.6 milli-ohms.

Shown is the "jellyroll," windings **2106** of the "jellyroll" electrode assembly **2108**, the contact edge **2110** of the first foil electrode, the contact edge **2112** of the second foil electrode, the hollow core **2160**, a first stud/collector disk **2114**, the first terminal post **2116**, the lid **2118**, the second stud/collector disk/terminal post **2120**, the can **2122**, a first insulating washer **2124**, a second insulating washer **2126**, a flat washer **2128**, a Belleville washer **2130**, and a locknut **2132**.

In order to form the "jellyroll" windings **2106** comprising the first and second foil electrodes, and the first and second separators, as described hereinabove, the "jellyroll" windings **2106** are wound, as described hereinabove.

The first stud/collector disk **2114** comprises a disk-shaped portion **2134**, a stud portion **2136**, and a fastener **2138**, such as a screw, formed as a single integral piece. The first/stud collector **2114** is aligned with the first end of the hollow core **2160**, and the stud portion **2136** of the first stud/collector disk **2114** is inserted into an opening at the first end of the hollow core **2160**.

When a stud portion **2136** of the first stud/collector disk **2114** is inserted into the opening at the first end of the hollow core **2160**, the disk-shaped portion **2134** (or collector disk portion **2134**) of the first/stud collector disk **2114** seats against the first end of the "jellyroll" electrode assembly **2108** including first and second aluminum coated regions (similar to those shown in FIG. **12**) on the first contact edge **2110** of the first end of the "jellyroll" electrode assembly **2108**, and is laser welded to the first and second aluminum regions and the first contact edge **2110** of the first end of the "jellyroll" electrode assembly **2108**.

The lid **2118** is then welded to the first terminal post **2116**, and a socket, which may be for example, threaded, is coupled to the fastener **2138** on the first stud/collector disk **2114**, such as by screwing the first terminal post **2116** onto the first stud/collector disk **2114**.

Next, the second stud/collector disk/terminal post **2120** is aligned with the second end of the hollow core **2160**. The second stud/collector disk/terminal post **2120** includes a stud portion **2140**, a disk-shaped portion **2142** (or collector disk portion **2142**), and a terminal post portion **2144** (or second terminal post **2144**). The stud portion **2140** of the second stud/collector disk/terminal post **2120** is inserted into an opening at a second end of The hollow core **2160**, and the collector disk portion **2142** of the second stud/collector disk/terminal post **2120** is seated against the second end of the "jellyroll" electrode assembly **2108** including the first and second aluminum regions (similar to those shown in FIG. **12**) and second contact edge **2112** of the second end of the "jellyroll" electrode assembly **2108**. The collector disk portion **2142** of the second stud/collector disk/terminal post **2120** is laser welded to the second end of The "jellyroll" electrode assembly **2108** including the first and second aluminum regions and the second contact edge **2112** of the second end of the "jellyroll" electrode assembly **2108**.

The can **2122** is then slid over the "jellyroll" electrode assembly **2108** so that the second stud/collector disk/terminal post **2120** enters the can **2122** first, and passes through the first insulating washer **2124**. The first insulating washer **2124** may be made from Tefzel. Next, the second stud/collector disk/terminal post **2120** passes through an axial hole at an end of the can **2122** and through the second insulating washer **2126**. The second insulating washer **2126** may also be made from Tefzel.

EXHIBIT 3
PAGE 88

US 6,631,074 B2

23                                                                                    24

The second stud/collector disk/terminal post **2120** next passes through the flat washer **2128** and the Belleville washer **2130**. The locknut **2132** is then tightened over the Belleville washer **2130**, which compresses the Belleville washer **2130** against the flat washer **2128**, which in turn is compressed against the second insulating washer **2126**. The second insulating washer **2126** is compressed against the exterior periphery of the axial hole in the can **2122**, and as the second stud/collector disk/terminal post **2120** is drawn by this compressive force toward the axial hole, the first insulating washer **2124** is compressed between the second stud/collector disk/terminal post **2120** and an interior periphery of the axial hole in the can **2122**. A flange on the first insulating washer **2124** prevents electrical contact between the second stud/collector disk/terminal post **2120** and a rim of the axial hole.

Simultaneously, the lid **2118** is drawn into an opening of the can **2122**, so that a rim of the lid **2118** sits just inside a lip of the opening of the can **2122**. The rim of the lid **2118** is then welded to the lip of the opening of the can **2122**.

Once the locknut **2132** is tightened against the Belleville washer **2130**, a hermetic seal is formed between the axial hole, the first insulating washer **2124**, the second insulating washer **2126**, and the second stud/collector disk/terminal post **2120**.

Similarly, the welding of the lid **2118** to the lip of the can **2122**, and the welding of the lid **2118** to the first terminal post **2116** form another hermetic seal.

The hole **2146** in the lid **2118** remains and serves as a fill port for an electrolyte solution, which may be made up of a solvent and a salt, as described above. Once the electrolyte solution is in the can (i.e., drawn into the can under vacuum, as described above), a bushing **2148** is then placed into the hole **2146**, and is seated against a flange **2150** at an interior edge of the hole **2146**. The bushing **2148** is a hollow cylinder in shape, fashioned to receive a plug **2152**.

The plug **2152**, which is cylindrical in shape, is next pressed into a center of the bushing **2148**, thereby compressing the bushing **2148** against an interior of the hole **2146** and forming a hermetic seal between the hole **2146**, the bushing **2148**, and the plug **2152**.

The plug **2152** and the bushing **2148** may be selected to dislodge when a prescribed level of pressure is reached within the electrochemical double layer capacitor, thereby forming an overpressure safety mechanism.

FIG. 22 is a top view of a second stud/collector disk/terminal post **2120** of the second terminal assembly **2104** of the variation of FIG. 21.

Shown are a collector disk portion **2142**, a threaded portion **2406**, and a terminal post portion **2144**. The terminal post portion **2144** includes a threaded portion for engaging the locknut **2132** (FIG. 21), and thereby allowing the locknut **2132** (FIG. 21) to be tightened down onto the terminal post portion **2144** during assembly as described above.

Advantageously, by forming the stud portion **2140** (FIG. 21), the collector disk portion **2142**, and the terminal post portion **2144** in a single unit, the assembly steps and the number of pieces required to construct the electrochemical double layer capacitor of the present embodiment are reduced, thereby reducing cost and complexity.

FIG. 23 is a side view of a stud/collector disk/terminal post **2120** of the second terminal assembly **2104** of the variation of FIG. 21.

Shown are a stud portion **2140**, the threaded portion **2406**, a collector disk portion **2142**, and a terminal post portion **2144**. The terminal post portion **2144** includes a threaded portion for engaging the locknut **2132** (FIG. 21), and thereby

allowing the locknut **2132** (FIG. 21) to be tightened down onto the terminal post portion **2144** during assembly as described above.

FIG. 24 is a side view of a stud/collector disk **2400** of the first terminal of the variation of FIG. 21.

Shown are a stud portion **2402** (also shown as the stud portion **2136** in FIG. 21), a collector disk portion **2404** (also shown as the collector disk portion **2134** in FIG. 21), and a threaded portion **2406**. The threaded portion **2406** is inserted into a threaded hole in the first terminal post (not shown) during assembly, as described above.

FIG. 25 is a top view of a stud/collector disk **2400** of the first terminal of the variation of FIG. 21.

Shown are the collector disk portion **2404** and the threaded portion **2406** along with a notched cylindrical portion **2502**. The notched cylindrical portion **2502** is used to apply a rotational force to the threaded portion **2406** as the threaded portion is assembled with the first terminal post (not shown), such as by using a tool that engages flat surfaces of notches in the notched cylindrical portion **2502**. The notches in the notched cylindrical portion **2502** do not affect the surface area of the collector disk that contacts the second electrode at the second end of the "jellyroll."

Referring to FIG. 26, a side cross-sectional view is shown of another variation of the "jellyroll" embodiment of FIGS. 12 through 20, employing a pocket **2602** in the can in a modified second electrode assembly.

Shown are the "jellyroll" electrode assembly **1200** of FIG. 13, a first collector disk **1404**, a first terminal post **1504**, a lid **2606**, a first insulating washer **1702**, a second insulating washer **1802**, a flat washer **1804**, a Belleville washer **1806**, a locknut **1808**, a hole **1902** in the lid **2606**, a second collector disk **1604**, second terminal post **1504**, a can **2604**, and the pocket **2602** in the can **2604**.

The "jellyroll" electrode assembly **1200** is prepared in accordance with the process described above, and the first and second collector disks **1404**, **1604**, and the first and second terminal posts **1504**, **1606** are affixed to the "jellyroll" electrode assembly **1200**, such as by laser welding or arc spraying, as described above. Next, the "jellyroll" electrode assembly **1200**, with the respective first and second collector disks **1404**, **1604**, and first and second terminal posts **1504**, **1606**, is slid into the can **2604** (with the second terminal post **1606** entering the can **2604** first). The second terminal post **1604** seats in an interior of the pocket **2602** in the can **2604** as the "jellyroll" electrode assembly **1200** is slid into the can **2604**, and the pocket **2602** is crimped against the second terminal post **1606**, so as to electrically and mechanically connect the second terminal post **1606** to the interior of the pocket **2602**. An exterior of the pocket serves as a first terminal of the electrochemical double layer capacitor **1200**.

Next, the first insulating washer **1702** is slid over the first terminal post **1504**, and then the lid **2606** is inserted into the can **2604** over the first terminal post **1504**. A rim of the lid **2606** is welded to a lip of the can **2604**, as described above, so as to form a hermetic seal. The second insulating washer **1802**, the flat washer **1804**, and the Belleville washer **1806** are slid over the first terminal post **1504**, and the locknut **1808** is tightened down onto the Belleville washer **1806**, so as to form a further hermetic seal.

The electrolyte solution is then introduced into the can through the hole **1902** in the lid, as described above, and the bushing (not shown), and plug (not shown) are used to form a hermetic seal at the hole **1902** in the lid.

Referring to FIG. 27, a side cross-sectional view is shown of another variation of the "jellyroll" embodiment of FIGS.

EXHIBIT 3
PAGE 89

US 6,631,074 B2

25

12 through 20, employing a crimp seal to secure a crimp lid 2702 to the can 2604, and employing a pocket 2704 in the lid 2702 in a modified first electrode assembly.

Shown are the "jellyroll" electrode assembly 1200 of FIG. 13, a first collector disk 1404, a first terminal post 1504, a crimp lid 2702, a second collector disk 1604, a second terminal post 1606, a can 2604, and a pocket 2602 in the can 2604, and a pocket 2704 in the crimp lid 2702.

The "jellyroll" electrode assembly 1200 in prepared in accordance with the process described above, and the first and second collector disks 1404, 1604, and the first and second terminal posts 1504, 1606 are affixed to the "jellyroll" electrode assembly 1200, such as by laser welding or arc spraying, as described above. Next, the "jellyroll" electrode assembly 1200, with the respective first and second collector disks 1404, 1604, and first and second terminal posts 1504, 1606, is slid into the can 2604 (with the second terminal post 1606 entering the can 2604 first). The second terminal post 1606 seats in an interior of the pocket 2602 in the can 2604 as the "jellyroll" electrode assembly 1200 is slid into the can 2604, and the pocket 2602 in the can 2604 is crimped against the second terminal post 1606, so as to electrically and mechanically connect the second terminal post 1606 to the interior of the pocket 2602. An exterior of the pocket serves as a second terminal of the electrochemical double layer capacitor.

Next, the electrolyte solution is introduced into the can, as described above.

Then, a seal 2706 is placed onto a lip of the can 2604, and the crimp lid 2702 is placed into the opening of the can 2604, with a rim of the crimp lid 2702 engaging the seal 2706. The first terminal post 1504 seats in an interior of the pocket 2704 in the crimp lid 2702 as the crimp lid 2702 is placed into the opening of the can 2604.

The lip of the can 2604 is crimped onto the rim of the crimp lid 2702, with the seal 2706 being interposed thereinbetween, so as to form a hermetic seal between the crimp lid 2702 and the can 2604.

An interior of the pocket 2704 in the crimp lid 2702 is then crimped against the first terminal post 1504, so as to electrically and mechanically connect the first terminal post 1504 to the pocket 2704 in the crimp lid 2702. An exterior of the pocket 2704 in the crimp lid 2702 serves as a first terminal of the electrochemical double layer capacitor.

Referring to FIG. 28, a side cross-sectional view is shown of another variation of the "jellyroll" embodiment of FIGS. 12 through 20, employing a low profile "can-within-a-can" assembly and modified first and second electrode assemblies.

Shown are the "jellyroll" electrode assembly 1200 of FIG. 13, a first collector disk 1404, a first terminal post 1504, a second collector disk 1604, a second terminal post 1606, an inner can 2802, an outer can 2804, a pocket 2806 in the inner can 2802, and a pocket 2808 in the outer can 2804.

The "jellyroll" electrode assembly 1200 is prepared in accordance with the process described above, and the first and second collector disks 1404, 1604, and the first and second terminal posts 1504, 1606 are affixed to the "jellyroll" electrode assembly 1200, such as by laser welding or arc spraying, as described above.

A seal 2810 is then placed at a periphery of an interior basal end of the outer can 2804.

Next, the "jellyroll" electrode assembly 1200, with the respective first and second collector disks 1404, 1604, and first and second terminal posts 1504, 1606, is slid into the outer can 2804 (with the second terminal post 1606 entering the outer can 2804 first). The second terminal post 1606

26

seats in an interior of the pocket 2808 in the outer can 2804 as the "jellyroll" electrode assembly 1200 is slid into the outer can 2804, and the pocket 2808 is crimped against the second terminal post 1606, so as to electrically and mechanically connect the second terminal post 1606 to the pocket 2808 in the outer can 2804. An exterior of the pocket serves as a second terminal of the electrochemical double layer capacitor.

The inner can 2802 is then slid into the outer can 2804, with a lip of the inner can 2802 engaging the seal 2810 at the periphery of the interior basal end of the outer can 2804. As the inner can 2802 is slid into the outer can 2804, an interior of the pocket 2806 in the inner can 2802 engages the first terminal post 1504.

A lip of the outer can 2804 is then crimped against a periphery of an exterior basal end of the inner can 2802, so as to form a hermetic seal at the periphery of the interior basal end of the outer can 2804, and the lip of the inner can 2802, with the seal 2810.

The pocket 2806 in the inner can 2802 is then crimped against the first terminal post 1504, so as to electrically and mechanically connect the first terminal post 1504 to the pocket 2806 in the inner can 2802. An exterior of the pocket 2806 in the inner can 2802 serves as a first terminal of the electrochemical double layer capacitor.

The electrolyte solution is then introduced into the inner and outer cans 2802, 2804 through a hole 2812 in the end of the outer can 2804, and a bushing (not shown), and plug (not shown) are used to form a hermetic seal at the hole 1812 in the outer can 1804, as described above.

Referring to FIG. 29, a side cross-sectional view is shown of another variation of the "jellyroll" embodiment of FIGS. 12 through 20, employing a ceramic seal 2902 between the lid 2904 and the first terminal assembly.

Shown are the "jellyroll" electrode assembly 1200 of FIG. 13, a first collector disk 1404, a first terminal post 1504, a lid 2904, a ceramic seal 2902, a second collector disk 1604, second terminal post 1606, a can 2604, and a pocket 2602 in the can 2604.

The "jellyroll" electrode assembly 1200 is prepared in accordance with the process described above.

Next, the ceramic seal 2902 is bonded to the first terminal post 1504, and the lid 2904 is bonded to the ceramic seal 2902, such as by diffusion bonding, so as to form a hermetic, insulating seal between the ceramic seal 2902 and the first terminal post 1404, and between the ceramic seal 2902 and the lid 2904.

Then, the first and second collector disks 1404, 1604, and the first and second terminal posts 1504, 1606 are affixed to the "jellyroll" electrode assembly 1200, such as by laser welding or arc spraying, as described above.

Next, the "jellyroll" electrode assembly 1200, with the respective first and second collector disks 1404, 1604, and first and second terminal posts 1504, 1606, is slid into the can 2604 (with the second terminal post 1606 entering the can 2604 first). The second terminal post 1606 seats in an interior of the pocket 2602 in the can 2604 as the "jellyroll" electrode assembly 1200 is slid into the can 2604, and the pocket is crimped against the second terminal post 1606, so as to electrically and mechanically connect the second terminal post 1606 to the pocket 2602. An exterior of the pocket serves as a second terminal of the electrochemical double layer capacitor.

A rim of the lid 2904 is welded to a lip of the can 2604, as described above, so as to form a hermetic seal.

The electrolyte solution is then introduced into the can 2604 through a hole (not shown) in the lid 2904, and a

EXHIBIT 3
PAGE 90

US 6,631,074 B2

27

bushing (not shown), and plug (not shown) are used to form a hermetic seal at the hole (not shown) in the can **2604**, as described above.

While the invention herein disclosed has been described by the specific embodiments and applications thereof, numerous modifications and variations could be made thereto by those skilled in the art without departing from the scope of the invention set forth in the claims.

What is claimed is:

1. A double layer capacitor comprising:

a first electrode structure that includes a first current collector foil, a first primary coating formed on a portion of the first current collector foil, and a first secondary coating formed on the first primary coating;

a second electrode structure that includes a second current collector foil, a second primary coating formed on a portion of the second current collector foil, and a second secondary coating formed on the second primary coating, wherein the first and second primary coatings include conducting carbon powder and the first and second secondary coatings include activated carbon powder;

a porous separator positioned between the first and second electrodes structures such that the porous separator contacts and separates the first and second secondary coatings; and means for saturating the porous separator and the first and second electrodes structures with a prescribed electrolyte solution.

2. The double layer capacitor of claim **1** further comprising:

a first capacitor terminal; and

a second capacitor terminal:

wherein a portion of the first current collector foil is coupled to the first capacitor terminal and a portion of the second current collector foil is coupled to the second capacitor terminal.

3. An electrode structure for use in a double layer capacitor comprising:

a current collector foil;

28

a primary coating formed on each of a first side and a second side of the current collector foil, each primary coating including conducting carbon and a binder; and

a secondary coating formed on each of the primary coatings, each secondary coating including activated carbon powder, a solvent and a binder.

4. The structure of claim **3** wherein the current collector foil includes a length, a width and a thickness, wherein the primary coating covers an area on each side of the current collector foil across the entire length and across a portion of the width, wherein a contact portion is the portion of the current collector foil not covered by the primary coatings.

5. A double layer capacitor comprising:

a first electrode structure that includes a first current collector foil, a first primary coating formed on each side of the first current collector foil, and a first secondary coating formed on each of the first primary coatings;

a second electrode structure that includes a second current collector foil, a second primary coating formed on each side of the second current collector foil, and a second secondary coating formed on each of the second primary coatings, wherein the first and second primary coatings include conducting carbon powder and the first and second secondary coatings include activated carbon powder;

a porous separator positioned between the first and second electrodes structures such that the porous separator contacts and electrically separates the first and second secondary coatings of the first and second electrode structures facing each other; and

means for saturating the porous separator and the first and second electrodes structures in a prescribed electrolyte solution.

6. The capacitor of claim **5** wherein the first and second secondary coatings further comprise conducting carbon powder.

* * * * *

EXHIBIT 3
PAGE 91

**CERTIFICATE OF SERVICE**

I hereby certify that two copies of the attached **FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT** were personally served on November 2, 2006, on the agent for service of process for Nesscap, Inc., and Nesscap Co., Ltd, as follows:

Huhnsik Chung
Edwards & Angell, LLP
750 Lexington Ave.
New York, NY  10022

_____
Diana J. Coletti

Case No. 06cv2311-JAH-BLM
MAXWELL'S 1st AMENDED COMPLAINT FOR
PATENT INFRINGEMENT

sd-342006

**EXHIBIT 2**

1  Callie A. Bjurstrom, State Bar No. 137816
   Email: cbjurstrom@luce.com
2  Michelle A. Herrera, State Bar No. 209842
   Email: mherrera@luce.com
3  LUCE, FORWARD, HAMILTON & SCRIPPS LLP
   600 West Broadway, Suite 2600
4  San Diego, California 92101-3372
   Telephone No.: 619.236.1414
5  Fax No.: 619.232.8311

6  Brian M. Gaff, State Bar No. 202896
   Email: bgaff@eapdlaw.com
7  EDWARDS ANGELL PALMER & DODGE LLP
   111 Huntington Avenue
8  Boston, MA  02199-7613
   Telephone: 617-439-4444
9  Facsimile: 617-439-4170

10 Attorneys for NessCap, Inc.

11              UNITED STATES DISTRICT COURT

12             SOUTHERN DISTRICT OF CALIFORNIA

13

   MAXWELL TECHNOLOGIES, INC.,              Case No. 06CV2311-JAH(BLM)
14
        Plaintiff,                          **NESSCAP, INC.'S ANSWER TO FIRST**
15                                          **AMENDED COMPLAINT,**
                                            **AFFIRMATIVE DEFENSES AND**
   v.                                       **COUNTERCLAIMS; DEMAND FOR**
16                                          **JURY TRIAL**
   NESSCAP, INC. and NESSCAP CO., LTD.,
17
        Defendants.                         Judge:  The Hon. John A. Houston
18                                          Crtrm: 11

19                                          Complaint Filed: October 17, 2006

20

21         Defendant, NessCap, Inc., hereby answers the First Amended Complaint of Plaintiff

22  Maxwell Technologies, Inc. ("Maxwell") as follows:

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

                                1                    Case No. 06CV2311-JAH(BLM)

1

**I.**

**ANSWER**

**Parties**

4      1.      Maxwell Technologies, Inc. ("Maxwell" or "Plaintiff") is a public corporation existing under the laws of the State of California and has its principal place of business at 9244 Balboa Avenue, San Diego, California 92123.

7      **ANSWER:**   NessCap, Inc. is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

9      2.      Nesscap, Inc. is incorporated under the laws of Delaware.  Nesscap, Inc. owns 100% of its Korean subsidiary, Nesscap Co., Ltd. which has its principal place of business at 750-8, Gomae-Dong, Kiheung-Gu, Yongin, Kyonggi-Do, 449-901, Republic of Korea.  Nesscap, Inc. and Nesscap Co., Ltd will collectively be referred to as "Nesscap" or "Defendant".

13      **ANSWER:**   NessCap, Inc. admits that it is a corporation that is organized under Delaware law.  NessCap, Inc. admits that it owns 100% of NessCap Co., Ltd., which is located at (466-901) 750-8 Gome-Dong, Kiheung-Gu, Yongin-City, Kyonggi-Do, South Korea.  NessCap, Inc. denies the remaining allegations in this paragraph.

**Jurisdiction And Venue**

18      3.      This is an action arising under the patent laws of the United States, Title 35 of the United States Code, Section 271.  The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1338(a) and 1331.

21      **ANSWER:**   The allegations in this paragraph are legal conclusions to which no response is required.

23      4.      Personal jurisdiction is based upon Fed. R. Civ. P. 4(h) and Cal. Civ. Proc. Code § 410.10 governing long-arm jurisdiction.  Nesscap's contacts with this jurisdiction include Nesscap's doing business in this district, and its commission of acts of patent infringement in this district.

27      / / /

28      / / /

2

1       **ANSWER:**   NessCap, Inc. denies that it does business in the Southern District of

2   California.   NessCap, Inc. denies that it has committed any act of patent infringement in the

3   Southern District of California or anywhere else.   The remaining allegations in this paragraph are

4   legal conclusions to which no response is required.

5       5.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).

6   Nesscap's contacts with this district are sufficient to render it amenable to personal jurisdiction in

7   this district, and Nesscap has committed acts of infringement in this district.   Nesscap's contacts

8   with this district include sales and offers for sale of infringing products.   These contacts are related

9   to, or gave rise to, Maxwell's claims for patent infringement.

10       **ANSWER:**   NessCap, Inc. denies having sufficient contacts with this district to render it

11   amenable to personal jurisdiction in this district for this patent infringement action.   NessCap, Inc.

12   denies that it has committed any act of patent infringement in the Southern District of California

13   or anywhere else.   NessCap, Inc. denies that it has made sales or offers for sale of products in the

14   Southern District of California.   The remaining allegations in this paragraph are legal conclusions

15   to which no response is required.

16                        **First Claim**

17       6.    Plaintiff hereby incorporates by this reference paragraphs 1 through 5 inclusive.

18       **ANSWER:**   NessCap, Inc. repeats and incorporates herein by reference its answers to

19   paragraphs 1-5.

20       7.    On February 25, 2003, U.S. Patent No. 6,525,924 ("the '924 patent") entitled

21   "Device for Accumulating Electrical Energy Composed of a Winding of Superimposed Strips and

22   Method of Production" was duly and legally issued, and assigned to Montena Components S.A. by

23   the named inventors.   A true and correct copy of the '924 patent is attached hereto as Exhibit 1.

24       **ANSWER:**   NessCap, Inc. admits that U.S. Patent No. 6,525,924 bears an issue date of

25   February 25, 2003, but denies any implication that this patent is valid or enforceable.   NessCap,

26   Inc. is without knowledge or information sufficient to form a belief as to the truth of the remaining

27   allegations in this paragraph.

28   / / /

8.      Plaintiff acquired Montena Components S.A. and all of its assets pursuant to a Stock Purchase and Barter Agreement dated May 30, 2002.  Therefore, Plaintiff is the current owner of the '924 patent.  This Stock Purchase and Barter Agreement was recorded with the U.S. Patent and Trademark Office on October 13, 2006.  A true and correct copy of the Stock Purchase and Barter Agreement as recorded with the U.S. Patent and Trademark Office is attached hereto as Exhibit 2.

**ANSWER:**    NessCap, Inc. is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

9.      Defendant has been infringing the '924 patent in violation of 35 U.S.C. § 271 by making, using, and/or selling or offering for sale products embodying the patented invention in the United States.

**ANSWER:**    Denied.

10.     Upon information and belief, Defendant will continue to infringe the '924 patent unless enjoined by this court.

**ANSWER:**    Denied.

11.     Upon information and belief, Defendant's past and continued infringement of the '924 patent is willful and deliberate, rendering this case appropriate for treble damages under 35 U.S.C. § 284 and making this an exceptional case under 35 U.S.C. § 285.

**ANSWER:**    Denied.

**Second Claim**

12.     Plaintiff hereby incorporates by this reference paragraphs 1 through 11 inclusive.

**ANSWER:**    NessCap, Inc. repeats and incorporates herein by reference its answers to paragraphs 1-11.

13.     On October 7, 2003, U.S. Patent No. 6,631,074 ("the '074 patent") entitled "Electrochemical Double Layer Capacitor Having Carbon Powder Electrodes" was duly and legally issued, and assigned to Maxwell Technologies, Inc. by the named inventors.  A true and correct copy of the '074 patent is attached hereto as Exhibit 3.

/ / /

1    **ANSWER:**    NessCap, Inc. admits that U.S. Patent No. 6,631,074 bears an issue date of

2    October 7, 2003, but denies any implication that this patent is valid or enforceable.  NessCap, Inc.

3    is without knowledge or information sufficient to form a belief as to the truth of the remaining

4    allegations in this paragraph.

5        14.    Defendant has been infringing the '074 patent in violation of 35 U.S.C. § 271 by

6    making, using, and/or selling or offering for sale products embodying the patented invention in the

7    United States.

8        **ANSWER:**    Denied.

9        15.    Upon information and belief, Defendant will continue to infringe the '074 patent

10   unless enjoined by this court.

11       **ANSWER:**    Denied.

12       16.    Upon information and belief, Defendant's past and continued infringement of the

13   '074 patent is willful and deliberate, rendering this case appropriate for treble damages under 35

14   U.S.C. § 284 and making this an exceptional case under 35 U.S.C. § 285.

15       **ANSWER:**    Denied.

16                                    **Prayer For Relief**

17       NessCap, Inc. denies that Plaintiff is entitled to any of the relief requested in the First

18   Amended Complaint.

19                                            **II.**

20                               **AFFIRMATIVE DEFENSES**

21       17.    Maxwell's First Amended Complaint fails to state a claim against NessCap, Inc. on

22   which relief may be granted.

23       18.    NessCap, Inc. has not infringed, contributorily infringed, and/or induced

24   infringement, and does not infringe, contributorily infringe, and/or induce infringement of any

25   valid claims of the '924 patent or the '074 patent, either literally or under the Doctrine of

26   Equivalents.

27       19.    The '924 patent and the '074 patent are invalid for failure to meet one or more of

28   the conditions of patentability set forth in 35 U.S.C. §§101, 102, 103, and/or 112.

                                            5                    Case No. 06CV2311-JAH(BLM)

20. By virtue of the prosecution histories of the '924 patent and the '074 patent, Maxwell is estopped from construing the claims of these patents to cover any products made, sold, or used by NessCap Co., Ltd., or any acts by NessCap, Inc.

21. Maxwell has failed to comply with 35 U.S.C. §287.

22. Maxwell is precluded from recovering its costs under the provisions of 35 U.S.C. § 288.

23. Maxwell comes to this Court with unclean hands.

24. The '924 patent and the '074 patent are unenforceable due to laches.

### III.

### COUNTERCLAIMS

A. **Invalidity And Noninfringement Of U.S. Patent No. 6,525,924**

25. NessCap, Inc.'s answers to paragraphs 1-16 and allegations of paragraphs 17-24 are incorporated in this Counterclaim.

26. This Counterclaim is for a Declaratory Judgment and arises under the Patent Laws of the United States. 35 U.S.C. § 1 *et seq.*

27. This Court has jurisdiction over the subject matter of this Counterclaim under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, and under Rule 13 of the Federal Rules of Civil Procedure.

28. Venue is proper in this judicial district under 28 U.S.C. §§1391(b) and 1391(c), and Maxwell, by virtue of having brought suit against NessCap, Inc., has submitted itself to the jurisdiction of this Court.

29. An actual and justiciable controversy exists between Maxwell and NessCap, Inc. based on Maxwell having filed the Complaint and the First Amended Complaint.

30. Maxwell alleges that it is the owner of U.S. Patent No. 6,525,924 ("the '924 patent") entitled "Device for Accumulating Electrical Energy Composed of a Winding of Superimposed Strips and Method of Production."

31. NessCap, Inc. does not infringe the '924 patent.

32. On information and belief, the '924 patent is invalid.

Case No. 06CV2311-JAH(BLM)

**B.    Invalidity And Noninfringement Of U.S. Patent No. 6,631,074**

33.    NessCap, Inc.'s answers to paragraphs 1-16 and allegations of paragraphs 17-32 are incorporated in this Counterclaim.

34.    Maxwell alleges that it is the owner of U.S. Patent No. 6,631,074 ("the '074 patent") entitled "Electrochemical Double Layer Capacitor Having Carbon Powder Electrodes."

35.    NessCap, Inc. does not infringe the '074 patent.

36.    On information and belief, the '074 patent is invalid.

**IV.**

**PRAYERS FOR RELIEF**

WHEREFORE, NessCap, Inc. denies that Maxwell is entitled to any of the relief prayed for in its First Amended Complaint, and NessCap, Inc. requests judgment against Maxwell and respectfully prays that this Court enter orders that:

(a)    Maxwell's Complaint and First Amended Complaint be dismissed with prejudice;

(b)    Declare that the claims of the '924 patent and the '074 patent are invalid;

(c)    Declare that NessCap, Inc. has not committed any act of direct and/or indirect infringement of the '924 patent or the '074 patent with respect to products that NessCap Co., Ltd. makes, uses, imports into the United States, offers for sale, or sells, or any act by NessCap, Inc.;

(d)    Enjoin Maxwell, its agents, servants, employees and attorneys, and all those in active participation or privity with any of them, from charging NessCap, Inc. or its agents, distributors, or customers with infringement of the '924 patent or the '074 patent, from representing to others that NessCap, Inc. is liable for patent infringement of either of these patents, and from otherwise interfering in any way with the manufacture, use, import into the United States, offer for sale, or sale of electrical energy storage products by NessCap Co., Ltd. and with any of the business activities of NessCap, Inc.;

(e)    This is an exceptional case, pursuant to 35 U.S.C. § 285.  NessCap, Inc., therefore, specifically requests that the Court award NessCap, Inc. its reasonable attorney's fees, expenses and costs in this action; and

/ / /

Case No. 06CV2311-JAH(BLM)

1        (f)        Grant NessCap, Inc. such other and further relief as the Court deems just and

2    proper.

3

4    DATED: March 14, 2007                    LUCE, FORWARD, HAMILTON & SCRIPPS LLP

5

6                                            By:  s/Callie A. Bjurstrom

7                                                 Callie A. Bjurstrom
                                                 Michelle A. Herrera
8                                                 Attorneys for NessCap, Inc.

9    DATED: March 14, 2007                    EDWARDS ANGELL PALMER & DODGE LLP

10

11

12                                           By:  s/Brian M. Gaff

13                                                George W. Neuner
                                                 Brian M. Gaff
14                                                Attorneys for NessCap, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 06CV2311-JAH(BLM)

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38, NessCap, Inc. demands a trial by jury on

3    all issues so triable.

4    DATED: March 14, 2007              LUCE, FORWARD, HAMILTON & SCRIPPS LLP

5

6                                      By:  s/Callie A. Bjurstrom
                                            Callie A. Bjurstrom
7                                           Michelle A. Herrera
                                            Attorneys for NessCap, Inc.
8

9    DATED: March 14, 2007              EDWARDS ANGELL PALMER & DODGE LLP

10

11

12                                     By:  s/Brian M. Gaff
                                            George W. Neuner
13                                          Brian M. Gaff
                                            Attorneys for NessCap, Inc.
14

15

16   3799120.1

17

18

19

20

21

22

23

24

25

26

27

28

<table>
<tr><td>1</td><td>Callie A. Bjurstrom, State Bar No. 137816<br>Email: cbjurstrom@luce.com</td></tr>
<tr><td>2</td><td>Michelle A. Herrera, State Bar No. 209842<br>Email: mherrera@luce.com</td></tr>
<tr><td>3</td><td>LUCE, FORWARD, HAMILTON & SCRIPPS LLP<br>600 West Broadway, Suite 2600</td></tr>
<tr><td>4</td><td>San Diego, California 92101-3372<br>Telephone No.: 619.236.1414</td></tr>
<tr><td>5</td><td>Fax No.: 619.232.8311</td></tr>
<tr><td>6</td><td>Brian M. Gaff State Bar No. 202896<br>Email: bgaff@eapdlaw.com</td></tr>
<tr><td>7</td><td>EDWARDS ANGELL PALMER & DODGE LLP<br>101 Federal Street</td></tr>
<tr><td>8</td><td>Boston, MA  02110-1810<br>Telephone: 617-439-4444</td></tr>
<tr><td>9</td><td>Facsimile: 617-439-4170</td></tr>
<tr><td>10</td><td>Attorneys for NessCap, Inc.</td></tr>
</table>

1  Callie A. Bjurstrom, State Bar No. 137816
   Email: cbjurstrom@luce.com
2  Michelle A. Herrera, State Bar No. 209842
   Email: mherrera@luce.com
3  LUCE, FORWARD, HAMILTON & SCRIPPS LLP
   600 West Broadway, Suite 2600
4  San Diego, California 92101-3372
   Telephone No.: 619.236.1414
5  Fax No.: 619.232.8311

6  Brian M. Gaff State Bar No. 202896
   Email: bgaff@eapdlaw.com
7  EDWARDS ANGELL PALMER & DODGE LLP
   101 Federal Street
8  Boston, MA  02110-1810
   Telephone: 617-439-4444
9  Facsimile: 617-439-4170

10  Attorneys for NessCap, Inc.

11              UNITED STATES DISTRICT COURT

12            SOUTHERN DISTRICT OF CALIFORNIA

13

14  MAXWELL TECHNOLOGIES, INC.,          Case No. 06CV2311-JAH(BLM)

15       Plaintiff,                       **PROOF OF SERVICE**

16  v.

17  NESSCAP, INC. and NESSCAP CO., LTD.,  Crtrm: 11
                                          Judge: The Hon. John A. Houston
18       Defendants.
                                          Complaint Filed:  October 17, 2006
19

20       I declare as follows:

21       I am an attorney with the law firm of Luce, Forward, Hamilton & Scripps LLP, whose

22  address is 600 West Broadway, Suite 2600, San Diego, California 92101-3372.  I am a member of

23  the bar of this court, over the age of eighteen years and not a party to this action.

24       On March 14, 2007, I caused the following to be served:

25       **1.     NESSCAP, INC.'S ANSWER TO FIRST AMENDED COMPLAINT,**
    **AFFIRMATIVE DEFENSES AND COUNTERCLAIMS; DEMAND FOR JURY TRIAL**
26

27  / / /

28  / / /

                                1              Case No. 06CV2311-JAH(BLM)

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

> David C. Doyle, Esq.
> Morrison & Foerster LLP
> 12531 High Bluff Drive,
> Suite 100
> San Diego, CA 92130-2040
> ddoyle@mofo.com
> Pfleming@mofo.com
> Attorneys for Plaintiff Maxwell Technologies,
> Inc.

> Katherine Lind Parker, Esq.
> Morrison & Foerster LLP
> 12531 High Bluff Drive,
> Suite 100
> San Diego, CA 92130-2040
> kparker@mofo.com
> dcoletti@mofo.com
> Attorneys for Plaintiff Maxwell Technologies,
> Inc.

> Eric Martin Acker, Esq.
> Morrison & Foerster LLP
> 12531 High Bluff Drive,
> Suite 100
> San Diego, CA 92130-2040
> Eacker@mofo.com
> Aeliopulos@mofo.com
> Attorneys for Plaintiff Maxwell Technologies,
> Inc.

> E. Dale Buxton II, Esq.
> Morrison & Foerster LLP
> 12531 High Bluff Drive,
> Suite 100
> San Diego, CA 92130-2040
> dbuxton@mofo.com
> Attorneys for Plaintiff Maxwell Technologies,
> Inc.

> Brian M. Kramer, Esq.
> Morrison & Foerster LLP
> 12531 High Bluff Drive,
> Suite 100
> San Diego, CA 92130-2040
> bmkramer@mofo.com
> Attorneys for Plaintiff Maxwell Technologies,
> Inc.

/ / /

**Manual Notice List**

      The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing).

      Not applicable.

      I declare that I am employed in the office at whose direction the service was made.

      Executed at San Diego, California on March 14, 2007.

                            s/Callie A. Bjurstrom
                            Attorneys for NessCap, Inc.

3760519.1

## CERTIFICATE OF SERVICE

I, Denise Seastone Kraft, hereby certify that on March 28, 2007, the attached **NESSCAP CO., LTD.'S AND NESSCAP, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STRIKE DEFENDANT'S ANSWER AND MOTION TO STRIKE OR DISMISS DEFENDANT'S COUNTERCLAIMS** was served on the following persons and was electronically filed with the Clerk of the Court using CM/ECF:

| **VIA HAND DELIVERY** | **VIA U.S. FIRST CLASS MAIL** |
|---|---|
| Josy W. Ingersoll, Esq. | David C. Doyle, Esq. |
| John W. Shaw, Esq. | Brian M. Kramer, Esq. |
| Karen E. Keller, Esq. | Morrison & Foerster LLP |
| Young Conaway Stargatt & Taylor LLP | 12531 High Bluff Drive |
| 1000 West Street | Suite 100 |
| Brandywine Building, 17th Floor | San Diego, CA  92130 |
| Wilmington, DE  19801 | |

_____
Denise Seastone Kraft (DE No. 2778)